10.    **TERMINATION.**

10.1    This Agreement shall become effective upon the execution and delivery hereof by Debtor and Secured Party and shall continue in full force and effect for two years from the date hereof.

10.2    Upon the Termination Date, the unpaid balance of the Obligations shall be due and payable without demand or notice.

11.    **MISCELLANEOUS.**

11.1    Notices.

11.1.1    All notices required to be given to either party hereunder shall be deemed given upon the first to occur of: (a) deposit thereof in a receptacle under the control of the United States Postal Service; (b) transmittal by electronic means to a receiver under the control of the party to whom notice is being given; or (c) actual receipt by the party to whom notice is being given, or an employee or agent of thereof. For purposes hereof, the addresses of the parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one party to the other in accordance with the provisions hereof.

**DEBTOR**

Address:       D'Annunzio Distribution, Inc.
               60G Commerce Way
               Totowa, NJ 07512
Attention:     Arthur D'Annunzio
Fax Number:    973-237-0444

**SECURED PARTY**

Address:       1350 Avenue of the Americas, 24th Floor
               New York, NY 10019
Attention:     Joseph F. Ingrassia
Fax Number:    212-755-6833

11.2    Survival. All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory.

11.3    Amendment and Waiver. Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

11.4    No Waiver. No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Secured Party may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or

any acquiescence in any breach or default hereunder, nor shall any waiver by Secured Party of any breach or default by Debtor hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Secured Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies that Secured Party would otherwise have. Any waiver, permit, consent or approval by Secured Party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

11.5    Choice of Law. This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

11.6    Waiver of Statute of Limitations. Debtor waives the pleading of any statute of limitations with respect to any and all actions in connection herewith. To the extent that Debtor may now or in the future have any claim against Secured Party, arising out of this agreement or the transaction contemplated herein whether in contract or tort or otherwise, Debtor must assert such claim within one year of it accruing. Failure to assert such claim within one year shall constitute a waiver thereof. Debtor agrees that such period is reasonable and sufficient for it to investigate and act upon the claim. This Section shall survive any termination of this agreement. A copy of the waiver may be filed as a written consent in any judicial proceeding.

11.7    Venue. The parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement, shall, if Secured Party so elects, be instituted in the United States District Court for the Southern District of the Chosen State or any court of said state located in the Chosen State (the "Acceptable Forums"), each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the Chosen State or otherwise in those courts in any such suit, action or proceeding. Should such proceeding be initiated in any other forum, Debtor waives any right to oppose any motion or application made by Secured Party as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

11.8    WAIVER OF TRIAL BY JURY. IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH

PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

12. **INTERCREDITOR AGREEMENT.**

12.1    Remittance of Factoring Advances and Application of Payments Thereof. Factor shall pay all sums due to Debtor under the Factoring Agreement to Secured Party. Upon receipt of any such sums, Secured Party shall immediately apply such sums to all Obligations of Debtor then due to Secured Party, and remit any balance to Debtor.

12.2    Priority. Notwithstanding the terms or provisions of any agreement or arrangement which either Secured Party or Factor may now or hereafter have with Debtor or any rule of law, and irrespective of the time, order, or method of attachment or perfection of any security interest or the recordation or filing in any public record of any financing statement, Factor's security interest in Debtor's assets, including receivables that that are the proceeds of the product of inventory which is sold in the ordinary course of business and proceeds of such receivables, shall at all times have priority over and be superior to any security interest that Secured Party may have in Debtor's assets and Secured Party, and its successors and assigns, hereby subordinate their security interest in the Debtor's assets to Factor, and its successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

DEBTOR:

D'ANNUNZIO DISTRIBUTION, INC.

By:

Name: Arthur D'Annunzio
Title: President

SECURED PARTY:

CAPSTONE CAPITAL GROUP I, LLC

By:

Name: Joseph F. Ingrassia
Title: Managing Member

BN 967329v2

Agreed as to Section 12 hereof:

FACTOR:

CAPSTONE BUSINESS CREDIT, LLC.

By: _____
Name: Robert L. Olson
Title: Chief Financial Officer

## EXHIBIT A – SUPPLIER LETTER

*[letterhead of Supplier]*

Date:

XXXXX

Re: *[name of Client]* (the "Buyer")

Ladies and Gentlemen:

This will confirm that we have agreed to supply to Buyer the goods described in that certain purchase order # _____ dated _____ (the "Purchase Order") issued by Buyer to us (the "Goods").

To induce you to pay to us the sum of $_____ (the "Payment"), representing the full purchase price of the Goods, we agree with you that we will ship the Goods to you in accordance with the terms of the Purchase Order, irrespective of any claims to which we may now or hereafter have against Buyer.

Should we fail to ship the Goods as set forth herein, we will repay the Payment to you, on demand, together with interest at the rate of __% per annum, computed from the date of receipt of the Payment by us to the date of repayment to you.

In the event of any litigation arising hereunder, whether such litigation is based on tort or contract, the prevailing party shall recover its attorneys fees and expenses from the unsuccessful party.

Very truly yours,

*[name of supplier]*

By:

BN 967329v2

Page 17 of 17

# 'B'

# DISCOUNT FACTORING AGREEMENT

## BETWEEN

## CAPSTONE BUSINESS CREDIT, LLC,
### AS THE FACTOR

## AND

## D'ANNUNZIO DISTRIBUTION, INC.,
### AS THE COMPANY

DISCOUNT FACTORING AGREEMENT

THIS DISCOUNT FACTORING AGREEMENT (this "Agreement"), made and executed this 20th day of October 2006, by and between D'ANNUNZIO DISTRIBUTION, INC.,(the "Company"), and CAPSTONE BUSINESS CREDIT, LLC (the "Factor").

    1.    *Definitions.*  In addition to the terms defined elsewhere in this Agreement, the following terms shall have the following meanings for the purposes of this Agreement:

"Accounts" shall have the meaning ascribed to such term in the Code.

"Accounts Receivable" shall have the meaning set forth in Section 2 of this Agreement.

"Anniversary Date" means the last day of the twenty-fourth (24th) month following the date of this Agreement and the same day in each year thereafter.

"Chattel Paper" shall have the meaning ascribed to such term in the Code.

"Clearance Days" means three business days.

"Closed" means an Account Receivable that is either (a) paid in full by the Customer obligated on such Account Receivable, or (b) repurchased in cash by the Company.

"Code" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

"Collateral" shall have the meaning set forth in Section 7 of this Agreement.

"Company Risk Accounts Receivable" shall have the meaning set forth in Section 3 of this Agreement.

"Customer" means the purchaser of goods or services from Company and who is obligated on an Account, Instrument, Document, Chattel Paper or General Intangible initially owing to such Company.

"Documents" shall have the meaning ascribed to such term in the Code.

"Event of Default" shall have the meaning set forth in Section 17.1 of this Agreement.

"Factor Risk Accounts Receivable" shall have the meaning set forth in Section 3 of this Agreement.

"Factored Accounts" means all Accounts, Instruments, Documents, Chattel Paper and General Intangibles which are (a) initially owing to Company by a Customer, and (b) subsequently purchased by Factor from Company pursuant to this Agreement.  Factored Accounts shall include all returned or repossessed goods arising out of or relating to the sale or other disposition of goods giving rise thereto, all proceeds thereof and the merchandise

represented thereby, and all invoices and other records evidencing or pertaining to the Factored Accounts.

"Factoring Agreement" means an agreement between Company providing for the purchase by Factor from Company of Accounts owing to Company by its Customers.

"Factoring Documents" means this Agreement, together with any documents, instruments and agreements, executed and/or delivered in connection herewith, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Funds Employed" means gross Factored Accounts outstanding on Factor's books less any balance outstanding in the Reserve Account to the credit of Company.

"General Intangibles" shall have the meaning ascribed to such term in the Code.

"Instruments" shall have the meaning ascribed to such term in the Code.

"Lender" means Capstone Capital Group I, LLC.

"Misdirected Payment Fee" shall be fifteen percent (15%) of the amount of any payment on account of a Factored Account which has been received by Company and not delivered in kind to Factor on the next business day following the date of receipt by Company.

"Missing Notation Fee" shall be 15% of the face amount of each invoice.

"Obligations" means all obligations, liabilities and indebtedness of Company to Factor, now existing or hereafter incurred, direct or indirect, absolute or contingent, whether created under this Agreement, any supplement hereto or any other agreement between Company and Factor or otherwise, including without limitation, obligations owed by Company to others which Factor obtains by assignment.

"Person" means an individual, corporation, partnership, trust, or unincorporated organization, or a government or any agency or political subdivision thereof.

"Purchase Price" shall have the meaning set forth in Section 4 of this Agreement.

"Required Reserve Amount" means the Reserve Percentage multiplied by the unpaid balance of Accounts Receivable.

"Reserve Account" shall have the meaning set forth in Section 5 of this Agreement.

"Reserve Percentage" means 20%.

"Reserve Shortfall" means the amount by which the Reserve Account is less than the Required Reserve Amount.

"Solvent" means that Company (i) owns property whose fair saleable value is greater than the amount required to pay all of its indebtedness (including contingent debts), (ii) is able to

pay all of its indebtedness as such indebtedness matures and (iii) has capital sufficient to carry on its business and transactions and all business and transactions in which it is engaged.

2. **Appointment.** Company appoints Factor as its sole factor with respect to all sales of its merchandise or rendition of services to Customers and hereby offers to sell and assign only to Factor, as absolute owner, all Accounts Receivables arising out of such sales or services, including all such sales or services arising under any trade names or through any division or selling agent. "Accounts Receivable" shall mean and include Accounts, contract rights, Instruments, Documents, Chattel Paper, General Intangibles, returned or repossessed goods arising out of or relating to the sale or other disposition of goods at any time or from time to time, all proceeds thereof and merchandise represented thereby. The assignment of Accounts Receivable to Factor shall vest in Factor all of Company's rights, securities, guaranties and liens with respect to each Account Receivable, including all rights of stoppage in transit, replevin, reclamation, and all claims of lien filed by Company or held by Company on personal property, and all rights and interest in the merchandise sold, and all of Company's defenses and rights of offset with respect to any payments received by Factor on Accounts Receivable, but Factor shall not be obligated to, and shall not be liable for, exercising or refusing to exercise any rights granted to Factor hereby.

3. **Purchase of Accounts Receivable.** Factor agrees to purchase from Company at the office of Factor all Accounts Receivable first approved by Factor in writing as to credit risk and terms of sale (each such approved Account Receivable being herein called a "Factor Risk Account Receivable"). All orders from Customers including the amount and terms of each proposed sale or service to such Customers shall be submitted in advance of purchase or rendition of service to Factor for prior written approval, which may be granted or withheld at Factor's sole discretion. Factor's approval is subject to withdrawal either orally or in writing at any time prior to delivery of merchandise or rendition of services, and shall be deemed no longer effective in any event if Company's delivery of merchandise or rendition of services is made more than thirty (30) days beyond the date specified for such delivery or rendition in the terms of sales submitted to Factor for its approval, or more than thirty (30) days from the date of Factor's approval if no delivery or rendition date has been specified. Submission of orders for Factor's prior written approval shall not be required with regard to a sale made by Company in compliance with any Customer credit line which may from time to time be issued to Company by Factor in its sole discretion, provided that shipments are made prior to the expiration date of the credit line approval. Any Customer credit line issued by Factor may be amended or withdrawn by Factor in whole or in part at any time and for any reason without advance notice. The amount of all Accounts Receivable of each Customer as to which Factor shall have approved a Customer credit line shall, in the order in which they have arisen, be treated as Factor Risk Accounts Receivable up to the limit of the Customer credit line in effect from time to time. Upon the receipt of any payment in collected funds from or issuance of credit to a Customer with respect to a Factor Risk Account Receivable, the Accounts Receivable of such Customer in excess of the Customer credit line shall, to the extent of such payment or credit and in the order in which they have arisen, be treated as Factor Risk Accounts Receivable, unless prior to such payment or credit Factor shall have withdrawn the credit line approval. Factor's withholding or withdrawing of a Customer order approval or credit line approval shall at all times be in Factor's sole discretion, and Factor's actions with regard thereto shall not render Factor liable to Company in any respect for damages or otherwise. Subject to Company's warranties and

*Capstone Business Credit, LLC*
BN 967332v2

4.

representations herein contained, Factor will assume the credit loss on each Factor Risk Account Receivable specifically assigned to Factor hereunder within twenty-one (21) days from the earlier of its invoice date or shipping date if the Customer, after receiving and accepting delivery of goods or services, fails to pay in full such Factor Risk Account Receivable on its longest maturity solely because of its financial inability to pay. If, however, such failure to pay is due in whole or in part to any other cause, Factor shall not be responsible and shall have full recourse to Company. Factor at its option may purchase Accounts Receivable not approved as to credit risk or terms of sale (each such Account Receivable not approved by Factor being herein called a "Company Risk Account Receivable"), but each purchase of a Company Risk Account Receivable shall be with full recourse to Company and Company agrees to pay Factor on demand for each Company Risk Account Receivable.

4.    *Purchase Price.*  The purchase price of each Account Receivable (the "Purchase Price") is the gross amount of the Account Receivable. The Purchase Price shall be remitted to the Company upon acceptance by Factor of the assignment of the Accounts Receivables provided at that time Factor has received a Letter of Acceptance substantially in the form of Exhibit C annexed hereto or such other evidence acceptable to Factor, in its sole discretion, that the Customer has received and accepted the merchandise and that the Customer will assert no defenses, claims or offsets in excess of ten (10%) percent of the invoice amount. After purchase of an Account Receivable by Factor, a discount, credit, unidentifiable payment or allowance may be claimed solely by the Customer, and if not so claimed, such discount, credit, payment or allowance shall be the property of Factor.

5.    *Company Reserve Account.*  Factor shall establish on its books in Company's name a reserve account (the "Reserve Account") which Factor shall credit with the Purchase Price of all Accounts Receivable purchased by Factor from Company and which Factor shall debit with all disbursements of funds made to Company or on its behalf, as well as all credits, discounts to Company's Customers, anticipations earned by Company's Customers, factoring charges, interest, bank wire transfer and other fees and any other amounts chargeable to Company under this Agreement or any supplement hereto or any other agreement between Company and Factor. Factor shall furnish Company with advices of all credits and debits to the Reserve Account. Factor will render to Company on a monthly basis a statement of its Reserve Account. Each statement of account will be considered correct and binding on Company, absent manifest error, unless Company objects in writing, by certified mail, return receipt requested, to capstone within thirty (30) days of the date of such statement of account, setting forth each and every specific exception by Company to such statement. Each statement of account shall be deemed delivered when e-mailed or when mailed through the United States postal service, three days after the date of such statement. Each statement shall be dated within 10 days of the 1st day of each month, and Company will be deemed to have received such statement unless it claims non-receipt in writing by certified mail, return receipt requested, by the twenty-fifth day of such month.

6.    *Warranties and Representations.*  Company warrants and represents that each Account Receivable sold and assigned to Factor hereunder:  (a) shall be genuine and valid and shall represent a completed delivery or performance in fulfillment in every respect of the terms, conditions and specifications of a bona fide, uncancelled and unexpired sale or service in the ordinary course of business to a Customer which is not affiliated with Company in full

compliance with the specifications of such Customer; (b) Company shall be at the time of delivery or performance the absolute owner of all merchandise and other property involved; (c) Company has not granted and, without Factor's prior written consent, Company will not hereafter grant to any other Person until all security interests granted hereunder have been terminated, a security interest in, or grant to any other Person any right to purchase, the Factored Accounts; (d) is enforceable for the full amount thereof and will be subject to no dispute or claim by the Customer in whole or in part as to price, terms, quality, quantity, delay in shipment, offsets, counterclaims, contra accounts or any other defense of any other kind and character, real or claimed; (e) will be subject to no discounts, deductions, allowances, offsets, counterclaims or other contra items or to no special terms of payment which are not shown on the face of the invoice thereof; (f) will not represent a delivery of merchandise upon "consignment," "guaranteed sale," "sale or return," "payment on reorder" or similar terms; (g) is payable in United States Dollars and has been invoiced to the Customer by an invoice that bears notice of the sale and assignment to Factor in compliance with the terms of this Agreement; and (h) will not represent a "pack, bill and hold" transaction unless Company furnishes Factor with a copy of the Customer's purchase order and has obtained Customer's agreement to grant Factor a security interest in the merchandise and to pay for the merchandise at the maturity date of the invoice irrespective of whether or not Company has received instructions to deliver the same; (i) Company agrees to notify Factor promptly of any change in the name, corporate structure, or business addresses or location of the Company; (j) All applicable state and federal laws have been complied with in conjunction with all of the Factoring Agreement, as well as all of the transactions arising pursuant to the Factoring Agreement. Company acknowledges to Factor that the non-compliance with such laws constitutes a breach of this Agreement and would have an adverse impact on the value, enforceability and/or collectability of any Factored Account sold and assigned to Factor pursuant to this Agreement; (k) Company is duly incorporated and in good standing in its state of incorporation and those states in which Company conducts business and shall remain so for so long as this Agreement is in effect; (l) the Factoring Agreement, and the transaction entered into in connection therewith, does not and shall not contravene any applicable statute, law or regulation; and (m) the Factoring Agreement correctly sets forth all of the terms of the factoring relationship between Company and the Factor. Company shall provide Factor with immediate notice of any breach of the Factoring Agreement.

7.    *Collateral, No Lien Termination Without Release, Liquidation Success Premium.*

7.1    As security for all of the Obligations, Company grants Factor a continuing lien in, and security interest in the collateral described in Exhibit A (being herein referred to as the "Collateral"). Recourse to the Collateral or any other security shall not at any time be required and Company shall at all times remain liable for the repayment upon demand of all Obligations at any time owing by Company to Factor. During the term of this Agreement, Company shall not sell or assign, negotiate, pledge or grant any security interest in any of the Collateral to anyone other than Factor or Lender.

7.2    In recognition of Factor's right to have all its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Accounts Receivables and other collateral, notwithstanding payment in full of any deficiency by Company, Factor shall not be required to record any termination or satisfactions of any liens on the Accounts Receivables and

Collateral unless the Company has executed and delivered to Factor general releases in a form reasonably acceptable to Factor. The Company understands that this provision constitutes a waiver of rights under Section 9-513(c) of the UCC.

7.3   If Company substantially ceases operating as a going concern, and the proceeds of the Collateral created after an Event of Default are in excess of the balance due at the time of default, Company shall pay to Factor a liquidation success premium of ten (10%) percent of the amount of such excess.

8.   *Invoicing.* All invoices for merchandise sold or services rendered to a Customer shall be prepared by the Company and shall bear a notice that they have been assigned to, are owned by and are payable directly and only to Factor's Refactor in substantially the form shown on the notice of assignment attached hereto as Exhibit B attached hereto. Upon Factor's request, Company shall furnish Factor with copies of all invoices, accompanied by duly executed assignment schedules, original shipping or delivery receipts, and such other information or Documents as Factor in its discretion may request from time to time. Company represents and warrants to Factor that it has given or will promptly give, or has caused or will promptly cause to be given, written notification to all Customers of Factor's purchase and ownership thereof. In the event that such notification for any reason is not timely provided to a Customer, Factor at its option shall have the right (but no obligation) to provide such notification to such Customer, with the same effect as if such notice had been given directly by Company. If Company fails for any reason to provide Factor, within two (2) days after a request by Factor, with copies of such invoices (or the equivalent) or such proof of shipment or delivery when requested by Factor for any Factor Risk Account Receivable or fails to provide the Letter of Acceptance or other evidence concerning acceptance of merchandise by the Customer as provided in Section 3, such Factor Risk Account Receivable shall automatically become a Company Risk Account Receivable. Factor shall have no liability with respect such Company Risk Account Receivable and Company shall immediately reimburse Factor for the amount of any remittances made by Factor to Company thereon. Each invoice shall bear the terms of sale and no change from the original terms of sale shall be made without Factor's prior written consent. Factor reserves the right to mail original invoices to the Customers at Company's expense; however, mailing, sending or delivery by Factor of a bill or invoice shall not be deemed to be any representation by Factor with respect thereto.

9.   *Payment of Accounts Receivable.* All payments of Accounts Receivable and other payments on behalf of Company received by Factor shall be credited to Company's Reserve Account. No check, draft or other instrument received by Factor shall constitute final payment unless and until such check, draft or other instrument shall have been actually collected by Factor in immediately available funds. The amount of the Purchase Price of any Factor Risk Account Receivable which remains unpaid will be deemed collected and will be credited to Company's account as of the earlier of the following dates: (a) the date of the Account Receivables longest maturity if any proceeding or petition is instituted or filed by or against the Customer for relief under any federal or state bankruptcy or insolvency law, code or act, or if a receiver or trustee is appointed for the Customer; or (b) as of the last day of the fourth (4th) month following its longest maturity date if such Factor Risk Account Receivable remains unpaid as of such date without the happening of any of the events specified in the preceding clause (a). If any Factor Risk Account Receivable credited to Company's Reserve Account is not

paid for any reason other than the Customer's financial inability to pay, Factor shall reverse the credit and charge Company's Reserve Account accordingly and such Account Receivable shall then be deemed a Company Risk Account Receivable.

10.     *Remittances.*   Without limiting the obligations of Company under Section 9 hereof, all remittances received by Company with respect to all of its Accounts Receivable purchased by Factor shall be held in trust for Factor, and Company shall immediately deliver to Factor the identical checks, drafts, monies or other forms of payment received, and Factor shall have the right to endorse Company's name on any check, draft or other form of remittance received, where such endorsement is required to effect collection. Company hereby appoints Factor or such Person as Factor may name as its attorney-in-fact to execute all necessary documents in Company's name and do all things necessary to carry out this Agreement. Company ratifies and approves all acts of the attorney and agrees that neither Factor nor the attorney shall be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law.  This power being coupled with an interest is irrevocable as long as Company is indebted to Factor in any manner.

11.     *Customer Disputes and Claims.*  Company agrees to notify Factor immediately of all returns and allowances and of all disputes with and claims made by Customers and to adjust all such claims and disputes at its own expense, issuing credit memoranda promptly, but subject to Factor's approval.  It is Factor's practice to allow a reasonable time for the settlement of disputes between Company and Company's Customers without waiving Factor's right at any time to adjust any claims and disputes on a Factor Risk Account Receivable directly with the Customer and to charge back to the Reserve Account at any time the full amount of the Account Receivable involved.  Factor may at any time charge the Reserve Account the full amount of: (a) any Customer deduction of not more than one hundred dollars; (b) any Factor Risk Account which is not paid in full when due for any reason (real or imaginary) other than the Customer's financial inability to pay; (c) any Account for which there is a breach of any of Company's warranties or representations set forth herein; (d) any anticipation deducted by such Customer on any Account; and (e) any Company Risk Account Receivable which is not paid in full when due. Any such charge back shall not be deemed to constitute a reassignment of the Account Receivable, and Factor shall retain a security interest therein as security for all Obligations owing to Factor.

12.     *Collection of Accounts; Returned Goods.*  As owner of the Accounts Receivable, Factor shall have the right to (a) bring suit, or otherwise enforce collection, of the Account Receivable in the name of Company or Factor, (b) modify the terms of payment, settle, compromise or release, in whole or in part, any amounts owing, on terms Factor may deem advisable, and (c) issue credits in the name of Company or Factor. Should any goods be returned or rejected by Company's Customers or otherwise recovered by Company, Company shall segregate and hold such goods in trust for Factor, but at Company's sole risk and expense. Company shall also promptly notify Factor and, at Factor's request, will deliver such goods to Factor, pay Factor the invoice price thereof, or sell such goods at Company's expense for the purpose of paying Company's Obligations to Factor.  Once Company has granted or issued a discount, credit or allowance to a Customer on any Account Receivable, Company shall have no further interest therein.  Any remittances received by Company on account of any of the Accounts Receivable shall be held by Company as trustee of an express trust for Factor's benefit,

separate from its own property, and Company shall immediately deliver the same in kind properly endorsed to Factor. Factor may endorse Company's name on any check, instrument, draft or other document in payment of an Account Receivable. Any payments made to either Company or Factor from, or credits issued to, a Customer shall be applied first to the Factor Risk Accounts Receivable owing by such Customer, irrespective of instructions of the Customer or the invoice dates of such Factor Risk Accounts Receivable or the manner in which payment is made; and Factor shall have recourse to Company to the extent any such payment is made directly to Company.

13.   *Commissions.*   Company agrees to pay Factor a commission of two percent (2%), in the form of a discount on the face amount of each Factor Risk Accounts Receivable or Company Risk Accounts Receivable for the first thirty (30) days or part thereof that such Account Receivable is outstanding. In no event, however, shall the commission payable for each invoice be less than $7.00. All commissions due hereunder shall be payable by debit to the Reserve Account. After the first thirty (30) days that any portion of a Factor Risk Accounts Receivable or Company Risk Accounts Receivable has not been Closed and until such Account Receivable is Closed, the commission due to Factor shall be one percent (1%) for each additional fourteen (14) day period, or portion thereof that such Account Receivable is outstanding, and shall be earned on the first day of such period. The minimum commissions to be earned by Factor under this Agreement for (i) the first year of this Agreement, commencing the date hereof shall be $90,000, and (ii) the second year of this Agreement, commencing on the first anniversary date hereof shall be $150,000 (each, a "Minimum Commission"). The difference between the Minimum Commissions and the amount of commissions actually received in each such year shall be chargeable to the Reserve Account as of the end of such year (or, if this Agreement is terminated for any reason before the Anniversary Date, as of the date of such termination).

14.   *Refactoring.*   The Company acknowledges and agrees that the Factor may, from time to time, reassign and resell any Account Receivables and the Collateral to (i) CIT Commercial Services, Inc. or any of its successors in interest; (ii) any other factor; or (iii) such other business entity as Factor in its sole discretion may determine (any such entity collectively and severally referred to herein as the "Refactor"). Pursuant to the terms and conditions of agreements entered into with such Refactor from time to time (the "Refactoring Agreements"), the Company hereby consents to any such resale, reassignment and hypothecation. Company agrees that all agreements, representations, warranties and covenants made by it hereunder shall be deemed to be made both to the Factor and the Refactor, jointly and severally as the context may require and that the term "Factor" as used throughout this Agreement shall in all instances be interpreted to mean "either the Factor or the Refactor or both of them." The Company agrees that (i) this Agreement is and shall at all times be subject to the terms, provisions and covenants of the Refactoring Agreements which may now or hereafter affect this Agreement and to any renewals, modifications, replacements or extensions thereof; and (ii) the Refactor may exercise all of the Factor's rights and remedies hereunder whether or not such rights or remedies have been specifically granted herein to the Refactor. The Company covenants and agrees that the Refactor, its employees and its agents shall not be liable to it for any act, omission, breach or violation on its part or on the Factor's part with respect to performance or non-performance of any of the terms and provisions of the Refactoring Agreements, and with respect to performance or non-performance of any of the terms and provisions of this Agreement, or any other

agreement between the parties hereto and any indebtedness owing by the Factor to the Company of any kind or nature whatsoever, if any, and that the Company shall look solely to the Factor for enforcement of its rights under this Agreement and the Reassignment Agreements.

15.     *Financial Statements and Information; Inspections.*

15.1    Company shall furnish Factor with annual financial statements prepared by an independent accountant acceptable to Factor and also furnish on a timely basis interim financial statements and other financial information upon Factor's request.

15.2    Factor shall have the right at any time to access, review and copy, at Company's expense, all records and documents relating to any Collateral, and to access and utilize computer hardware and software and other data processing systems used by Company. Company shall maintain, and shall furnish to Factor on request, such other supporting documents and reports with respect to the Factored Accounts as Factor may reasonably request from time to time. If any of Company's records or reports in respect of reporting any of the foregoing information are prepared by an accounting service or other agent, Company hereby irrevocably authorizes such service or agent to deliver such records, reports and related documents to Factor, and such accounting service or agent may rely upon a copy of this Agreement as evidencing such authorization without necessity of notice to or further consent by Company.

15.3    Company shall permit any representative of Factor to visit and inspect any of the properties of Company; to examine all books of accounts, records, reports and other papers, to make copies and extracts therefrom, and to discuss the affairs, finances and accounts of Company with its officers, employees, independent public accountants, creditors and depository institutions all at such reasonable times and as often as may be reasonably requested. Company agrees to do all things necessary or appropriate to permit Factor to fully exercise its rights under this Section 15.3.

16.     *Financial Condition.*   Company warrants that it is Solvent and shall remain Solvent during the term of this Agreement; that any financial statements delivered to Factor accurately and fairly state Company's financial condition; that there has been no material adverse change in Company's financial condition as reflected in the statements since the date thereof nor do the statements fail to disclose any fact or facts which might materially adversely affect Company's financial condition; and there is no litigation pending or threatened, which taken in the aggregate if adversely determined, can reasonably be expected to have a material adverse affect on Company's financial condition.

17.     *Term of Agreement; Termination.*

17.1    This Agreement shall take effect on the date of acceptance by Factor and shall remain in full force and effect until terminated: (a) by Company at any time upon the giving of not less than thirty (30) days prior written notice of termination to Factor or (b) by Factor at any time upon the giving of not less than thirty (30) days prior written notice of termination to Company, or, (c) without notice if any of the following events (each, an "Event of Default") shall occur: (i) Company shall default in the payment of any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise); (ii) any

representation or warranty made in this Agreement or any supplement hereto, or in any other document executed in connection herewith, or any instrument, certification or financial statement furnished in compliance with or in reference hereto or thereto, or in any other agreement between Company and Factor, shall prove incorrect or misleading in any material respect when made or furnished; (iii) Company shall fail or neglect to perform, keep or observe any covenant or agreement contained in this Agreement or any supplement hereto or any other agreement between Company and Factor; (iv) Company or any guarantor of the Obligations shall file or have filed against it a petition, answer or consent seeking relief under Title 11 of the United States Bankruptcy Code, as now constituted or hereafter amended, or any other applicable Federal or state bankruptcy law or other similar law, or a receiver, liquidator, assignee, trustee, custodian, sequestrator or similar official shall be appointed for Company or any guarantor of the Obligations or any substantial part of its or his property; (v) the occurrence of any event or condition which, alone or when taken together with all other events or conditions occurring or existing concurrently therewith, Factor determines (1) has or may be reasonably expected to have a material adverse effect upon Company's business, operations, properties, condition (financial or otherwise); (2) has or may be reasonably expected to have any material adverse effect whatsoever upon the validity or enforceability of this Agreement or any other agreement between Company and Factor; (3) has or may be reasonably expected to have any material adverse effect upon any security for the Obligations, Factor's liens therein or the priority of such liens; or (4) materially impairs the ability of Company to perform its Obligations under this Agreement or any other agreement between Company and Factor, or the ability of Factor to enforce and collect the Obligations or realize upon any of the security for the Obligations in accordance with the terms of this Agreement or any other agreement between Company and Factor or applicable law; (vi) Company is no longer Solvent, or fails, closes, suspends, or goes out of business; or (vii) there is a change (by death or otherwise) in Company's principal stockholders or owners. In the event that this Agreement is terminated by Company prior to an Anniversary Date, Factor shall be entitled to the unpaid portion of the minimum factoring commissions which would have been payable to Factor pursuant to Section 13 of this Agreement through such Anniversary Date.

17.2    Company shall indemnify Factor and hold Factor harmless from and against any liability, loss, damage, suit, action or proceeding ever suffered or incurred by Factor (including reasonable attorneys' fees and expenses) as the result of Company's failure to observe, perform or discharge any of its Obligations or duties hereunder or under any Factoring Agreement. In addition, Company shall defend Factor against and save Factor harmless from the actions, demands or claims of any Person with respect to any of the Factored Accounts or any of the other Collateral, except any such actions, demands or claims directly arising from Factor's willful misconduct or gross negligence.

17.3    In the event that this Agreement is terminated by Company or by Factor as a result of an Event of Default prior to an Anniversary Date, Factor shall be entitled to the unpaid portion of the minimum factoring commissions which would have been payable to Factor pursuant to Section 13 of this Agreement through such Anniversary Date.

18.    *Effect of Termination.*  Upon the effective date of termination, all Obligations of Company to Factor shall become immediately due and payable without further notice or demand irrespective of any maturity dates established prior thereto. However, no such termination shall

release or abrogate any security interest held by Factor in any collateral of Company until all of Company's Obligations to Factor, including commissions, interest and all costs, expenses and attorneys' fees as herein provided, are paid in full. In the event that Factor shall cease to act as factor for Company, Company agrees to furnish Factor with indemnity satisfactory to Factor that will protect Factor against possible charges to Company under the terms of this Agreement and with a release satisfactory to Factor of all claims Company may have against Factor and until Company does so, Factor may hold any balance remaining to Company's credit in the Reserve Account as security for all Obligations of Company to Factor. Company shall pay Factor upon demand all costs and expenses, including reasonable attorneys' fees, incurred by Factor to obtain or enforce payment of any Obligations due from Company to Factor or in the prosecution or successful defense of any action or proceeding concerning any matter arising out of or related to this Agreement, the factoring of the Company's Accounts Receivable by Factor, or any Obligations owing by Company to Factor.

19. *Lien Perfection.* Company agrees to execute and deliver to Factor all financing statements provided for by the Uniform Commercial Code and all other documents or instruments which may be required by law or which Factor may request to perfect its first priority security interest hereunder and to cooperate with Factor in the filing, recording or renewal thereof, and to pay all filing and recording fees and expenses related thereto, and Company authorizes Factor and any Person whom Factor designates as Company's attorney with power to sign Company's name thereon. This power being coupled with an interest is irrevocable as long as Company is indebted to Factor in any manner. Company shall execute, acknowledge and/or deliver such other Instruments as assurances as may reasonably be requested to effectuate the purposes of this Agreement. At Factor's option, this Agreement may be filed as a financing statement.

20. *Preferences.* Company shall indemnify and hold Factor harmless from any loss, damage or expense (including attorneys' fees) incurred by Factor as a result of a claim made at any time against Factor for the repayment or recovery of any amount received by Factor in payment of any Company Risk Account Receivable by the payor or legal representative thereof (including a trustee in bankruptcy or assignee for the benefit of creditors) on the grounds of preference under the provisions of the Bankruptcy Code or any other federal or state insolvency law. If such claim is ever made against Factor, in addition to all of Factor's other rights under this Agreement, Company shall pay to Factor on demand the full net face amount of any such Company Risk Account Receivable, or if Factor so elects, Factor shall have the right to charge against the Reserve Account the full net face amount of any such Company Risk Account Receivable, but such charge back shall not be deemed a reassignment thereof. The provisions of this Section 20 shall survive the termination of this Agreement and the payment in full of the Obligations.

21. *Notices.* Any notices, demands, consents, or other writings or communications permitted or required by this Agreement shall be given by facsimile transmitter, overnight air courier or certified mail, return receipt requested, addressed to the party to be notified as follows:

(a)   If to Factor:          Capstone Business Credit, LLC.
                             1350 Avenue of the Americas, 24th Floor
                             New York, NY 10019
                             Facsimile No.: 212-755-6833

(b)   If to Company:         D'Annunzio Distribution, Inc.
                             60G Commerce Way
                             Totowa, NJ 07512
                             Facsimile No.: 973-237-0444

or to such other address as each party may designate for itself by notice given in accordance with this Section 21. Any written notice or demand that is not sent in conformity with the provisions hereof shall nevertheless be effective on the date that such notice is actually received by the noticed party.

22.   *ACH Authorization.*  In order to satisfy any of the Obligations, Factor is hereby authorized by Company to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Company wherever located.

23.   *Miscellaneous.*  This Agreement, together with any supplement hereto, contains the entire agreement between the parties, and cannot be modified, altered, changed or amended orally. This Agreement is intended solely for the benefit of Factor and Company, and no other person or party (including any guarantor), is intended to be benefited hereby in any way. The captions in this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof. Failure of Factor to exercise any rights granted to it hereunder upon any breach or default by Company shall not be deemed a waiver thereof in the event of further breaches or defaults. The remedies of Factor hereunder shall be deemed to be cumulative and not exclusive. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns and shall become effective only from the date of Factor's written acceptance. This Agreement is made and accepted and shall be construed, interpreted and enforced in accordance with the laws of the State of New York, without regard to conflict of law principles, and Company irrevocably consents and submits to the jurisdiction of state courts of, and federal courts in, the State of New York, for the purpose of any suit, action or proceeding relating hereto.

24.   *WAIVER OF JURY TRIAL.*  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FACTOR AND COMPANY HEREBY WAIVE, IRREVOCABLY AND UNCONDITIONALLY, TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ANY SUPPLEMENT HERETO OR ANY OF THE OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY CLAIM, DEFENSE, RIGHT OF SETOFF OR OTHER ACTION PERTAINING HERETO, OR TO ANY OF THE FOREGOING.

25.    *Electronic Data Transmission.* Factor may authorize Company to send to Factor or receive from Factor assignments, invoices, credit memoranda, credit approval requests, credit approvals, and other reports to be delivered to or transmitted by Factor under this Agreement by electronic means (each, an "Electronic Transmission"). Any documents authorized by Factor to be sent by Electronic Transmission shall be deemed (a) to have been transmitted by a Person duly authorized to do so, and (b) to have been received by the Person for whom such documents were intended on the actual date of receipt of such documents, unless such day is not a business day, in which event such documents shall be deemed to have been received on the first business day following actual receipt. Each party may rely upon, and assume the authenticity of, any signatures contained in any documents Factor authorizes to be transmitted by Electronic Transmission, and such signatures shall have the same effect and weight as original signatures and shall be sufficient to satisfy the requirements of the Uniform Commercial Code or any applicable statute, rule of law, or rule of evidence. Electronic Transmissions which are not readily capable of bearing either a signature or a reproduction of a signature (e.g., e-mail transmissions) shall be deemed signed, for purposes of the Uniform Commercial Code and all other rules of law and evidence, if they contain the name or an abbreviation of the name of the party sending the Electronic Transmission, it being agreed that such name or abbreviation serves as a symbol adopted by the sender with the intent to authenticate such writing. On the request of either party, the other party shall immediately confirm the receipt of any documents transmitted by Electronic Transmission. The sender of any documents transmitted by Electronic Transmission shall maintain backup paper documents for such documents until at least the third anniversary of the date of the termination of this Agreement and shall, on request of the receiving party, furnish such backup paper documents within two business days of the receipt of a request therefor. Each party may rely upon documents authorized by Factor to be sent by Electronic Transmission to the same extent as if original documents had been personally delivered.

26.    *Fees.* Company agrees to remit to Factor:

26.1    The fees set forth herein in the amounts and on the dates set forth herein and authorizes Factor to collect such fees on their respective due dates by charging Company's Reserve Account;

26.2    Any Misdirected Payment Fee immediately upon its accrual;

26.3    The Missing Notation Fee on any Invoice that is sent by Company to a Customer which does not contain the notice as required by Exhibit B hereof;

26.4    Any charges or expenses charged by Factor for any Factor Risk Accounts Receivable or Company Risk Accounts Receivable where the account debtor is located in a country other than the United States;

26.5    All past due amounts due from Company to Factor hereunder; and

26.6    The out-of-pocket expenses directly incurred by Factor in the administration of this Agreement such as wire transfer fees, postage and audit fees. Company shall not be required

to pay for more than four audits per twelve-month period unless an Event of Default has occurred.

27.   *Special Covenants.*   For so long as any of the Obligations are outstanding, Company covenants that, unless otherwise consented to by Factor in writing, it shall comply with the covenants set forth in Schedule A attached hereto.

28.   *Clearance Days.*   For all purposes under this Agreement, Clearance Days will be added to the date on which Factor receives any payment.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first above written.

D'ANNUNZIO DISTRIBUTION, INC.

By: _____

Name:   Arthur D'Annunzio
Title:   President

Accepted by Factor:

CAPSTONE BUSINESS CREDIT, LLC

By: _____

Name:   Joseph Ingrassia
Title:   Managing Member

EXHIBIT A
to
Factoring Agreement

1.    Description of Collateral:

(a)    All inventory and goods, including without limitation, all inventory and goods held for sale or lease or to be furnished under contracts of service, raw materials, work in process, finished goods, goods in transit, advertising, packaging and shipping materials, and all designs, creations, patterns, styles, samples and all other material and supplies (collectively, the "Inventory");

(b)    All documents, including without limitation, documents of transport, payment and title relating to any of the foregoing and all such other documents as are made available to Company for the purpose of ultimate sale or exchange of goods or for the purpose of loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with goods in a manner preliminary to their sale or exchange;

(c)    All rights, claims, rights of offset, rights of return, actions and causes of action against any Person, including without limitation, those arising out of the purchase by Company of any of its Inventory including, without limitation, the supplier orders, and all rights of stoppage in transit, replevin, reclamation and rights of any unpaid vendor or as a lienor;

(d)    All equipment, machinery, fixtures, trade fixtures, vehicles, furnishings, furniture supplies, materials, tools, machine tools, office equipment, appliances, apparatus, dies, jigs, and chattels, trucks, trailers, loaders and other vehicles and all replacements and substitutions therefore and all accessories thereto;

(e)    All of Company's now owned or hereafter acquired General Intangibles, including, without limitation, trademarks, tradenames, tradestyles, trade secrets, equipment formulation, manufacturing procedures, quality control procedures, product specifications, patents, patent applications, copyrights, registrations, contract rights, choses in action, causes of action, corporate or other business records, inventions, designs, goodwill, claims under guarantees, licenses, franchises, tax refunds, tax refund claims, computer programs, computer data bases, computer program flow diagrams, source codes, object codes and all other intangible property of every kind and nature;

(f)    All of Company's now owned or hereafter acquired Accounts and contract rights, Instruments, insurance proceeds, Documents, Chattel Paper, letters of credit and Company's rights to receive payment thereunder, any and all rights to the payment or receipt of money or other forms of consideration of any kind at any time now or hereafter owing or to be owing to Company ("Receivables"), all proceeds thereof and all files in which Company has any interest whatsoever containing information identifying or pertaining to any of Company's Receivables, together with all of Company's rights to any merchandise which is represented thereby, and all Company's right, title, security and guarantees with respect to each Receivable, including, without limitation, all rights of stoppage in transit, replevin and reclamation and all rights as an unpaid vendor; .

*Capstone Business Credit, LLC*                  A-1
*BN 967332v2*

(g)    All of Company's now owned and hereafter acquired investment property, including, without limitation, securities (whether certificated or uncertificated, securities entitlements, securities accounts, commodities accounts, and commodities contracts;

(h)    All representations, liens on real or personal property, leases and other agreements and property which in any way secures or relates to the foregoing, or are acquired for the purpose of securing and enforcing any item thereof;

(i)    (1) all cash held as collateral to the extent not otherwise constituting collateral, all other cash or property at any time on deposit with or held by lender for the account of Company (whether for safekeeping, custody, pledge, transmission or otherwise), (2) all present or future deposit accounts (whether time or demand or interest or non-interest bearing) of Company with Lender any other Person including those to which any such cash may at any time and from time to time be credited, (3) all investments and reinvestments (however evidenced) of amounts from time to time credited to such accounts, and (4) all interest, dividends, distributions and other proceeds payable on or with respect to (x) such investments and reinvestments and (y) such accounts;

(j)    All Instruments, Chattel Paper, Documents, and contract rights and other rights, irrespective of when acquired; and

(k)    All proceeds, insurance proceeds, products and accessions of or to any and all of the foregoing, and all collateral and security for, and guarantees of, any and all of the foregoing, and all books and records relating to any and all of the foregoing (including without limitation, any and all microfilm, microfiche, computer programs and records, source materials, tapes and discs) and all equipment containing said books and records.

## EXHIBIT B
## TO
## FACTORING AGREEMENT

"This invoice has been sold and assigned to CAPSTONE BUSINESS CREDIT, LLC ("Company"), and has been reassigned by Company to CIT Commercial Services, Inc., by whom it is now owned and to whom it is exclusively payable at the following address:

> CIT Group/Commercial Service, Inc.
> POST OFFICE BOX 1036
> Charlotte, NC 28201-1036

Prompt notice must be given to CIT Group/Commercial Service, Inc., of any merchandise returns and any claims or disputes whether based on shortages, non-delivery, offsets or any other claim."

**EXHIBIT C**
**Letter Of Acceptance**
[Attached]

**Capstone Business Credit, LLC**
*1350 Avenue of the Americas, 24th Floor*
*New York, NY 10019*
*Tel: 212 755 3636*
*Fax: 212 755 6833*
*e-mail: crice@capstonetrade.com*

Mr. John Doe
Controller
Sam's Club, Inc.
Address
City, State, Zip

RE:

PO Number    PO Date    Invoice Number    Invoice Date    Terms    Invoice Amt.

Dear Mr. Doe,

We are a finance company and assignee for the above named entity, providing funding during a period of rapid growth and expansion. Attached is a letter from that company authorizing all payments to be sent directly and solely to Capstone Business Credit, LLC.

By signing at the bottom and returning this letter to us by fax, you will acknowledge to us both your understanding of the foregoing, and the correctness of the above invoice numbers pursuant to the terms immediately above your signature.

Sincerely,

Joseph F. Ingrassia
Managing Member

The undersigned acknowledges to Capstone Business Credit, LLC that the above invoice amounts are correct and owing: that the work and/or merchandise has been completed and accepted and that there are not now nor will there be, any setoffs beyond 10% of the invoice amount(s); and that there will be no claims against the funds paid. Neither Capstone nor its agents have made any representations except as herein set forth. This estoppel is not subject to modification. New York law shall apply hereto.

Authorized Signature _____    Title _____

## SCHEDULE A
## TO FACTORING AGREEMENT

### Special Covenants

1.  <u>No Material Change or Change of Control</u>. Absent prior written consent from Factor, Company shall not (a) make or permit any material change in the nature of its business as carried on as of the Effective Date, or (b) allow to occur a Change of Control.

"Change of Control" shall mean, on or after the Effective Date, that any change in the composition of Company's stockholders as of the Effective Date shall occur which would result in any stockholder or group acquiring 20% or more of any class of the capital stock of Company, or that any Person or entity (or group of Persons or entities acting in concert) shall otherwise acquire, directly or indirectly, the power to elect a majority of the Board of Directors of Company or otherwise direct the management or affairs of Company by obtaining proxies, entering into voting agreements or trusts, acquiring securities or otherwise.

2.  <u>Negative Pledge</u>.  Company shall not create, incur, assume or permit to exist any lien upon or with respect to any Collateral now owned or hereafter acquired by Company, except for liens in favor of Lender or Factor.



**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

DEPARTMENT OF TREASURY
UCC SECTION

2009 JAN 24 P 5: 00

A. NAME & PHONE OF CONTACT AT FILER [optional]
Phone:(800) 331-3282  Fax: (818) 662-4141

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)          17884 CAPSTONE BUSIN

UCC Direct Services          13236773
P.O. Box 29071
Glendale, CA 91209-9071     NJNJ

2456148-9

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| DANNUNZIO DISTRIBUTION INC. | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 60G Commerce Way | Totowa | NJ | 07512 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | CORPORATION | NJ | 0100948252 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Capstone Business Credit, LLC | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1350 Avenue of the Americas 24th Floor | New York | NY | 10019 | USA |

4. This FINANCING STATEMENT covers the following collateral

Collateral-All assets of the Debtor. NOTICE - PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH SECURED PARTY'S RIGHTS BY SUCH ENCUMBRANCER. IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

PAGE ATTACHMENT

S 1960098
J 3651935

| 5. ALTERNATIVE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

13236773                                         D'Annunzio Distribution Inc.

FILING OFFICE COPY - NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Prepared by UCC Direct Services, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| 9a. ORGANIZATION'S NAME | | |
|---|---|---|
| DANNUNZIO DISTRIBUTION INC. | | |

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

**10. MISCELLANEOUS**

13236773-NJ-0

**17884 CAPSTONE BUSIN**

D'Annunzio Distribution Inc.

File with: New Jersey

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names**

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTION | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**12. [X] ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P's NAME - insert only one name (12a or 12b)**

| 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Capstone Capital Group I, LLC | | | |

OR

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1350 Avenue of the Americas 24th Floor | New York | NY | 10019 | |

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral or is filed as a ☐ fixture filing.

**14.** Description of real estate:

**16.** Additional collateral description:

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest).

**17.** Check only if applicable and check only one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust   or ☐ Decedent's Estate

**18.** Check only if applicable and check only one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY - NATIONAL UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

Prepared by UCC-Direct Services, Inc., P.O. Box 29071
Glendale, CA 91209-9071 Tel (800) 331-3282

## AMENDED AND RESTATED GUARANTEE

1.    The undersigned (each a "Guarantor" and collectively, the "Guarantors"), for good and valuable consideration and to induce Capstone Capital Group I, LLC, a Delaware limited liability company (the "Lender") to lend to D'Annunzio Distribution, Inc., a New Jersey corporation ("Borrower") pursuant to a Purchase Order Financing Agreement between Borrower and the Lender dated as of October 20, 2006 (together all other documents executed in connection therewith, as each such agreement may be amended from time to time, shall hereinafter be referred to as the "Loan Documents"), hereby jointly and severally (a) makes and affirms to the Lender each of the representations and warranties made by Borrower in the Loan Documents, and (b) irrevocably and unconditionally guarantees to the Lender the faithful and timely performance and satisfaction of all of the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Loan Documents, including without limitation the payment of all amounts when due under such agreements, including interest that, but for the filing of a petition under the United States Bankruptcy Code with respect to Borrower, would have accrued on any such obligations, and attorneys' fees (collectively, the "Guaranteed Obligations"). If Borrower fails at any time promptly and fully to perform or satisfy any of such obligations, covenants or conditions, Guarantors shall perform or satisfy the same as provided therein. The Lender may at any time require Guarantors to perform or satisfy any such obligation, covenant or condition that Borrower has not performed or satisfied by giving notice to such effect to Guarantors in any manner prescribed for the giving of notices to Borrower under the Loan Documents, addressed to Guarantors at the address below.

The obligations of Guarantors hereunder are primary and direct, and are in addition to, and independent of, the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Loan Documents. Guarantors hereby waive all rights that they might otherwise have to require the Lender to commence any proceeding against Borrower or the Collateral (as defined in the Loan Documents) or to exhaust the Lender's remedies against Borrower before seeking to enforce this Guarantee.

The validity of this Guarantee and the obligations of Guarantors hereunder shall in no manner be terminated, impaired or in any way modified or affected by reason of:

(a)    the enforcement by the Lender against Borrower of any of the Lender's rights or remedies under the Loan Documents;

(b)    the granting to the Lender, under the Loan Documents or otherwise, of any collateral security for the performance or satisfaction of Borrower's obligations, covenants or conditions under the Loan Documents, any action of the Lender to proceed against or realize upon such collateral security, or an impairment or release of any such collateral security;

(c)    commencement by or against Borrower of any bankruptcy or other insolvency proceeding or any stay, discharge or other relief granted or issued thereunder;

(d)    any extension of time or other indulgence or forbearance by the Lender, or an amendment, modification, renewal or extension of any Loan Document or waiver of any of the obligations, covenants or conditions of Borrower under any Loan Document; or

(e)      any other defense, set-off, counterclaim or discharge that might otherwise be available to Borrower or any Guarantor.

2.      Notwithstanding the foregoing, the liability of each Guarantor hereunder is limited to the lesser of the following amounts minus, in either case, one dollar ($1):

(a)      The lowest amount which would render this Guarantee a fraudulent conveyance under the Uniform Fraudulent Transfer Act, or other similar or analogous law or statute of the appropriate jurisdiction; and

(b)      The lowest amount which would render this Guarantee a fraudulent transfer under Section 548 of the Bankruptcy Code of 1978, as amended.

It is presumed that the liability of each Guarantor hereunder is equal to the amount of the Guaranteed Obligations. Therefore, in the event that any Guarantor, or successor-in-interest thereof ("Guaranty Opponent"), shall claim that the amount of its liability hereunder is less than the amount of the Guaranteed Obligations hereunder, the burden of proof with respect to the amount of such liability shall rest with such Guaranty Opponent, in light of the fact that the information concerning and circumstances of the financial condition of such Guarantor is more readily available to and under the control of such Guaranty Opponent.

3.      To secure the payment and performance in full of the Guarantor's obligations hereunder, each Guarantor grants to the Lender a security interest in all of Guarantor's now owned and hereafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation: Accounts; Chattel Paper; Goods, including Inventory and Equipment; Instruments; Investment Property; Documents; and General Intangibles (as each is defined in Article 9 of the Uniform Commercial Code in effect from time to time in the State of New York).

4.      Each Guarantor hereby represents and warrants to the Lender that:

(a)      Such Guarantor has full power and authority to make this Guarantee and to assume and perform its or his/her obligations hereunder. This Guarantee has been duly executed and delivered by each Guarantor, and is a legally valid and binding obligation of each Guarantor, enforceable against each Guarantor in accordance with its terms, except to the extent such enforceability may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and equitable principles limiting the availability of certain remedies.

(b)      If it is a registered entity:

(i)      It is organized, validly existing, and in good standing under the laws of the jurisdiction of its formation;

(ii)      It has the power and authority and all governmental licenses, authorizations, consents, and approvals to execute, deliver, and perform its obligations hereunder;

(iii)   This Guarantee has been authorized by all necessary action by Guarantor, and does not and will not:

(1)   Contravene the terms of Guarantor's organizational documents;

(2)   Conflict with or result in any breach or contravention of, any contractual obligation to which Guarantor is a party or any order, injunction, writ, or decree of any governmental authority to which Guarantor or Guarantor's properties are subject;

(3)   Violate any law, rule, or regulation of any governmental authority.

(c)   There are no actions, suits, proceedings, claims, or disputes pending, or, to the best knowledge of Guarantor, threatened or contemplated, at law, in equity, in arbitration, or before any governmental authority, against Guarantor or any of Guarantor's properties which purport to affect or pertain to this Guarantee or any of the transactions contemplated hereby or thereby.

5.   Each Guarantor waives:

(a)   ANY AND ALL SURETYSHIP DEFENSES, WHETHER ARISING BY CONTRACT, STATUTE OR BY OPERATION OF LAW.

(b)   Notice of (i) any adverse change in the financial condition of Borrower; (ii) any default in the performance of the Guaranteed Obligations; and (iii) any other notice to which such Guarantor might be entitled.

(c)   Any defense or claim arising out of (i) the release of any collateral securing the Guaranteed Obligations, or (ii) any fact that may increase such Guarantor's risk hereunder.

(d)   Any claim of usury.

(e)   Any other defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations have been fully paid) of Borrower including any defense arising from any statute of limitations.

(f)   Any defense based on the invalidity, irregularity, or unenforceability of all or any part of the Guaranteed Obligations or any other circumstance which might constitute a defense of a guarantor.

(g)   Any claim or defense based on (i) the validity, legality or enforceability in whole or in part of the Guaranteed Obligations, (ii) any assignment, amendment, transfer, modification, renewal, waiver, compromise, addition or supplement relating to Guaranteed Obligations, (c) any setoff, counterclaim or any circumstances which might constitute a defense or discharge of Guarantor.

(h)   Any lack of power or authority of Borrower.

(i)     Any defense to payment hereunder resulting from Lender's releasing Borrower or any other obligor owing the Guaranteed Obligations from their obligation to pay the Guaranteed Obligations, as well as Lender's failure to give such Guarantor notice thereof.

6.      Each Guarantor waives any right to revoke the Guarantee as to future Guaranteed Obligations. If, contrary to the express intent of this agreement, any such revocation is effective, (a) it shall not be effective until written notice thereof has been actually received by any officer of Lender; (b) it shall not apply to any Guaranteed Obligations in existence on such date (including any subsequent continuation, extension, or renewal thereof); (c) it shall not apply to any Guaranteed Obligations made or created after such date pursuant to a commitment of Lender which was, or is believed in good faith by Lender to be, in existence on the date of such revocation; (d) no payment by any other Guarantor or Borrower, or from any other source, prior to the date of such revocation shall reduce the obligations of Guarantor hereunder; and (e) any payment by Borrower or from any source other than Guarantor, subsequent to the date of such revocation, shall first be applied to that portion of the Guaranteed Obligations, if any, as to which the revocation by Guarantor is effective and, to the extent so applied, shall not reduce the obligations of Guarantor hereunder.

7.      Without notice to Guarantors and without affecting or impairing the obligations of Guarantors hereunder, Lender may, compromise or settle, extend the period of duration or the time for the payment, or discharge the performance of, or may refuse to, or otherwise not enforce, or may, release any obligor of the Guaranteed Obligations or may grant other indulgences to Borrower in respect thereof, or may amend the Loan Documents, or may enforce, exchange, release, or waive any security for the Guaranteed Obligations or any guaranty of the Guaranteed Obligations.

8.      All present and future indebtedness of Borrower to any Guarantor is subordinated to the payment of the Guaranteed Obligations. In this regard, no payment of any kind whatsoever shall be made with respect to such indebtedness until all Guaranteed Obligations have been indefeasibly paid in full. Any payment received by any Guarantor in respect of such indebtedness shall be held by any Guarantor as trustee for Lender, and promptly paid over to Lender on account of the Guaranteed Obligations but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guarantee. Upon request by Lender, any notes or other instruments now or hereafter evidencing such indebtedness of Borrower to any Guarantor, shall be marked with a legend that the same are subject to this Guarantee or shall be delivered to Lender for safekeeping.

9.      If the Lender prevails in any action, suit or other proceeding against any Guarantor to enforce this Guarantee, Guarantors jointly and severally shall pay to the Lender and indemnify the Lender for the Lender's reasonable attorneys' fees and disbursements so incurred. All rights of the Lender hereunder shall inure to the benefit of the Lender and its successors and assigns, and shall be binding upon Guarantors and their heirs, distributees, legal representatives, successors and assigns. This Guarantee shall be governed by, and interpreted and enforced in accordance with, the laws of the State of New York without regard to principles of choice of law or conflicts of laws. Guarantors hereby irrevocably consent and submit to the same provisions relating to arbitration and remedies, and the jurisdiction of the same courts, the same venue and

the same manner of service of process, to which Borrower consents to and submits in the Loan Documents.

10.    This Amended and Restated Guarantee amends and restates in its entirety that certain Limited Guarantee executed as of October 20, 2006 by the undersigned in favor of Lender with respect to obligations of Borrower.

[execution on next page]

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Guarantee as of March 8, 2007.

D'ANNUNZIO SHOWCASE DEALERS, INC.

By: _____

Name: Arthur D'Annunzio

Title: President

'D'

## AMENDED AND RESTATED GUARANTEE

I.   The undersigned (each a "Guarantor" and collectively, the "Guarantors"), for good and valuable consideration and to induce Capstone Business Credit, LLC, a Delaware limited liability company (the "Lender") to factor the accounts receivable of D'Annunzio Distribution, Inc., a New Jersey corporation ("Borrower") pursuant to a Discount Factoring Agreement between Borrower and the Lender dated as of October 20, 2006 (together all other documents executed in connection therewith, as each such agreement may be amended from time to time, shall hereinafter be referred to as the "Financing Documents"), hereby jointly and severally (a) makes and affirms to the Lender each of the representations and warranties made by Borrower in the Financing Documents, and (b) irrevocably and unconditionally guarantees to the Lender the faithful and timely performance and satisfaction of all of the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Financing Documents, including without limitation the payment of all amounts when due under such agreements, including interest that, but for the filing of a petition under the United States Bankruptcy Code with respect to Borrower, would have accrued on any such obligations, and attorneys' fees (collectively, the "Guaranteed Obligations"). If Borrower fails at any time promptly and fully to perform or satisfy any of such obligations, covenants or conditions, Guarantors shall perform or satisfy the same as provided therein. The Lender may at any time require Guarantors to perform or satisfy any such obligation, covenant or condition that Borrower has not performed or satisfied by giving notice to such effect to Guarantors in any manner prescribed for the giving of notices to Borrower under the Financing Documents, addressed to Guarantors at the address below.

The obligations of Guarantors hereunder are primary and direct, and are in addition to, and independent of, the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Financing Documents. Guarantors hereby waive all rights that they might otherwise have to require the Lender to commence any proceeding against Borrower or the Collateral (as defined in the Financing Documents) or to exhaust the Lender's remedies against Borrower before seeking to enforce this Guarantee.

The validity of this Guarantee and the obligations of Guarantors hereunder shall in no manner be terminated, impaired or in any way modified or affected by reason of:

(a)   the enforcement by the Lender against Borrower of any of the Lender's rights or remedies under the Financing Documents;

(b)   the granting to the Lender, under the Financing Documents or otherwise, of any collateral security for the performance or satisfaction of Borrower's obligations, covenants or conditions under the Financing Documents, any action of the Lender to proceed against or realize upon such collateral security, or an impairment or release of any such collateral security;

(c)   commencement by or against Borrower of any bankruptcy or other insolvency proceeding or any stay, discharge or other relief granted or issued thereunder;

(d)    any extension of time or other indulgence or forbearance by the Lender, or an amendment, modification, renewal or extension or waiver of any Financing Document or any of the obligations, covenants or conditions of Borrower under any Financing Document; or

(e)    any other defense, set-off, counterclaim or discharge that might otherwise be available to Borrower or any Guarantor.

2.    Notwithstanding the foregoing, the liability of each Guarantor hereunder is limited to the lesser of the following amounts minus, in either case, one dollar ($1):

(a)    The lowest amount which would render this Guarantee a fraudulent conveyance under the Uniform Fraudulent Transfer Act, or other similar or analogous law or statute of the appropriate jurisdiction; and

(b)    The lowest amount which would render this Guarantee a fraudulent transfer under Section 548 of the Bankruptcy Code of 1978, as amended.

It is presumed that the liability of each Guarantor hereunder is equal to the amount of the Guaranteed Obligations. Therefore, in the event that any Guarantor, or successor-in-interest thereof ("Guaranty Opponent"), shall claim that the amount of its liability hereunder is less than the amount of the Guaranteed Obligations hereunder, the burden of proof with respect to the amount of such liability shall rest with such Guaranty Opponent, in light of the fact that the information concerning and circumstances of the financial condition of such Guarantor is more readily available to and under the control of such Guaranty Opponent.

3.    To secure the payment and performance in full of the Guarantor's obligations hereunder, each Guarantor grants to the Lender a security interest in all of Guarantor's now owned and hereafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation: Accounts; Chattel Paper; Goods, including Inventory and Equipment; Instruments; Investment Property; Documents; and General Intangibles (as each is defined in Article 9 of the Uniform Commercial Code in effect from time to time in the State of New York).

4.    Each Guarantor hereby represents and warrants to the Lender that:

(a)    Such Guarantor has full power and authority to make this Guarantee and to assume and perform its or his/her obligations hereunder. This Guarantee has been duly executed and delivered by each Guarantor, and is a legally valid and binding obligation of each Guarantor, enforceable against each Guarantor in accordance with its terms, except to the extent such enforceability may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and equitable principles limiting the availability of certain remedies.

(b)    If it is a registered entity:

(i)    It is organized, validly existing, and in good standing under the laws of the jurisdiction of its formation;

(ii)    It has the power and authority and all governmental licenses, authorizations, consents, and approvals to execute, deliver, and perform its obligations hereunder;

(iii)    This Guarantee has been authorized by all necessary action by Guarantor, and does not and will not:

(1)    Contravene the terms of Guarantor's organizational documents;

(2)    Conflict with or result in any breach or contravention of, any contractual obligation to which Guarantor is a party or any order, injunction, writ, or decree of any governmental authority to which Guarantor or Guarantor's properties are subject;

(3)    Violate any law, rule, or regulation of any governmental authority.

(c)    There are no actions, suits, proceedings, claims, or disputes pending, or, to the best knowledge of Guarantor, threatened or contemplated, at law, in equity, in arbitration, or before any governmental authority, against Guarantor or any of Guarantor's properties which purport to affect or pertain to this Guarantee or any of the transactions contemplated hereby or thereby.

5.    Each Guarantor waives:

(a)    ANY AND ALL SURETYSHIP DEFENSES, WHETHER ARISING BY CONTRACT, STATUTE OR BY OPERATION OF LAW.

(b)    Notice of (i) any adverse change in the financial condition of Borrower; (ii) any default in the performance of the Guaranteed Obligations; and (iii) any other notice to which such Guarantor might be entitled.

(c)    Any defense or claim arising out of (i) the release of any collateral securing the Guaranteed Obligations, or (ii) any fact that may increase such Guarantor's risk hereunder.

(d)    Any claim of usury.

(e)    Any other defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations have been fully paid) of Borrower including any defense arising from any statute of limitations.

(f)    Any defense based on the invalidity, irregularity, or unenforceability of all or any part of the Guaranteed Obligations or any other circumstance which might constitute a defense of a guarantor.

(g)    Any claim or defense based on (i) the validity, legality or enforceability in whole or in part of the Guaranteed Obligations, (ii) any assignment, amendment, transfer, modification, renewal, waiver, compromise, addition or supplement relating to Guaranteed Obligations, (c) any setoff, counterclaim or any circumstances which might constitute a defense or discharge of Guarantor.

(h)      Any lack of power or authority of Borrower.

(i)      Any defense to payment hereunder resulting from Lender's releasing Borrower or any other obligor owing the Guaranteed Obligations from their obligation to pay the Guaranteed Obligations, as well as Lender's failure to give such Guarantor notice thereof.

6.      Each Guarantor waives any right to revoke the Guarantee as to future Guaranteed Obligations. If, contrary to the express intent of this agreement, any such revocation is effective, (a) it shall not be effective until written notice thereof has been actually received by any officer of Lender; (b) it shall not apply to any Guaranteed Obligations in existence on such date (including any subsequent continuation, extension, or renewal thereof); (c) it shall not apply to any Guaranteed Obligations made or created after such date pursuant to a commitment of Lender which was, or is believed in good faith by Lender to be, in existence on the date of such revocation; (d) no payment by any other Guarantor or Borrower, or from any other source, prior to the date of such revocation shall reduce the obligations of Guarantor hereunder; and (e) any payment by Borrower or from any source other than Guarantor, subsequent to the date of such revocation, shall first be applied to that portion of the Guaranteed Obligations, if any, as to which the revocation by Guarantor is effective and, to the extent so applied, shall not reduce the obligations of Guarantor hereunder.

7.      Without notice to Guarantors and without affecting or impairing the obligations of Guarantors hereunder, Lender may, compromise or settle, extend the period of duration or the time for the payment, or discharge the performance of, or may refuse to, or otherwise not enforce, or may, release any obligor of the Guaranteed Obligations or may grant other indulgences to Borrower in respect thereof, or may amend the Financing Documents, or may enforce, exchange, release, or waive any security for the Guaranteed Obligations or any guaranty of the Guaranteed Obligations.

8.      All present and future indebtedness of Borrower to any Guarantor is subordinated to the payment of the Guaranteed Obligations. In this regard, no payment of any kind whatsoever shall be made with respect to such indebtedness until all Guaranteed Obligations have been indefeasibly paid in full. Any payment received by any Guarantor in respect of such indebtedness shall be held by any Guarantor as trustee for Lender, and promptly paid over to Lender on account of the Guaranteed Obligations but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guarantee. Upon request by Lender, any notes or other instruments now or hereafter evidencing such indebtedness of Borrower to any Guarantor, shall be marked with a legend that the same are subject to this Guarantee or shall be delivered to Lender for safekeeping.

9.      If the Lender prevails in any action, suit or other proceeding against any Guarantor to enforce this Guarantee, Guarantors jointly and severally shall pay to the Lender and indemnify the Lender for the Lender's reasonable attorneys' fees and disbursements so incurred. All rights of the Lender hereunder shall inure to the benefit of the Lender and its successors and assigns, and shall be binding upon Guarantors and their heirs, distributees, legal representatives, successors and assigns. This Guarantee shall be governed by, and interpreted and enforced in accordance with, the laws of the State of New York without regard to principles of choice of law or conflicts of laws. Guarantors hereby irrevocably consent and submit to the same provisions

relating to arbitration and remedies, and the jurisdiction of the same courts, the same venue and the same manner of service of process, to which Borrower consents to and submits in the Financing Documents.

10.     This Amended and Restated Guarantee amends and restates in its entirety that certain Limited Guarantee executed as of October 20, 2006 by the undersigned in favor of Lender with respect to obligations of Borrower.

[execution on next page]

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Guarantee as of March 8, 2007.

D'ANNUNZIO SHOWCASE DEALERS, INC.

By:
Name: Arthur D'Annunzio
Title: President



## AMENDED AND RESTATED GUARANTEE

I.     The undersigned (each a "Guarantor" and collectively, the "Guarantors"), for good and valuable consideration and to induce Capstone Business Credit, LLC, a Delaware limited liability company (the "Lender") to factor the accounts receivable of D'Annunzio Distribution, Inc., a New Jersey corporation ("Borrower") pursuant to a Discount Factoring Agreement between Borrower and the Lender dated as of October 20, 2006 (together all other documents executed in connection therewith, as each such agreement may be amended from time to time, shall hereinafter be referred to as the "Financing Documents"), hereby jointly and severally (a) makes and affirms to the Lender each of the representations and warranties made by Borrower in the Financing Documents, and (b) irrevocably and unconditionally guarantees to the Lender the faithful and timely performance and satisfaction of all of the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Financing Documents, including without limitation the payment of all amounts when due under such agreements, including interest that, but for the filing of a petition under the United States Bankruptcy Code with respect to Borrower, would have accrued on any such obligations, and attorneys' fees (collectively, the "Guaranteed Obligations"). If Borrower fails at any time promptly and fully to perform or satisfy any of such obligations, covenants or conditions, Guarantors shall perform or satisfy the same as provided therein. The Lender may at any time require Guarantors to perform or satisfy any such obligation, covenant or condition that Borrower has not performed or satisfied by giving notice to such effect to Guarantors in any manner prescribed for the giving of notice to Borrower under the Financing Documents, addressed to Guarantors at the address below;

The obligations of Guarantors hereunder are primary and direct, and are in addition to, and independent of, the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Financing Documents. Guarantors hereby waive all rights that they might otherwise have to require the Lender to commence any proceeding against Borrower or the Collateral (as defined in the Financing Documents) or to exhaust the Lender's remedies against Borrower before seeking to enforce this Guarantee.

The validity of this Guarantee and the obligations of Guarantors hereunder shall in no manner be terminated, impaired or in any way modified or affected by reason of:

(a)     the enforcement by the Lender against Borrower of any of the Lender's rights or remedies under the Financing Documents;

(b)     the granting to the Lender, under the Financing Documents or otherwise, of any collateral security for the performance or satisfaction of Borrower's obligations, covenants or conditions under the Financing Documents, any action of the Lender to proceed against or realize upon such collateral security, or an impairment or release of any such collateral security;

(c)     commencement by or against Borrower of any bankruptcy or other insolvency proceeding or any stay, discharge or other relief granted or issued thereunder;

(d)    any extension of time or other indulgence or forbearance by the Lender, or an amendment, modification, renewal or extension of any Financing Document or waiver of any of the obligations, covenants or conditions of Borrower under any Financing Document; or

(e)    any other defense, set-off, counterclaim or discharge that might otherwise be available to Borrower or any Guarantor.

2.    Notwithstanding the foregoing, the liability of each Guarantor hereunder is limited to the lesser of the following amounts minus, in either case, one dollar ($1):

(a)    The lowest amount which would render this Guarantee a fraudulent conveyance under the Uniform Fraudulent Transfer Act, or other similar or analogous law or statute of the appropriate jurisdiction; and

(b)    The lowest amount which would render this Guarantee a fraudulent transfer under Section 548 of the Bankruptcy Code of 1978, as amended.

It is presumed that the liability of each Guarantor hereunder is equal to the amount of the Guaranteed Obligations. Therefore, in the event that any Guarantor, or successor-in-interest thereof ("Guaranty Opponent"), shall claim that the amount of its liability hereunder is less than the amount of the Guaranteed Obligations hereunder, the burden of proof with respect to the amount of such liability shall rest with such Guaranty Opponent, in light of the fact that the information concerning and circumstances of the financial condition of such Guarantor is more readily available to and under the control of such Guaranty Opponent.

3.    To secure the payment and performance in full of the Guarantor's obligations hereunder, each Guarantor grants to the Lender a security interest in all of Guarantor's now owned and hereafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation: Accounts; Chattel Paper; Goods, including Inventory and Equipment; Instruments; Investment Property; Documents; and General Intangibles (as each is defined in Article 9 of the Uniform Commercial Code in effect from time to time in the State of New York).

4.    Each Guarantor hereby represents and warrants to the Lender that:

(a)    Such Guarantor has full power and authority to make this Guarantee and to assume and perform its or his/her obligations hereunder. This Guarantee has been duly executed and delivered by each Guarantor, and is a legally valid and binding obligation of each Guarantor, enforceable against each Guarantor in accordance with its terms, except to the extent such enforceability may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and equitable principles limiting the availability of certain remedies.

(b)    If it is a registered entity:

(i)    It is organized, validly existing, and in good standing under the laws of the jurisdiction of its formation;

(ii)     It has the power and authority and all governmental licenses, authorizations, consents, and approvals to execute, deliver, and perform its obligations hereunder;

(iii)     This Guarantee has been authorized by all necessary action by Guarantor, and does not and will not:

(1)     Contravene the terms of Guarantor's organizational documents;

(2)     Conflict with or result in any breach or contravention of, any contractual obligation to which Guarantor is a party or any order, injunction, writ, or decree of any governmental authority to which Guarantor or Guarantor's properties are subject;

(3)     Violate any law, rule, or regulation of any governmental authority.

(e)     There are no actions, suits, proceedings, claims, or disputes pending, or, to the best knowledge of Guarantor, threatened or contemplated, at law, in equity, in arbitration, or before any governmental authority, against Guarantor or any of Guarantor's properties which purport to affect or pertain to this Guarantee or any of the transactions contemplated hereby or thereby.

5.     Each Guarantor waives:

(a)     ANY AND ALL SURETYSHIP DEFENSES, WHETHER ARISING BY CONTRACT, STATUTE OR BY OPERATION OF LAW.

(b)     Notice of (i) any adverse change in the financial condition of Borrower; (ii) any default in the performance of the Guaranteed Obligations; and (iii) any other notice to which such Guarantor might be entitled.

(c)     Any defense or claim arising out of (i) the release of any collateral securing the Guaranteed Obligations, or (ii) any fact that may increase such Guarantor's risk hereunder.

(d)     Any claim of usury.

(e)     Any other defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations have been fully paid) of Borrower including any defense arising from any statute of limitations.

(f)     Any defense based on the invalidity, irregularity, or unenforceability of all or any part of the Guaranteed Obligations or any other circumstance which might constitute a defense of a guarantor.

(g)     Any claim or defense based on (i) the validity, legality or enforceability in whole or in part of the Guaranteed Obligations, (ii) any assignment, amendment, transfer, modification, renewal, waiver, compromise, addition or supplement relating to Guaranteed Obligations, (c) any setoff, counterclaim or any circumstances which might constitute a defense or discharge of Guarantor.