(h)     Any lack of power or authority of Borrower.

(i)     Any defense to payment hereunder resulting from Lender's releasing Borrower or any other obligor owing the Guaranteed Obligations from their obligation to pay the Guaranteed Obligations, as well as Lender's failure to give such Guarantor notice thereof.

6.      Each Guarantor waives any right to revoke the Guarantee as to future Guaranteed Obligations. If, contrary to the express intent of this agreement, any such revocation is effective, (a) it shall not be effective until written notice thereof has been actually received by any officer of Lender; (b) it shall not apply to any Guaranteed Obligations in existence on such date (including any subsequent continuation, extension, or renewal thereof); (c) it shall not apply to any Guaranteed Obligations made or created after such date pursuant to a commitment of Lender which was, or is believed in good faith by Lender to be, in existence on the date of such revocation; (d) no payment by any other Guarantor or Borrower, or from any other source, prior to the date of such revocation shall reduce the obligations of Guarantor hereunder; and (e) any payment by Borrower or from any source other than Guarantor, subsequent to the date of such revocation, shall first be applied to that portion of the Guaranteed Obligations, if any, as to which the revocation by Guarantor is effective and, to the extent so applied, shall not reduce the obligations of Guarantor hereunder.

7.      Without notice to Guarantors and without affecting or impairing the obligations of Guarantors hereunder, Lender may, compromise or settle, extend the period of duration or the time for the payment, or discharge the performance of, or may refuse to, or otherwise not enforce, or may, release any obligor of the Guaranteed Obligations or may grant other indulgences to Borrower in respect thereof, or may amend the Financing Documents, or may enforce, exchange, release, or waive any security for the Guaranteed Obligations or any guaranty of the Guaranteed Obligations.

8.      All present and future indebtedness of Borrower to any Guarantor is subordinated to the payment of the Guaranteed Obligations. In this regard, no payment of any kind whatsoever shall be made with respect to such indebtedness until all Guaranteed Obligations have been indefeasibly paid in full. Any payment received by any Guarantor in respect of such indebtedness shall be held by any Guarantor as trustee for Lender, and promptly paid over to Lender on account of the Guaranteed Obligations but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guarantee. Upon request by Lender, any notes or other instruments now or hereafter evidencing such indebtedness of Borrower to any Guarantor, shall be marked with a legend that the same are subject to this Guarantee or shall be delivered to Lender for safekeeping.

9.      If the Lender prevails in any action, suit or other proceeding against any Guarantor to enforce this Guarantee, Guarantors jointly and severally shall pay to the Lender and indemnify the Lender for the Lender's reasonable attorneys' fees and disbursements so incurred. All rights of the Lender hereunder shall inure to the benefit of the Lender and its successors and assigns, and shall be binding upon Guarantors and their heirs, distributees, legal representatives, successors and assigns. This Guarantee shall be governed by, and interpreted and enforced in accordance with, the laws of the State of New York without regard to principles of choice of law or conflicts of laws. Guarantors hereby irrevocably consent and submit to the same provisions

relating to arbitration and remedies, and the jurisdiction of the same courts, the same venue and the same manner of service of process, to which Borrower consents to and submits in the Financing Documents.

10.     This Amended and Restated Guarantee amends and restates in its entirety that certain Limited Guarantee executed as of October 20, 2006 by the undersigned in favor of Lender with respect to obligations of Borrower.

[execution on next page]

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Guarantee as of March 8, 2007.

D'ANNUNZIO SHOWCASE DEALERS, INC.

By: _____

Name: Arthur D'Annunzio

Title: President



## GUARANTEE

1.      The undersigned (each, a "Guarantor"; and collectively, the "Guarantors"), for good and valuable consideration and to induce Capstone Capital Group I, LLC, a Delaware limited liability company (the "Lender") to lend to D'Annunzio Distribution, Inc., a New Jersey corporation ("Borrower") pursuant to a Purchase Order Financing Agreement between Borrower and the Lender of even date herewith (together all other documents executed in connection therewith, as each such agreement may be amended from time to time, shall hereinafter be referred to as the "Loan Documents"), hereby (a) makes and affirms to the Lender each of the representations and warranties made by Borrower in the Loan Documents, and (b) irrevocably and unconditionally guarantees to the Lender the faithful and timely performance and satisfaction of all of the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Loan Documents, including without limitation the payment of all amounts when due under such agreements, including interest that, but for the filing of a petition under the United States Bankruptcy Code with respect to Borrower, would have accrued on any such obligations, and attorneys' fees (collectively, the "Guaranteed Obligations"). If Borrower fails at any time promptly and fully to perform or satisfy any of such obligations, covenants or conditions, Guarantors shall perform or satisfy the same as provided therein. The Lender may at any time require Guarantors to perform or satisfy any such obligation, covenant or condition that Borrower has not performed or satisfied by giving notice to such effect to Guarantors in any manner prescribed for the giving of notices to Borrower under the Loan Documents, addressed to Guarantors at the address below.

The obligations of Guarantors hereunder are primary and direct, and are in addition to, and independent of, the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Loan Documents. Guarantors hereby waive all rights that they might otherwise have to require the Lender to commence any proceeding against Borrower or the Collateral (as defined in the Loan Documents) or to exhaust the Lender's remedies against Borrower before seeking to enforce this Guarantee.

The validity of this Guarantee and the obligations of Guarantors hereunder shall in no manner be terminated, impaired or in any way modified or affected by reason of:

(a)      the enforcement by the Lender against Borrower of any of the Lender's rights or remedies under the Loan Documents;

(b)      the granting to the Lender, under the Loan Documents or otherwise, of any collateral security for the performance or satisfaction of Borrower's obligations, covenants or conditions under the Loan Documents, any action of the Lender to proceed against or realize upon such collateral security, or an impairment or release of any such collateral security;

(c)      commencement by or against Borrower of any bankruptcy or other insolvency proceeding or any stay, discharge or other relief granted or issued thereunder;

(d)      any extension of time or other indulgence or forbearance by the Lender, or an amendment, modification, renewal or extension of any Loan Document or waiver of any of the obligations, covenants or conditions of Borrower under any Loan Document; or

BN 968217v2

1

(e)     any other defense, set-off, counterclaim or discharge that might otherwise be available to Borrower or any Guarantor.

2.      Notwithstanding the foregoing, the liability of each Guarantor hereunder is limited to the lesser of the following amounts minus, in either case, one dollar ($1):

(a)     The lowest amount which would render this Guarantee a fraudulent conveyance under the Uniform Fraudulent Transfer Act, or other similar or analogous law or statute of the appropriate jurisdiction; and

(b)     The lowest amount which would render this Guarantee a fraudulent transfer under Section 548 of the Bankruptcy Code of 1978, as amended.

It is presumed that the liability of each Guarantor hereunder is equal to the amount of the obligations guaranteed. Therefore, in the event that any Guarantor, or successor-in-interest thereof ("Guaranty Opponent"), shall claim that the amount of its liability hereunder is less than the amount of the obligations guaranteed hereunder, the burden of proof with respect to the amount of such liability shall rest with such Guaranty Opponent, in light of the fact that the information concerning and circumstances of the financial condition of such Guarantor is more readily available to and under the control of such Guaranty Opponent.

3.      To secure the payment and performance in full of each Guarantor's obligations hereunder, such Guarantor grants to the Lender a security interest in all of such Guarantor's now owned and hereafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation: Accounts; Chattel Paper; Goods, including Inventory and Equipment; Instruments; Investment Property; Documents; and General Intangibles (as each is defined in Article 9 of the Uniform Commercial Code in effect from time to time in the State of New York).

4.      Each Guarantor hereby represents and warrants to the Lender that:

(a)     Such Guarantor has full power and authority to make this Guarantee and to assume and perform its or his/her obligations hereunder. This Guarantee has been duly executed and delivered by each Guarantor, and is a legally valid and binding obligation of each Guarantor, enforceable against each Guarantor in accordance with its terms, except to the extent such enforceability may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and equitable principles limiting the availability of certain remedies.

(b)     If it is a registered entity:

(i)     It is organized, validly existing, and in good standing under the laws of the jurisdiction of its formation;

(ii)    It has the power and authority and all governmental licenses, authorizations, consents, and approvals to execute, deliver, and perform its obligations hereunder;

2

(iii)    This Guarantee has been authorized by all necessary action by Guarantor, and does not and will not:

(1)    Contravene the terms of Guarantor's organizational documents;

(2)    Conflict with or result in any breach or contravention of, any contractual obligation to which Guarantor is a party or any order, injunction, writ, or decree of any governmental authority to which Guarantor or Guarantor's properties are subject;

(3)    Violate any law, rule, or regulation of any governmental authority.

(c)    There are no actions, suits, proceedings, claims, or disputes pending, or, to the best knowledge of Guarantor, threatened or contemplated, at law, in equity, in arbitration, or before any governmental authority, against Guarantor or any of Guarantor's properties which purport to affect or pertain to this Guarantee or any of the transactions contemplated hereby or thereby.

5.    Each Guarantor waives:

(a)    ANY AND ALL SURETYSHIP DEFENSES, WHETHER ARISING BY CONTRACT, STATUTE OR BY OPERATION OF LAW.

(b)    Notices of (i) any adverse change in the financial condition of Borrower; (ii) any default in the performance of the Guaranteed Obligations; and (iii) any other notice to which such Guarantor might be entitled;

(c)    Any defense or claim arising out of (i) the release of any collateral securing the Guaranteed Obligations, or (ii) any fact that may increase such Guarantor's risk hereunder.

(d)    Any claim of usury.

(e)    Any other defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations have been fully paid) of Borrower including any defense arising from any statute of limitations.

(f)    Any defense based on the invalidity, irregularity, or unenforceability of all or any part of the Guaranteed Obligations or any other circumstance which might constitute a defense of a guarantor.

(g)    Any claim or defense based on (i) the validity, legality or enforceability in whole or in part of the Guaranteed Obligations, (ii) any assignment, amendment, transfer, modification, renewal, waiver, compromise, addition or supplement relating to Guaranteed Obligations, (c) any setoff, counterclaim or any circumstances which might constitute a defense or discharge of Guarantor.

(h)    Any lack of power or authority of Borrower.

(i)    Any defense to payment hereunder resulting from Lender's releasing Borrower or any other obligor owing the Guaranteed Obligations from their obligation to pay the Guaranteed Obligations, as well as Lender's failure to give such Guarantor notice thereof.

6.    Each Guarantor waives any right to revoke the Guarantee as to future Guaranteed Obligations. If, contrary to the express intent of this agreement, any such revocation is effective, (a) it shall not be effective until written notice thereof has been actually received by any officer of Lender; (b) it shall not apply to any Guaranteed Obligations in existence on such date (including any subsequent continuation, extension, or renewal thereof); (c) it shall not apply to any Guaranteed Obligations made or created after such date pursuant to a commitment of Lender which was, or is believed in good faith by Lender to be, in existence on the date of such revocation; (d) no payment by any other Guarantor or Borrower, or from any other source, prior to the date of such revocation shall reduce the obligations of Guarantor hereunder; and (e) any payment by Borrower or from any source other than Guarantor, subsequent to the date of such revocation, shall first be applied to that portion of the Guaranteed Obligations, if any, as to which the revocation by Guarantor is effective and, to the extent so applied, shall not reduce the obligations of Guarantor hereunder.

7.    Without notice to Guarantors and without affecting or impairing the obligations of Guarantors hereunder, Lender may, compromise or settle, extend the period of duration or the time for the payment, or discharge the performance of, or may refuse to, or otherwise not enforce, or may, release any obligor of the Guaranteed Obligations or may grant other indulgences to Borrower in respect thereof, or may amend the Loan Documents, or may enforce, exchange, release, or waive any security for the Guaranteed Obligations or any guaranty of the Guaranteed Obligations.

8.    All present and future indebtedness of Borrower to any Guarantor is subordinated to the payment of the Guaranteed Obligations. In this regard, no payment of any kind whatsoever shall be made with respect to such indebtedness until all Guaranteed Obligations have been indefeasibly paid in full. Any payment received by any Guarantor in respect of such indebtedness shall be held by any Guarantor as trustee for Lender, and promptly paid over to Lender on account of the Guaranteed Obligations but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guarantee. Upon request by Lender, any notes or other instruments now or hereafter evidencing such indebtedness of Borrower to any Guarantor, shall be marked with a legend that the same are subject to this Guarantee or shall be delivered to Lender for safekeeping.

9.    If the Lender prevails in any action, suit or other proceeding against any Guarantor to enforce this Guarantee, Guarantors jointly and severally shall pay to the Lender and indemnify the Lender for the Lender's reasonable attorneys' fees and disbursements so incurred. All rights of the Lender hereunder shall inure to the benefit of the Lender and its successors and assigns, and shall be binding upon Guarantors and their heirs, distributees, legal representatives, successors and assigns. This Guarantee shall be governed by, and interpreted and enforced in accordance with, the laws of the State of New York without regard to principles of choice of law or conflicts of laws. Guarantors hereby irrevocably consent and submit to the same provisions relating to arbitration and remedies, and the jurisdiction of the same courts, the same venue and

the same manner of service of process, to which Borrower consents to and submits in the Loan Documents.

[execution on next page]

IN WITNESS WHEREOF, the undersigned have duly executed this Guarantee on October 20, 2006.

_____
Arthur D'Annunzio

_____
Philip D'Annunzio

# 'G'

## GUARANTEE

1.       The undersigned (each, a "Guarantor", and collectively, the "Guarantors"), for good and valuable consideration and to induce Capstone Business Credit, LLC, a Delaware limited liability company (the "Lender") to factor the accounts receivable of D'Annunzio Distribution, Inc., a New Jersey corporation ("Borrower") pursuant to a Discount Factoring Agreement between Borrower and the Lender of even date herewith (together all other documents executed in connection therewith, as each such agreement may be amended from time to time, shall hereinafter be referred to as the "Loan Documents"), hereby (a) makes and affirms to the Lender each of the representations and warranties made by Borrower in the Loan Documents, and (b) irrevocably and unconditionally guarantees to the Lender the faithful and timely performance and satisfaction of all of the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Loan Documents, including without limitation the payment of all amounts when due under such agreements, including interest that, but for the filing of a petition under the United States Bankruptcy Code with respect to Borrower, would have accrued on any such obligations, and attorneys' fees (collectively, the "Guaranteed Obligations"). If Borrower fails at any time promptly and fully to perform or satisfy any of such obligations, covenants or conditions, Guarantors shall perform or satisfy the same as provided therein. The Lender may at any time require Guarantors to perform or satisfy any such obligation, covenant or condition that Borrower has not performed or satisfied by giving notice to such effect to Guarantors in any manner prescribed for the giving of notices to Borrower under the Loan Documents, addressed to Guarantors at the address below.

The obligations of Guarantors hereunder are primary and direct, and are in addition to, and independent of, the obligations, covenants and conditions required to be performed or satisfied by Borrower under the Loan Documents. Guarantors hereby waive all rights that they might otherwise have to require the Lender to commence any proceeding against Borrower or the Collateral (as defined in the Loan Documents) or to exhaust the Lender's remedies against Borrower before seeking to enforce this Guarantee.

The validity of this Guarantee and the obligations of Guarantors hereunder shall in no manner be terminated, impaired or in any way modified or affected by reason of:

(a)      the enforcement by the Lender against Borrower of any of the Lender's rights or remedies under the Loan Documents;

(b)      the granting to the Lender, under the Loan Documents or otherwise, of any collateral security for the performance or satisfaction of Borrower's obligations, covenants or conditions under the Loan Documents, any action of the Lender to proceed against or realize upon such collateral security, or an impairment or release of any such collateral security;

(c)      commencement by or against Borrower of any bankruptcy or other insolvency proceeding or any stay, discharge or other relief granted or issued thereunder;

(d)      any extension of time or other indulgence or forbearance by the Lender, or an amendment, modification, renewal or extension of any Loan Document or waiver of any of the obligations, covenants or conditions of Borrower under any Loan Document; or

BN 968216v2                                          1

(e)    any other defense, set-off, counterclaim or discharge that might otherwise be available to Borrower or any Guarantor.

2.    Notwithstanding the foregoing, the liability of each Guarantor hereunder is limited to the lesser of the following amounts minus, in either case, one dollar ($1):

(a)    The lowest amount which would render this Guarantee a fraudulent conveyance under the Uniform Fraudulent Transfer Act, or other similar or analogous law or statute of the appropriate jurisdiction; and

(b)    The lowest amount which would render this Guarantee a fraudulent transfer under Section 548 of the Bankruptcy Code of 1978, as amended.

It is presumed that the liability of each Guarantor hereunder is equal to the amount of the obligations guaranteed. Therefore, in the event that any Guarantor, or successor-in-interest thereof ("Guaranty Opponent"), shall claim that the amount of its liability hereunder is less than the amount of the obligations guaranteed hereunder, the burden of proof with respect to the amount of such liability shall rest with such Guaranty Opponent, in light of the fact that the information concerning and circumstances of the financial condition of such Guarantor is more readily available to and under the control of such Guaranty Opponent.

3.    To secure the payment and performance in full of each Guarantor's obligations hereunder, such Guarantor grants to the Lender a security interest in all of such Guarantor's now owned and hereafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation: Accounts; Chattel Paper; Goods, including Inventory and Equipment; Instruments; Investment Property; Documents; and General Intangibles (as each is defined in Article 9 of the Uniform Commercial Code in effect from time to time in the State of New York).

4.    Each Guarantor hereby represents and warrants to the Lender that:

(a)    Such Guarantor has full power and authority to make this Guarantee and to assume and perform its or his/her obligations hereunder. This Guarantee has been duly executed and delivered by each Guarantor, and is a legally valid and binding obligation of each Guarantor, enforceable against each Guarantor in accordance with its terms, except to the extent such enforceability may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and equitable principles limiting the availability of certain remedies.

(b)    If it is a registered entity:

(i)    It is organized, validly existing, and in good standing under the laws of the jurisdiction of its formation;

(ii)    It has the power and authority and all governmental licenses, authorizations, consents, and approvals to execute, deliver, and perform its obligations hereunder;

(iii)    This Guarantee has been authorized by all necessary action by Guarantor, and does not and will not:

(1)    Contravene the terms of Guarantor's organizational documents;

(2)    Conflict with or result in any breach or contravention of, any contractual obligation to which Guarantor is a party or any order, injunction, writ, or decree of any governmental authority to which Guarantor or Guarantor's properties are subject;

(3)    Violate any law, rule, or regulation of any governmental authority.

(e)    There are no actions, suits, proceedings, claims, or disputes pending, or, to the best knowledge of Guarantor, threatened or contemplated, at law, in equity, in arbitration, or before any governmental authority, against Guarantor or any of Guarantor's properties which purport to affect or pertain to this Guarantee or any of the transactions contemplated hereby or thereby.

5.    Each Guarantor waives:

(a)    ANY AND ALL SURETYSHIP DEFENSES, WHETHER ARISING BY CONTRACT, STATUTE OR BY OPERATION OF LAW.

(b)    Notice of (i) any adverse change in the financial condition of Borrower, (ii) any default in the performance of the Guaranteed Obligations; and (iii) any other notice to which such Guarantor might be entitled.

(c)    Any defense or claim arising out of (i) the release of any collateral securing the Guaranteed Obligations, or (ii) any fact that may increase such Guarantor's risk hereunder.

(d)    Any claim of usury.

(e)    Any other defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations have been fully paid) of Borrower including any defense arising from any statute of limitations.

(f)    Any defense based on the invalidity, irregularity, or unenforceability of all or any part of the Guaranteed Obligations or any other circumstance which might constitute a defense of a guarantor.

(g)    Any claim or defense based on (i) the validity, legality or enforceability in whole or in part of the Guaranteed Obligations, (ii) any assignment, amendment, transfer, modification, renewal, waiver, compromise, addition or supplement relating to Guaranteed Obligations, (e) any setoff, counterclaim or any circumstances which might constitute a defense or discharge of Guarantor.

(h)    Any lack of power or authority of Borrower.

(i)       Any defense to payment hereunder resulting from Lender's releasing Borrower or any other obligor owing the Guaranteed Obligations from their obligation to pay the Guaranteed Obligations, as well as Lender's failure to give such Guarantor notice thereof.

6.       Each Guarantor waives any right to revoke the Guarantee as to future Guaranteed Obligations. If, contrary to the express intent of this agreement, any such revocation is effective, (a) it shall not be effective until written notice thereof has been actually received by any officer of Lender; (b) it shall not apply to any Guaranteed Obligations in existence on such date (including any subsequent continuation, extension, or renewal thereof); (c) it shall not apply to any Guaranteed Obligations made or created after such date pursuant to a commitment of Lender which was, or is believed in good faith by Lender to be, in existence on the date of such revocation; (d) no payment by any other Guarantor or Borrower, or from any other source, prior to the date of such revocation shall reduce the obligations of Guarantor hereunder; and (e) any payment by Borrower or from any source other than Guarantor, subsequent to the date of such revocation, shall first be applied to that portion of the Guaranteed Obligations, if any, as to which the revocation by Guarantor is effective and, to the extent so applied, shall not reduce the obligations of Guarantor hereunder.

7.       Without notice to Guarantors and without affecting or impairing the obligations of Guarantors hereunder, Lender may, compromise or settle, extend the period of duration or the time for the payment, or discharge the performance of, or may refuse to, or otherwise not enforce, or may, release any obligor of the Guaranteed Obligations or may grant other indulgences to Borrower in respect thereof, or may amend the Loan Documents, or may enforce, exchange, release, or waive any security for the Guaranteed Obligations or any guaranty of the Guaranteed Obligations.

8.       All present and future indebtedness of Borrower to any Guarantor is subordinated to the payment of the Guaranteed Obligations. In this regard, no payment of any kind whatsoever shall be made with respect to such indebtedness until all Guaranteed Obligations have been indefeasibly paid in full. Any payment received by any Guarantor in respect of such indebtedness shall be held by any Guarantor as trustee for Lender, and promptly paid over to Lender on account of the Guaranteed Obligations but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guarantee. Upon request by Lender, any notes or other instruments now or hereafter evidencing such indebtedness of Borrower to any Guarantor, shall be marked with a legend that the same are subject to this Guarantee or shall be delivered to Lender for safekeeping.

9.       If the Lender prevails in any action, suit or other proceeding against any Guarantor to enforce this Guarantee, Guarantors jointly and severally shall pay to the Lender and indemnify the Lender for the Lender's reasonable attorneys' fees and disbursements so incurred. All rights of the Lender hereunder shall inure to the benefit of the Lender and its successors and assigns, and shall be binding upon Guarantors and their heirs, distributees, legal representatives, successors and assigns. This Guarantee shall be governed by, and interpreted and enforced in accordance with, the laws of the State of New York without regard to principles of choice of law or conflicts of laws. Guarantors hereby irrevocably consent and submit to the same provisions relating to arbitration and remedies, and the jurisdiction of the same courts, the same venue and

the same manner of service of process, to which Borrower consents to and submits in the Loan Documents.

[execution on next page]

IN WITNESS WHEREOF, the undersigned have duly executed this Guarantee on October 20, 2006.

_____
Arthur D'Annunzio

_____
Philip D'Annunzio



# CAPSTONE CAPITAL GROUP I, LLC
1350 Avenue of the Americas
24th Floor
New York, New York 10019

April 24, 2009

VIA FACSIMILE AND FEDERAL EXPRESS

D'Annunzio Distribution, Inc.
60G Commerce Way
Totowa, NJ 07512
Attention: Arthur D'Annunzio

Dear Sirs:

Reference is made to that certain Purchase Order Financing Agreement dated as of October 20, 2006 (the "Financing Agreement") by and between D'Annunzio Distribution, Inc. ("D'Annunzio Distribution") and Capstone Capital Group I, LLC ("Capstone"). Terms used but not otherwise defined herein shall have the meaning defined in the Financing Agreement.

Notice is hereby given that Events of Default have occurred under Section 7.1 of the Financing Agreement as a result of breaches of the following covenants: Section 2.1.3 (failure to pay Purchase Money Advances before the Due Date), Section 3.1.1 (failure to timely and fully pay Interest on the unpaid balance of Advances), Section 3.2.2 (failure to pay Cash Advance Guarantee Fee), Section 6.2 (failure to maintain required insurance), Section 6.3.1.1 (failure to provide financial statements), Section 6.3.1.2 (failure to provide certified chief financial officer statements), Section 6.3.2 (failure to provide monthly balance sheets), Section 6.3.3.2 (failure to provide proof of payment of federal payroll taxes), Section 6.4.1 (failure to provide access to all premises), Section 6.4.2 (failure to provide access to company records), Section 6.5.1 (failure to execute new consignment agreements for collateral) and Section 6.10.3 (failure to maintain business liability insurance).

Notice is further given that an Event of Default has occurred under Section 7.2 of the Financing Agreement as a result of defaults under (i) that certain Discount Factoring Agreement, dated October 20, 2006, by and between D'Annunzio Distribution and Capstone Business Credit, LLC, (ii) that certain Discount Factoring Agreement, dated March 8, 2007, by and between D'Annunzio Showcase Dealers, Inc. and Capstone Business Credit, LLC, and (iii) that certain Purchase Order Financing Agreement, dated March 8, 2007, by and between D'Annunzio Showcase Dealers, Inc. and Capstone.

In addition, notwithstanding the foregoing Events of Default, notice is hereby given that, in accordance with Section 10 of the Financing Agreement, the Termination Date occurred on October 19, 2008. In light of the foregoing Events of Default, the unpaid amount due under the Financing Agreement, which totals an aggregate of $18,809,962.61, as of Friday, April 24, 2009, is hereby declared due and payable immediately.

Immediate payment of the amount due, together with all interest and other fees accruing from and after the date hereof should be made to Capstone at 1350 Avenue of the Americas, 24th Floor, New York, NY 10019 or by wire transfer of immediately available funds. Please contact Capstone for an updated payoff amount through the date of payment. If payment is not made by 5:00 p.m. New York City time on May 1, 2009, Capstone intends to exercise its remedies under the Financing Agreement and the other documents securing or evidencing D'Annunzio Distribution's Obligations to Capstone.

Sincerely,

CAPSTONE CAPITAL GROUP, LLC

By: _____

Name: Joseph F. Ingrassia
Title: Managing Member

84370693



**CAPSTONE BUSINESS CREDIT, LLC**
1350 Avenue of the Americas
24th Floor
New York, New York 10019

April 24, 2009

VIA FACSIMILE AND FEDERAL EXPRESS

D'Annunzio Distribution, Inc.
60G Commerce Way
Totowa, NJ 07512
Attention: Arthur D'Annunzio

Dear Sirs:

Reference is made to that certain Discount Factoring Agreement dated as of October 20, 2006 (the "Factoring Agreement") by and between D'Annunzio Distribution, Inc. ("D'Annunzio Distribution") and Capstone Business Credit, LLC ("Capstone"). Terms used but not otherwise defined herein shall have the meaning defined in the Factoring Agreement.

Notice is hereby given that Events of Default have occurred under Section 17.1(c) of the Factoring Agreement by reason of the following: Section 17.1(c)(i) (failure to pay any of the Obligations on the due date), Section 17.1(c)(ii) (breach of representations and warranties, including the representation regarding Solvency of the D'Annunzio Distribution), Section 17.1(c)(iii) (failure to perform, keep or observe any covenant or agreement, including failure to provide annual financial statements under Section 15.1, failure to permit inspection of company records under Section 15.2, failure to permit inspection of company properties under Section 15.3 and failure to deliver instruments to perfect Capstone's first priority security interest under Section 19), Section 17.1(c)(v) (occurrence of material adverse events, including a material adverse effect on Capstone's liens), and Section 17.1(c)(vi) (Solvency). In light of the foregoing, Capstone is hereby terminating the Factoring Agreement in accordance with the provisions of Section 17 of the Factoring Agreement.

Notice is further given that an Event of Default has occurred under Section 17.1(c) of the Factoring Agreement as a result of defaults under that certain Purchase Order Financing Agreement, dated October 20, 2006, by and between D'Annunzio Distribution and Capstone Capital Group, LLC.

In light of the foregoing, the unpaid amount due under the Factoring Agreement, which totals an aggregate of $715,984.92, as of Friday, April 24, 2009, is hereby declared due and payable immediately.

Immediate payment of the amount due, together with all interest and other fees accruing from and after the date hereof should be made to Capstone at 1350 Avenue of the Americas, 24th Floor, New York, NY 10019 or by wire transfer of immediately available funds. Please contact Capstone for an updated payoff amount through the date of payment. If payment is not made by 5:00 p.m. New York City time on May 1, 2009, Capstone intends to exercise its remedies under the Factoring Agreement and the other documents securing or evidencing the D'Annunzio Distribution's Obligations to Capstone.

Sincerely,

CAPSTONE BUSINESS CREDIT, LLC

By: _____
     Name: Joseph F. Ingrassia
     Title: Managing Member

84370703

'J'

## PURCHASE ORDER FINANCING AGREEMENT

This PURCHASE ORDER FINANCING AGREEMENT ("Agreement") is dated as of March 8, 2007, by and between D'Annunzio Showcase Dealers, Inc., a New Jersey corporation ("Debtor"), and Capstone Capital Group I, LLC ("Secured Party").

## RECITALS

A.      Debtor desires to obtain financing from Secured Party to enable Debtor to acquire goods for resale for which Debtor has obtained purchase orders.

B.      In connection therewith, Debtor has requested that Secured Party cause the issuance of Letters of Credit and make cash advances to Debtor in accordance with the terms and conditions herein.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

## AGREEMENT

1.      **DEFINITIONS.** All terms used herein that are defined in the Uniform Commercial Code shall have the meanings ascribed thereto therein. As used herein, the following terms shall have the following meanings:

1.1      "Account" – means the account between Debtor and Secured Party.

1.2      "Advances" – means L/C Advances and Purchase Money Advances.

1.3      "Advance Limit" – (i) for the first year of the Agreement, $3,360,419 and (ii) for the second year of the Agreement, $5,525,000.

1.4      "Agreement Term" – the period from the date that the Agreement becomes effective until the Termination Date.

1.5      "Annual Fee" – (i) for the first year of the Agreement, $84,010 and (ii) for the second year of the Agreement, $138,125.

1.6      "Buyer" – a customer of Debtor, acceptable to Secured Party in its sole discretion, who has agreed to purchase the Pre-Sold Goods which are the subject of a Financed Transaction.

1.7      "Cash Advance Guarantee Fee" – 2.5% for the first thirty days (or part thereof) that each Purchase Money Advance is outstanding and 1.25% for every fourteen days (or part thereof) thereafter that such Purchase Money Advance remains outstanding.

1.8      "Collateral" – all Debtor's present and future Accounts, Chattel Paper, Goods (including Inventory and Equipment), Instruments, Investment Property, Documents, and

Page 1 of 17

BN 1154712v4

General Intangibles, Letter of Credit Rights, Commercial Tort Claims, Deposit Accounts, and the proceeds thereof.

  1.9 "Chosen State" – New York.

  1.10 "Default Rate" – 24%.

  1.11 "Delivery Instructions" - arrangements to be used in shipping and storing any Pre-Sold Goods (including, but not limited to, the terms and conditions of any and all warehouse and other agreements relating to the Warehouse).

  1.12 "Due Date" – the earlier of sixty (60) days from the date of an Advance or the day on which any of the goods which are the subject of such Advance are shipped to a Buyer.

  1.13 "Eligible Purchase Orders" - purchase orders issued in favor of Debtor, and which have not expired or been cancelled, covering the purchase of goods from Debtor, issued by Buyers.

  1.14 "Factor" – Capstone Business Credit, LLC.

  1.15 "Factoring Agreement" – that certain Discount Factoring Agreement, between Debtor and Factor, dated as of March 8, 2007, as amended.

  1.16 "Financed Transaction" - a transaction whereby Debtor has agreed to purchase Pre-Sold Goods from a Supplier for resale to the Buyer of such Pre-Sold Goods, concerning which Secured Party has been requested to providing financing hereunder to enable Debtor to acquire the subject Pre-Sold Goods.

  1.17 "Financing Request Package" – the following documents relating to a Financed Transaction:

   1.17.1 all documents between Debtor and a Buyer evidencing a valid and binding contract for the sale by Debtor to a Buyer of Pre-Sold Goods, and the unconditional and irrevocable assignment of such contract to Secured Party;

   1.17.2 a Supplier Letter, duly executed by the subject Supplier;

   1.17.3 undated Invoice(s);

   1.17.4 Eligible Purchase Order(s);

   1.17.5 an itemization of all costs related to such Financed Transaction, including but not limited to the cost and sale price of the Pre-Sold Goods, shipping and insurance costs, and customs duties;

   1.17.6 a description of the freight forwarder, shipping company, Warehouse and any Delivery Instructions; and

   1.17.7 a fully executed Warehouse Agreement.

Page 2 of 17

**1.18** "Guarantor(s)" – all entities now or hereafter guaranteeing the Obligations.

**1.19** "Guaranty" – a continuing guaranty in form and substance acceptable to Secured Party by which a Guarantor guarantees the Obligations.

**1.20** "Issuer" – the issuer of a Letter of Credit.

**1.21** "Interest Rate" – at any time the rate which is 4% in excess of the Prime Rate.

**1.22** "Invoice(s)" – invoice(s), from Debtor to a Buyer, relating to all Pre-Sold Goods which are the subject of a Financed Transaction.

**1.23** "L/C Advances" – all amounts paid by Secured Party on account of Letters of Credit.

**1.24** "Letter of Credit" – a letter of credit issued in favor of Debtor's Suppliers:

    **1.24.1** to enable Debtor to acquire Pre-Sold Goods;

    **1.24.2** in a form acceptable to Secured Party;

    **1.24.3** requiring *inter alia*, as a condition of draw by the Beneficiary, that the Beneficiary present an inspection certificate by an independent inspection service acceptable to Secured Party that the subject goods conform to an Eligible Purchase Order;

    **1.24.4** requiring that the shipment of the Pre-Sold Goods be evidenced by a negotiable bill of lading, consigned to Secured Party; and

    **1.24.5** providing for honor by the acceptance by Issuer of a draft which shall be due at least thirty days from sight.

**1.25** "Letter of Credit Fees" – such commissions, issuance fees, transfer fees and other reasonable fees and charges in connection with the issuance or administration of each Letter of Credit as are generally imposed by Secured Party.

**1.26** "Letter of Credit Guarantee Fee" – 2.5% of the face amount of each Letter of Credit for the first thirty days (or part thereof) that each Letter of Credit is outstanding and 1.25% of the face amount of each Letter of Credit for every fourteen days (or part thereof) thereafter that such Letter of Credit remains outstanding.

**1.27** "Loan Documents" - this Agreement, together with any documents, instruments and agreements, executed and/or delivered in connection herewith, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

**1.28** "Obligors" – Debtor and all Guarantors.

**1.29** "Obligations" - all present and future obligations owing by Debtor to Secured Party whether arising hereunder or otherwise, and whether arising before, during or after the commencement of any Bankruptcy Case in which Debtor is a debtor.

1.30   "Pre-Sold Goods" – goods which are the subject of Eligible Purchase Orders.

1.31   "Prime Rate" – means that rate designated by JP Morgan Chase Bank, or any successor thereof, from time to time as its prime rate, which shall not necessarily constitute its lowest available rate.

1.32   "Purchase Money Advances" – all amounts paid by Secured Party as loans to Debtor to enable Debtor to acquire Pre-Sold Goods.

1.33   "Purchase Money Advance Limit" – That portion of the Eligible Purchase Orders which relates to the sales price of the Pre-Sold Goods, excluding shipping and like charges.

1.34   "Subject Account" – an Account created by the sale of the goods or services which are the subject of an Eligible Purchase Order to the issuer of the Eligible Purchase Order.

1.35   "Supplier" – a supplier, acceptable to Secured Party in its sole discretion, who has agreed to sell the Pre-Sold Goods which are the subject of a Financed Transaction.

1.36   "Supplier Letter" – a letter from Supplier, with all required information supplied, in the form attached hereto as Exhibit A.

1.37   "Termination Date" – the earlier of (i) two years from the date hereof, or (ii) the date on which Secured Party elects to terminate this Agreement pursuant to the terms herein.

1.38   "Warehouse" – a segregated warehouse space in which Debtor agrees to maintain the Pre-Sold Goods, at a location specified by Secured Party.

1.39   "Warehouse Agreement" – an agreement among the Warehouse, the Buyer and Secured Party, in form acceptable to Secured Party, acknowledging Secured Party's security interest in the Pre-Sold Goods and agreeing among other things that such Pre-Sold Goods shall not be released without Secured Party's prior written consent.

## 2.   CREDIT FACILITIES.

2.1   Purchase Money Advances.

2.1.1   During the Agreement Term, upon receipt and approval by Secured Party in its sole discretion of a Financing Request Package, Secured Party may make a Purchase Money Advance up to the Purchase Money Advance Limit.

2.1.2   The Purchase Money Advance will be paid directly by Secured Party to the Supplier for the account of Debtor.

2.1.3   Each Purchase Money Advance shall be repaid in full on or before the Due Date.

**2.2     Letters Of Credit.**

  **2.2.1** Subject to the terms and conditions of this Agreement, and during the Agreement Term:

   **2.2.1.1** **Issuance of Letters of Credit.**  Secured Party may, from time to time, in its sole discretion and at Debtor's request, cause the issuance of Letters of Credit in an amount or amounts determined by Secured Party.

   **2.2.1.2** **Request for Issuance.**  Each request by Debtor for the issuance of Letter of Credit shall be accompanied by the Financing Request Package on which such request is based.

  **2.2.2** **Reimbursement.**

   **2.2.2.1** Debtor shall repay Secured Party for the amount of any L/C Advance on or before its respective Due Date.

   **2.2.2.2** Secured Party shall have no duty to inquire into the propriety of any request by an Issuer for payment by Secured Party, and all such payments by Secured Party shall conclusively establish Debtor's reimbursement obligations hereunder.

   **2.2.2.3** Debtor unconditionally indemnifies Secured Party and holds Secured Party harmless from any and all loss, claim or liability incurred by Secured Party arising from any transactions or occurrences relating to any Letter of Credit, the collateral relating thereto and any drafts or acceptances thereunder, and all Obligations thereunder, including any such loss or claim due to any errors, omissions, negligence, misconduct or action taken by any Issuer.  This indemnity shall survive termination of this Agreement.  Debtor agrees that any charges incurred by Secured Party with respect to Issuer shall be conclusive on Secured Party and may be charged to the Account.

   **2.2.2.4** Secured Party shall not be responsible for: (a) the existence, character, quality, quantity, condition, packing, value or delivery of the goods purporting to be represented by any documents; (b) any difference or variation in the character, quality, quantity, condition, packing, value or delivery of the goods from that expressed in the documents; (c) the validity, sufficiency or genuineness of any documents or of any endorsements thereon, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged; (d) the time, place, manner or order in which shipment is made; partial or incomplete shipment, or failure or omission to ship any or all of the goods referred to in the Letters of Credit or documents; (e) any deviation from instructions; (f) delay, default, or fraud by the shipper and/or anyone else in connection with the goods or the shipping thereof; or (g) any breach of contract between the shipper or vendors and Debtor.

   **2.2.2.5** Debtor agrees that any action taken by Secured Party, if taken in good faith, or any action taken by any Issuer, under or in connection with any Letters of Credit, the drafts or acceptances, or the Collateral, shall be binding on Debtor and shall not result in any liability whatsoever of Secured Party to Debtor.  In furtherance thereof, Secured Party shall have the full right and authority to: (a) clear and resolve any questions of non compliance of

documents; (b) give any instructions as to acceptance or rejection of any documents or goods; (c) execute any and all steamship or airways guaranties (and applications therefore), indemnities or delivery orders; (d) grant any extensions of the maturity of, time of payment for, or time of presentation of, any drafts, acceptances, or documents; and (e) agree to any amendments, renewals, extensions, modifications, changes or cancellations of any of the terms or conditions of any of the applications, Letters of Credit, drafts or acceptances; all in Secured Party's sole name. The Issuer shall be entitled to comply with and honor any and all such documents or instruments executed by or received solely from Secured Party, all without any notice to or any consent from Debtor. Notwithstanding any prior course of conduct or dealing with respect to the foregoing including amendments and non-compliance with documents and/or Debtor's instructions with respect thereto, Secured Party may exercise its rights hereunder in its sole and reasonable business judgment. In addition, without Secured Party's express consent and endorsement in writing, Debtor agrees: (a) not to execute any and all applications for steamship or airway guaranties; indemnities or delivery orders; to grant any extensions of the maturity of, time of payment for, or time of presentation of, any drafts, acceptances or documents; or to agree to any amendments, renewals, extensions, modifications, changes or cancellations of any of the terms or conditions of any of the applications, Letters of Credit, drafts or acceptances; and (b) after the occurrence of an Event of Default which is not cured within any applicable grace period, if any, or waived by Secured Party, not to (i) clear and resolve any questions of non-compliance of documents, or (ii) give any instructions as to acceptances or rejection of any documents or goods.

2.2.2.6   Debtor agrees that: (a) any necessary import, export or other licenses or certificates for the import or handling of the Collateral will have been promptly procured; (b) all foreign and domestic governmental laws and regulations in regard to the shipment and importation of the Collateral, or the financing thereof will have been promptly and fully complied with; and (c) any certificates in that regard that Secured Party may at any time request will be promptly furnished. In connection herewith, Debtor warrants and represents that all shipments made under any such Letters of Credit are in accordance with the laws and regulations of the countries in which the shipments originate and terminate, and are not prohibited by any such laws and regulations. Debtor assumes all risk, liability and responsibility for, and agrees to pay and discharge, all present and future local, state, federal or foreign taxes, duties, or levies. Any embargo, restriction, laws, customs or regulations of any country, state, Secured Party, or other political subdivision, where the Collateral is or may be located, or wherein payments are to be made, or wherein drafts may be drawn, negotiated, accepted, or paid, shall be solely Debtor's risk, liability and responsibility.

2.2.2.7   Upon any payments made to the Issuer under the Letter of Credit, Secured Party shall acquire by subrogation, any rights, remedies, duties or obligations granted or undertaken by Debtor to the Issuing Bank in any standing agreement relating to Letters of Credit or otherwise, which shall be deemed to have been granted to Secured Party and apply in all respects to Secured Party and shall be in addition to any rights, remedies, duties or obligations contained herein.

2.3   Debtor acknowledges and agrees that Secured Party does not intend to make any Advances to the extent that, before or as a result thereof, the aggregate Obligations shall exceed the Advance Limit.

BN 1154712v4

3.    **INTEREST AND FEES.**

    3.1    **Interest.**

        3.1.1   Interest on the unpaid balance of Advances shall accrue interest at the Interest Rate and shall be payable on the first day of the month following its accrual.

        3.1.2   Secured Party may charge Debtor's Account with any past due amounts hereunder.

        3.1.3   Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If Secured Party shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the loans hereunder or, if it exceeds such unpaid principal, refunded to Debtor. In determining whether the interest contracted for, charged, or received by Secured Party exceeds the Maximum Rate, Secured Party may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

    3.2    **Fees.**

        3.2.1   **Letter of Credit Fees.** In consideration for Secured Party's causing the issuance of Letters of Credit, Debtor shall pay any Letter of Credit Fees to Secured Party immediately upon the issuance of a Letter of Credit and monthly thereafter, in arrears, on the first (1st) day of each month following the accrual thereof.

        3.2.2   **Cash Advance Guarantee Fee.** Debtor shall pay the Cash Advance Guarantee Fee to Secured Party monthly, in arrears, on the first (1st) day of each month following the accrual thereof.

        3.2.3   **Letter of Credit Guarantee Fee.** Debtor shall pay the Letter of Credit Guarantee Fee to Secured Party monthly, in arrears, on the first (1st) day of each month following the accrual thereof.

        3.2.4   **Annual Fee.** Debtor shall pay to Secured Party any amount by which the Cash Advance Guarantee Fees and Letter of Credit Guarantee Fees earned in the preceding twelve months is less than the Annual Fee, on each anniversary of the date hereof.

4.    **GRANT OF SECURITY INTEREST.** To secure the payment and performance in full of all of the Obligations, Debtor hereby grants to Secured Party a continuing security interest in and to and lien upon, and a right of setoff against, and Debtor hereby assigns and pledges to Secured Party, all of the Collateral.

5.    **CONDITIONS PRECEDENT TO ALL ADVANCES.** Secured Party shall not make any Advances unless and until:

BN 1154712v4

5.1    Secured Party holds a perfected security interest in the Collateral and the Subject Account.

5.2    Secured Party has received guaranties, in a form acceptable to it in its sole discretion, signed by all guarantors.

6.    <u>COVENANTS</u>.  Debtor covenants that:

6.1    Debtor shall immediately advise Secured Party if and when an Eligible Purchase Order has been cancelled or attempted to have been cancelled.

6.2    Debtor shall maintain or cause to be maintained at all times, with financially sound and reputable insurers, casualty insurance with respect to the Inventory and other assets. All such insurance policies shall be in such form, substance, amounts and coverage as may be satisfactory to Secured Party and shall provide for thirty (30) days' prior written notice to Secured Party of cancellation or reduction of coverage. Debtor hereby irrevocably authorizes Secured Party and any designee of Secured Party to obtain at debtor's expense, and, after an Event of Default, to adjust or settle any claim or other matter under or arising pursuant to such insurance or to amend or cancel such insurance. Debtor shall deliver to Secured Party evidence of such insurance and a Secured Party's loss payable endorsement naming Secured Party as loss payee as to all existing and future insurance policies relating to the Inventory. Debtor shall deliver to Secured Party, in kind, all instruments representing proceeds of insurance received by Debtor. Secured Party may apply any and all insurance proceeds received at any time to the cost of repairs to or replacement of any portion of the Inventory and/or, at Secured Party's option, to the payment of or as security for any of the Obligations, whether or not due, in any order or manner as Secured Party determines.

6.3    Debtor shall furnish to Secured Party, in form and substance satisfactory to Secured Party:

6.3.1    As soon as possible after the end of each fiscal year of Debtor, and in any event within one hundred and twenty (120) days thereafter:

6.3.1.1    a complete copy of Debtor's financial statements, including but not limited to (a) the management letter, if any, (b) the balance sheet as of the close of the fiscal year, and (c) the income statement for such year, together with a statement of cash flows, prepared by a firm of independent certified public accountants of recognized standing and acceptable to Debtor, or if permitted by Debtor in writing, by Debtor; and

6.3.1.2    A statement certified by the chief financial officer of Debtor that Debtor is in compliance with all the terms, conditions, covenants and warranties of this Agreement.

6.3.2    No later than fifteen (15) days after the close of each month (an "Accounting Period"), Debtor's balance sheet as of the close of such Accounting Period and its income statement for that portion of the then current fiscal year through the end of such Accounting Period certified by Debtor's chief financial officer as being complete, correct, and fairly representing its financial condition and results of operations.

Page 8 of 17

BN 1154712v4

6.3.3    Copies of each of Debtor's:

6.3.3.1    federal income tax returns, and any amendments thereto, within seventy-five (75) days of the filing thereof with the Internal Revenue Service; and

6.3.3.2    federal payroll tax returns within ten (10) days of filing, together with proof, satisfactory to Debtor, that all taxes have been paid.

6.4    Debtor shall permit Secured Party or any representatives thereof, during usual business hours, without notice to Debtor, to periodically:

6.4.1    have access to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Debtor's books and records; and

6.4.2    Permit Secured Party or its designees to inspect, audit, make copies of, and make extracts from Debtor's records as Debtor may request.

6.4.3    Without expense to Secured Party, Secured Party may use any of Debtor's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Secured Party, in its sole discretion, deems appropriate.

6.5    Debtor shall pay all reasonable out-of-pocket expenses of Secured Party (including, but not limited to, fees and disbursements of Secured Party's counsel) incident to (whether by judicial proceedings or otherwise, and whether any resulting dispute resolution procedure involving tort, contract or other claims):

6.5.1    the preparation, negotiation, execution, administration and enforcement of the Loan Documents, any amendments, extensions and renewals thereof, and any other documents prepared in connection with any transactions between Debtor and Secured Party, whether or not executed;

6.5.2    any expenses incurred by Secured Party (whether or not for the benefit of Debtor) under this Agreement, including, without limitation, all expenses for postage relating to the mailing of statements, invoices, and verifications, and all expenses relating to any audits of all or any portion of the Collateral;

6.5.3    the protection of Secured Party's rights under the Loan Documents;

6.5.4    defending against any and all claims against Secured Party relating to any of its acts of commission or omission directly or indirectly relating to the Loan Documents;

6.5.5    or in any way arising out of a bankruptcy proceeding commenced by or against Debtor, including but not limited to expenses incurred in enforcing or defending Secured Party's claims against Debtor or the Collateral, defending any avoidance actions, and expenses related to the administration of said proceeding.

6.6   Debtor shall indemnify and save Secured Party harmless from any and all liability with respect to any stamp or other taxes (other than transfer or income taxes) which may be determined to be payable in connection with the execution of the Loan Documents or any action of Secured Party with respect to the Collateral, including, without limitation, the transfer of the Collateral to Secured Party's name or that of Secured Party's nominee or any purchaser at a foreclosure sale.

6.7   Debtor shall reimburse Secured Party for all costs and expenses, including attorneys' fees, which Secured Party incurs in enforcing any judgment rendered in connection with this Agreement. This provision is severable from all other provisions hereof and shall survive and not be deemed merged into, such judgment.

6.8   Debtor shall make timely payment or deposit of all taxes, assessments or contributions required of Debtor. If Debtor fails to make any such payment or deposit or furnish proof of such payment immediately upon Secured Party's request, Secured Party may, in its sole discretion and without notice to Debtor:

    6.8.1   make payment of the same or any part thereof; or

    6.8.2   Set up such reserves against the Obligations as Secured Party deems necessary to satisfy the liability therefore, or both.

    6.8.3   Secured Party may conclusively rely on statements of the amount owing or other official statements issued by the appropriate governmental agency. Any payment made by Secured Party shall constitute neither:

        6.8.3.1   an agreement by Secured Party to make similar payments in the future; nor

        6.8.3.2   A waiver by Secured Party of any default under the Loan Documents. Secured Party need not inquire into, nor contest the validity of, any expense, tax, security interest, encumbrance or lien, and the receipt of the usual official notice requiring the payment thereof shall be conclusive evidence that the same was validly due and owing.

6.9   Debtor shall give Secured Party written notice immediately upon forming an intention to change its name, state of organization or form of business organization.

6.10   Debtor shall maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Such insurance shall be in such minimum amounts that the Secured Party will not be deemed a co-insurer under applicable insurance laws, regulations, and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Secured Party. In addition, all such insurance shall be payable to the Secured Party under a Secured Party Loss Payable Endorsement. Without limiting the foregoing, the Debtor will:

BN 1154712v4

**6.10.1** Keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverage and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property;

**6.10.2** Maintain all such workers' compensation or similar insurance as may be required by law;

**6.10.3** Maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death, or property damage occurring, on, in or about the properties of the Debtor, business interruption insurance, and product liability insurance.

**6.11** Debtor shall not create, incur, assume or permit to exist any lien upon or with respect to any Collateral now owned or hereafter acquired by Debtor. At the request of Debtor, Secured Party shall enter into a subordination agreement in form reasonably acceptable to Secured Party with respect to any Collateral that is Equipment, so long as Debtor is not in default hereunder at the time of such request.

**7.** **EVENTS OF DEFAULT.** Each of the following events or conditions shall also constitute an "Event of Default":

**7.1** Debtor defaults in the performance of any Obligations due hereunder; and

**7.2** Debtor is in default with respect to any agreement between Debtor and Secured Party or Debtor and Factor.

**7.3** An order for relief is entered against any Obligor by any United States Bankruptcy Court; or any Obligor does not generally pay its debts as they become due (within the meaning of 11 U.S.C. 303(h) as at any time amended, or any successor statute thereto); or any Obligor makes an assignment for the benefit of creditors; or any Obligor applies for or consents to the appointment of a custodian, receiver, trustee, or similar officer for it or for all or any substantial part of its assets, or such custodian, receiver, trustee, or similar officer is appointed without the application or consent of any Obligor; or any Obligor institutes (by petition, application, answer, consent, or otherwise) any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any such proceeding shall be instituted (by petition, application, or otherwise) against any Obligor; or any judgment, writ, warrant of attachment, execution, or similar process shall be issued or levied against a substantial portion of the property of any Obligor;

**7.4** An adverse change occurs with respect to the financial condition or operations of Debtor which results in a material impairment of the prospect of repayment of the Obligations;

**7.5** A sale, hypothecation or other disposition is made of twenty (20%) percent or more of the beneficial interest in any class of voting stock of Debtor; and

BN 1154712v4

7.6    Any Guarantor defaults in the performance of its obligations to Secured Party or shall notify Secured Party of its intention to rescind, modify, terminate or revoke the Guaranty with respect to future transactions, or the Guaranty shall cease to be in full force and effect for any reason whatever.

8.    **REMEDIES.**  Upon the occurrence of any Event of Default, all Obligations shall accrue interest at the Default Rate, and in addition to any other remedies available to Secured Party under the Loan Documents, at law, in equity or otherwise, Secured Party may:

8.1    Declare all Obligations to be immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Debtor; and

8.2    Debtor shall immediately provide Secured Party with cash collateral in the amount of any undrawn face amount of any Letter of Credit.

9.    **ATTORNEYS' FEES.**  Debtor agrees to reimburse Secured Party on demand for:

9.1    the actual amount of all costs and expenses, including attorneys' fees, which Secured Party has incurred or may incur in:

9.1.1    negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith; and

9.1.2    protecting, preserving or enforcing any lien, security interest or other right granted by Debtor to Secured Party or arising under applicable law, whether or not suit is brought;

9.2    the actual costs, including photocopying, travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Debtor is a party; and

9.3    either (the choice of which shall be in the sole discretion of Secured Party):

9.3.1    the actual amount of all costs and expenses, including attorneys' fees, which Secured Party may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Debtor, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversion of the bankruptcy proceeding or (ii) opposing confirmation of Debtor's plan thereunder; or

9.3.2    20% OF THE AMOUNT OF THE CLAIM OF SECURED PARTY AGAINST DEBTOR, WHICH DEBTOR AGREES SHALL CONSTITUTE A REASONABLE SUBSTITUTE FOR SUCH ACTUAL FEES AND EXPENSES.

## 10.    TERMINATION.

10.1    This Agreement shall become effective upon the execution and delivery hereof by Debtor and Secured Party and shall continue in full force and effect for two years from the date hereof.

10.2    Upon the Termination Date, the unpaid balance of the Obligations shall be due and payable without demand or notice.

## 11.    MISCELLANEOUS.

11.1    Notices.

11.1.1    All notices required to be given to either party hereunder shall be deemed given upon the first to occur of: (a) deposit thereof in a receptacle under the control of the United States Postal Service; (b) transmittal by electronic means to a receiver under the control of the party to whom notice is being given; or (c) actual receipt by the party to whom notice is being given, or an employee or agent of thereof. For purposes hereof, the addresses of the parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one party to the other in accordance with the provisions hereof:

### DEBTOR

|  |  |
|---|---|
| Address: | D'Annunzio Showcase Dealers, Inc. |
|  | 60G Commerce Way |
|  | Totowa, NJ 07512 |
|  | Facsimile No.: 973-237-0444 |
| Attention: | Arthur D'Annunzio |
| Fax Number: | 973-237-0444 |

### SECURED PARTY

|  |  |
|---|---|
| Address: | 1350 Avenue of the Americas, 24th Floor |
|  | New York, NY 10019 |
| Attention: | Joseph F. Ingrassia |
| Fax Number: | 212-755-6833 |

11.2    Survival. All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory.

11.3    Amendment and Waiver. Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

11.4    No Waiver. No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Secured Party may have, nor

Page 13 of 17

BN 1154712v4

shall any such delay be construed to be a waiver of any of such rights, powers, or remedies; or any acquiescence in any breach or default hereunder; nor shall any waiver by Secured Party of any breach or default by Debtor hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Secured Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies that Secured Party would otherwise have. Any waiver, permit, consent or approval by Secured Party of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

11.5    Choice of Law.  This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

11.6    Waiver of Statute of Limitations.  Debtor waives the pleading of any statute of limitations with respect to any and all actions in connection herewith.  To the extent that Debtor may now or in the future have any claim against Secured Party, arising out of this agreement or the transaction contemplated herein whether in contract or tort or otherwise, Debtor must assert such claim within one year of it accruing.  Failure to assert such claim within one year shall constitute of waiver thereof.  Debtor agrees that such period is reasonable and sufficient for it to investigate and act upon the claim.  This Section shall survive any termination of this agreement.  A copy of the waiver may be filed as a written consent in any judicial proceeding.

11.7    Venue.  The parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement, shall, if Secured Party so elects, be instituted in the United States District Court for the Southern District of the Chosen State or any court of said state located in the Chosen State (the "Acceptable Forums"), each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the Chosen State or otherwise in those courts in any such suit, action or proceeding.  Should such proceeding be initiated in any other forum, Debtor waives any right to oppose any motion or application made by Secured Party as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

11.8    WAIVER OF TRIAL BY JURY.  IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL AND, TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN

BN 1154712v4

WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

12.   INTERCREDITOR AGREEMENT.

12.1   Remittance of Factoring Advances and Application of Payments Thereof. Factor shall pay all sums due to Debtor under the Factoring Agreement to Secured Party. Upon receipt of any such sums, Secured Party shall immediately apply such sums to all Obligations of Debtor then due to Secured Party, and remit any balance to Debtor.

12.2   Priority. Notwithstanding the terms or provisions of any agreement or arrangement which either Secured Party or Factor may now or hereafter have with Debtor or any Guarantor or any rule of law, and irrespective of the time, order, or method of attachment or perfection of any security interest or the recordation or filing in any public record of any financing statement, Factor's security interest in Debtor's and in Guarantors' assets, including receivables that that are the proceeds of the product of inventory which is sold in the ordinary course of business and proceeds of such receivables, shall at all times have priority over and be superior to any security interest that Secured Party may have in Debtor's assets or in Guarantor's assets and Secured Party, and its successors and assigns, hereby subordinate their security interest in the Debtor's assets and in Guarantors' assets to Factor, and its successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

DEBTOR:                              D'ANNUNZIO SHOWCASE DEALERS, INC.

                                     By:
                                     Name:  Arthur D'Annunzio
                                     Title:  President


SECURED PARTY:                       CAPSTONE CAPITAL GROUP I, LLC

                                     By:
                                     Name:  Joseph F. Ingrassia
                                     Title:  Managing Member

                                     Page 15 of 17

BN.1154712v4

Agreed as to Section 12.2 hereof:

FACTOR:

CAPSTONE BUSINESS CREDIT, LLC

By: _____
Name: Robert L. Olson
Title: Chief Financial Officer

BN 1154712v4

## EXHIBIT A -- SUPPLIER LETTER

[letterhead of Supplier]

Date:

XXXXX

Re: [name of Client] (the "Buyer")

Ladies and Gentlemen:

This will confirm that we have agreed to supply to Buyer the goods described in that certain purchase order # _____ dated _____ (the "Purchase Order") issued by Buyer to us (the "Goods").

To induce you to pay to us the sum of $_____ (the "Payment"), representing the full purchase price of the Goods, we agree with you that we will ship the Goods to you in accordance with the terms of the Purchase Order, irrespective of any claims to which we may now or hereafter have against Buyer.

Should we fail to ship the Goods as set forth herein, we will repay the Payment to you, on demand, together with interest at the rate of __% per annum, computed from the date of receipt of the Payment by us to the date of repayment to you.

In the event of any litigation arising hereunder, whether such litigation is based on tort or contract, the prevailing party shall recover its attorneys' fees and expenses from the unsuccessful party.

Very truly yours,

[name of supplier]

By:

Acknowledged:

Capstone Capital Group I, LLC

By:_____
Name:_____
Title:_____

Page 17 of 17

BN 1154712v4



DISCOUNT FACTORING AGREEMENT

BETWEEN

CAPSTONE BUSINESS CREDIT, LLC,
AS THE FACTOR

AND

D'ANNUNZIO SHOWCASE DEALERS, INC.,
AS THE COMPANY

## DISCOUNT FACTORING AGREEMENT

THIS DISCOUNT FACTORING AGREEMENT (this "Agreement"), made and executed this 8 day of March, 2007, by and between D'Annunzio Showcase Dealers, Inc., a New Jersey corporation (the "Company"), and CAPSTONE BUSINESS CREDIT, LLC (the "Factor").

1.  *Definitions.* In addition to the terms defined elsewhere in this Agreement, the following terms shall have the following meanings for the purposes of this Agreement:

"Accounts" shall have the meaning ascribed to such term in the Code.

"Accounts Receivable" shall have the meaning set forth in Section 2 of this Agreement.

"Anniversary Date" means the last day of the twenty-fourth (24th) month following the date of this Agreement and the same day in each year thereafter.

"Chattel Paper" shall have the meaning ascribed to such term in the Code.

"Clearance Days" means three business days.

"Closed" means an Account Receivable that is either (a) paid in full by the Customer obligated on such Account Receivable, or (b) repurchased in cash by the Company.

"Code" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

"Collateral" shall have the meaning set forth in Section 7 of this Agreement.

"Company Risk Accounts Receivable" shall have the meaning set forth in Section 3 of this Agreement.

"Customer" means the purchaser of goods or services from Company and who is obligated on an Account, Instrument, Document, Chattel Paper or General Intangible initially owing to such Company.

"Documents" shall have the meaning ascribed to such term in the Code.

"Event of Default" shall have the meaning set forth in Section 17.1 of this Agreement.

"Factor Risk Accounts Receivable" shall have the meaning set forth in Section 3 of this Agreement.

"Factored Accounts" means all Accounts, Instruments, Documents, Chattel Paper and General Intangibles which are (a) initially owing to Company by a Customer, and (b) subsequently purchased by Factor from Company pursuant to this Agreement. Factored Accounts shall include all returned or repossessed goods arising out of or relating to the sale or other disposition of goods giving rise thereto, all proceeds thereof and the merchandise

represented thereby, and all invoices and other records evidencing or pertaining to the Factored Accounts.

"Factoring Agreement" means an agreement between Company providing for the purchase by Factor from Company of Accounts owing to Company by its Customers.

"Factoring Documents" means this Agreement, together with any documents, instruments and agreements, executed and/or delivered in connection herewith, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Funds Employed" means gross Factored Accounts outstanding on Factor's books less any balance outstanding in the Reserve Account to the credit of Company.

"General Intangibles" shall have the meaning ascribed to such term in the Code.

"Instruments" shall have the meaning ascribed to such term in the Code.

"Lender" means Capstone Capital Group I, LLC.

"Misdirected Payment Fee" shall be fifteen percent (15%) of the amount of any payment on account of a Factored Account which has been received by Company and not delivered in kind to Factor on the next business day following the date of receipt by Company.

"Missing Notation Fee" shall be 15% of the face amount of each invoice.

"Obligations" means all obligations, liabilities and indebtedness of Company to Factor, now existing or hereafter incurred, direct or indirect, absolute or contingent, whether created under this Agreement, any supplement hereto or any other agreement between Company and Factor or otherwise, including without limitation, obligations owed by Company to others which Factor obtains by assignment.

"Person" means an individual, corporation, partnership, trust, or unincorporated organization, or a government or any agency or political subdivision thereof.

"Purchase Price" shall have the meaning set forth in Section 4 of this Agreement.

"Required Reserve Amount" means the Reserve Percentage multiplied by the unpaid balance of Accounts Receivable.

"Reserve Account" shall have the meaning set forth in Section 5 of this Agreement.

"Reserve Percentage" means 20%.

"Reserve Shortfall" means the amount by which the Reserve Account is less than the Required Reserve Amount.

"Solvent" means that Company (i) owns property whose fair saleable value is greater than the amount required to pay all of its indebtedness (including contingent debts), (ii) is able to

pay all of its indebtedness as such indebtedness matures and (iii) has capital sufficient to carry on its business and transactions and all business and transactions in which it is engaged.

2. *Appointment.* Company appoints Factor as its sole factor with respect to all sales of its merchandise or rendition of services to Customers and hereby offers to sell and assign only to Factor, as absolute owner, all Accounts Receivable arising out of such sales or services, including all such sales or services arising under any trade names or through any division or selling agent. "Accounts Receivable" shall mean and include Accounts, contract rights, Instruments, Documents, Chattel Paper, General Intangibles, returned or repossessed goods arising out of or relating to the sale or other disposition of goods at any time or from time to time, all proceeds thereof and merchandise represented thereby. The assignment of Accounts Receivable to Factor shall vest in Factor all of Company's rights, securities, guaranties and liens with respect to each Account Receivable, including all rights of stoppage in transit, replevin, reclamation, and all claims of lien filed by Company or held by Company on personal property, and all rights and interest in the merchandise sold, and all of Company's defenses and rights of offset with respect to any payments received by Factor on Accounts Receivable, but Factor shall not be obligated to, and shall not be liable for, exercising or refusing to exercise any rights granted to Factor hereby.

3. *Purchase of Accounts Receivable.* Factor agrees to purchase from Company at the office of Factor all Accounts Receivable first approved by Factor in writing as to credit risk and terms of sale (each such approved Account Receivable being herein called a "Factor Risk Account Receivable"). All orders from Customers including the amount and terms of each proposed sale or service to such Customers shall be submitted in advance of purchase or rendition of service to Factor for prior written approval, which may be granted or withheld at Factor's sole discretion. Factor's approval is subject to withdrawal either orally or in writing at any time prior to delivery of merchandise or rendition of services, and shall be deemed no longer effective in any event if Company's delivery of merchandise or rendition of services is made more than thirty (30) days beyond the date specified for such delivery or rendition in the terms of sales submitted to Factor for its approval, or more than thirty (30) days from the date of Factor's approval if no delivery or rendition date has been specified. Submission of orders for Factor's prior written approval shall not be required with regard to a sale made by Company in compliance with any Customer credit line which may from time to time be issued to Company by Factor in its sole discretion, provided that shipments are made prior to the expiration date of the credit line approval. Any Customer credit line issued by Factor may be amended or withdrawn by Factor in whole or in part at any time and for any reason without advance notice. The amount of all Accounts Receivable of each Customer as to which Factor shall have approved a Customer credit line shall, in the order in which they have arisen, be treated as Factor Risk Accounts Receivable up to the limit of the Customer credit line in effect from time to time. Upon the receipt of any payment in collected funds from or issuance of credit to a Customer with respect to a Factor Risk Account Receivable, the Accounts Receivable of such Customer in excess of the Customer credit line shall, to the extent of such payment or credit and in the order in which they have arisen, be treated as Factor Risk Accounts Receivable, unless prior to such payment or credit Factor shall have withdrawn the credit line approval. Factor's withholding or withdrawing of a Customer order approval or credit line approval shall at all times be in Factor's sole discretion, and Factor's actions with regard thereto shall not render Factor liable to Company in any respect for damages or otherwise. Subject to Company's warranties and

representations herein contained, Factor will assume the credit loss on each Factor Risk Account Receivable specifically assigned to Factor hereunder within twenty-one (21) days from the earlier of its invoice date or shipping date if the Customer, after receiving and accepting delivery of goods or services, fails to pay in full such Factor Risk Account Receivable on its longest maturity solely because of its financial inability to pay. If, however, such failure to pay is due in whole or in part to any other cause, Factor shall not be responsible and shall have full recourse to Company. Factor at its option may purchase Accounts Receivable not approved as to credit risk or terms of sale (each such Account Receivable not approved by Factor being herein called a "Company Risk Account Receivable"), but each purchase of a Company Risk Account Receivable shall be with full recourse to Company and Company agrees to pay Factor on demand for each Company Risk Account Receivable.

4.  *Purchase Price*. The purchase price of each Account Receivable (the "Purchase Price") is the gross amount of the Account Receivable. The Purchase Price shall be remitted to the Company upon acceptance by Factor of the assignment of the Accounts Receivables provided at that time Factor has received a Letter of Acceptance substantially in the form of Exhibit C annexed ("Letter of Acceptance") hereto or such other evidence acceptable to Factor, in its sole discretion, that the Customer has received and accepted the merchandise and that the Customer will assert no defenses, claims or offsets in excess of ten (10%) percent of the invoice amount. After purchase of an Account Receivable by Factor, a discount, credit, unidentifiable payment or allowance may be claimed solely by the Customer, and if not so claimed, such discount, credit, payment or allowance shall be the property of Factor.

5.  *Company Reserve Account*. Factor shall establish on its books, in Company's name a reserve account (the "Reserve Account") which Factor shall credit with the Purchase Price of all Accounts Receivable purchased by Factor from Company and which Factor shall debit with all disbursements of funds made to Company or on its behalf, as well as all credits, discounts to Company's Customers, anticipations earned by Company's Customers, factoring charges, interest, bank wire transfer and other fees and any other amounts chargeable to Company under this Agreement or any supplement hereto or any other agreement between Company and Factor. Factor shall furnish Company with advices of all credits and debits to the Reserve Account. Factor will render to Company on a monthly basis a statement of its Reserve Account. Each statement of account will be considered correct and binding on Company, absent manifest error, unless Company objects in writing by certified mail, return receipt requested, to Factor within thirty (30) days of the date of such statement of account, setting forth each and every specific exception by Company to such statement. Each statement of account shall be deemed delivered when e-mailed or when mailed through the United States postal service, three days after the date of such statement. Each statement shall be dated within 10 days of the 1st day of each month, and Company will be deemed to have received such statement unless it claims non-receipt in writing by certified mail, return receipt requested, by the twenty-fifth day of such month.

6.  *Warranties and Representations*. Company warrants and represents that each Account Receivable sold and assigned to Factor hereunder: (a) shall be genuine and valid and shall represent a completed delivery or performance in fulfillment in every respect of the terms, conditions and specifications of a bona fide, uncancelled and unexpired sale or service in the ordinary course of business to a Customer which is not affiliated with Company in full

*Capstone Business Credit, LLC*
BN 1154695v4

5

compliance with the specifications of such Customer; (b) Company shall be at the time of delivery or performance the absolute owner of all merchandise and other property involved; (c) Company has not granted and, without Factor's prior written consent, Company will not hereafter grant to any other Person until all security interests granted hereunder have been terminated, a security interest in, or grant to any other Person any right to purchase, the Factored Accounts; (d) is enforceable for the full amount thereof and will be subject to no dispute or claim by the Customer in whole or in part as to price, terms, quality, quantity, delay in shipment, offsets, counterclaims, contra accounts or any other defense of any other kind and character, real or claimed; (e) will be subject to no discounts, deductions, allowances, offsets, counterclaims or other contra items or to no special terms of payment which are not shown on the face of the invoice thereof; (f) will not represent a delivery of merchandise upon "consignment," "guaranteed sale," "sale or return," "payment on reorder" or similar terms; (g) is payable in United States Dollars and has been invoiced to the Customer by an invoice that bears notice of the sale and assignment to Factor in compliance with the terms of this Agreement; and (h) will not represent a "pack, bill and hold" transaction unless Company furnishes Factor with a copy of the Customer's purchase order and has obtained Customer's agreement to grant Factor a security interest in the merchandise and to pay for the merchandise at the maturity date of the invoice irrespective of whether or not Company has received instructions to deliver the same; (i) Company agrees to notify Factor promptly of any change in the name, corporate structure, or business addresses or location of the Company; (j) All applicable state and federal laws have been complied with in conjunction with all of the Factoring Agreement, as well as all of the transactions arising pursuant to the Factoring Agreement. Company acknowledges to Factor that the non-compliance with such laws constitutes a breach of this Agreement and would have an adverse impact on the value, enforceability and/or collectability of any Factored Account sold and assigned to Factor pursuant to this Agreement; (k) Company is duly organized and in good standing in its state of organization and those states in which Company conducts business and shall remain so for so long as this Agreement is in effect; (l) the Factoring Agreement, and the transaction entered into in connection therewith, does not and shall not contravene any applicable statute, law or regulation; and (m) the Factoring Agreement correctly sets forth all of the terms of the factoring relationship between Company and the Factor.  Company shall provide Factor with immediate notice of any breach of the Factoring Agreement.

7.    *Collateral; No Lien Termination Without Release, Liquidation Success Premium.*

7.1    As security for all of the Obligations, Company grants Factor a continuing lien in, and security interest in the collateral described in Exhibit A (being herein referred to as the "Collateral"). Recourse to the Collateral or any other security shall not at any time be required and Company shall at all times remain liable for the repayment upon demand of all Obligations at any time owing by Company to Factor.  During the term of this Agreement, Company shall not sell or assign, negotiate, pledge or grant any security interest in any of the Collateral to anyone other than Factor, without Factor's prior written consent.

7.2    In recognition of Factor's right to have all its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Accounts Receivables and other collateral, notwithstanding payment in full of any deficiency by Company, Factor shall not be required to record any termination or satisfactions of any liens on the Accounts Receivables and

Collateral, unless the Company has executed and delivered to Factor general releases in a form reasonably acceptable to Factor. The Company understands that this provision constitutes a waiver of rights under Section 9-513(c) of the UCC.

7.3.     If Company substantially ceases operating as a going concern, and the proceeds of the Collateral created after an Event of Default are in excess of the balance due at the time of default, Company shall pay to Factor a liquidation success premium of ten (10%) percent of the amount of such excess.

8.     *Invoicing.* All invoices for merchandise sold or services rendered to a Customer shall be prepared by the Company and shall bear a notice that they have been assigned to, are owned by and are payable directly and only to Factor's Refactor in substantially the form shown on the notice of assignment attached hereto as Exhibit B attached hereto. Upon Factor's request, Company shall furnish Factor with copies of all invoices, accompanied by duly executed assignment schedules, original shipping or delivery receipts, and such other information or Documents as Factor in its discretion may request from time to time. Company represents and warrants to Factor that it has given or will promptly give, or has caused or will promptly cause to be given, written notification to all Customers of Factor's purchase and ownership thereof. In the event that such notification for any reason is not timely provided to a Customer, Factor at its option shall have the right (but no obligation) to provide such notification to such Customer, with the same effect as if such notice had been given directly by Company. If Company fails for any reason to provide Factor, within two (2) days after a request by Factor, with copies of such invoices (or the equivalent) or such proof of shipment or delivery when requested by Factor for any Factor Risk Account Receivable or fails to provide the Letter of Acceptance or other evidence concerning acceptance of merchandise by the Customer as provided in Section 4, such Factor Risk Account Receivable shall automatically become a Company Risk Account Receivable, Factor shall have no liability with respect such Company Risk Account Receivable and Company shall immediately reimburse Factor for the amount of any remittances made by Factor to Company thereon. Each invoice shall bear the terms of sale and no change from the original terms of sale shall be made without Factor's prior written consent. Factor reserves the right to mail original invoices to the Customers at Company's expense; however, mailing, sending or delivery by Factor of a bill or invoice shall not be deemed to be any representation by Factor with respect thereto.

9.     *Payment of Accounts Receivable.* All payments of Accounts Receivable and other payments on behalf of Company received by Factor shall be credited to Company's Reserve Account. No check, draft or other instrument received by Factor shall constitute final payment unless and until such check, draft or other instrument shall have been actually collected by Factor in immediately available funds. The amount of the Purchase Price of any Factor Risk Account Receivable which remains unpaid will be deemed collected and will be credited to Company's account as of the earlier of the following dates: (a) the date of the Account Receivables longest maturity if any proceeding or petition is instituted or filed by or against the Customer for relief under any federal or state bankruptcy or insolvency law, code or act, or if a receiver or trustee is appointed for the Customer; or (b) as of the last day of the fourth (4th) month following its longest maturity date if such Factor Risk Account Receivable remains unpaid as of such date without the happening of any of the events specified in the preceding clause (a). If any Factor Risk Account Receivable credited to Company's Reserve Account is not

paid for any reason other than the Customer's financial inability to pay, Factor shall reverse the credit and charge Company's Reserve Account accordingly and such Account Receivable shall then be deemed a Company Risk Account Receivable.

10.     *Remittances.*  Without limiting the obligations of Company under Section 9 hereof, all remittances received by Company with respect to all of its Accounts Receivable purchased by Factor shall be held in trust for Factor, and Company shall immediately deliver to Factor the identical checks, drafts, monies or other forms of payment received, and Factor shall have the right to endorse Company's name on any check, draft or other form of remittance received, where such endorsement is required to effect collection.  Company hereby appoints Factor or such Person as Factor may name as its attorney-in-fact to execute all necessary documents in Company's name and do all things necessary to carry out this Agreement. Company ratifies and approves all acts of the attorney and agrees that neither Factor nor the attorney shall be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law.  This power being coupled with an interest is irrevocable as long as Company is indebted to Factor in any manner.

11.     *Customer Disputes and Claims.*  Company agrees to notify Factor immediately of all returns and allowances and of all disputes with and claims made by Customers and to adjust all such claims and disputes at its own expense, issuing credit memoranda promptly, but subject to Factor's approval.  It is Factor's practice to allow a reasonable time for the settlement of disputes between Company and Company's Customers without waiving Factor's right at any time to adjust any claims and disputes on a Factor Risk Account Receivable directly with the Customer and to charge back to the Reserve Account at any time the full amount of the Account Receivable involved.  Factor may at any time charge the Reserve Account the full amount of: (a) any Customer deduction of not more than one hundred dollars; (b) any Factor Risk Account which is not paid in full when due for any reason (real or imaginary) other than the Customer's financial inability to pay; (c) any Account for which there is a breach of any of Company's warranties or representations set forth herein; (d) any anticipation deducted by such Customer on any Account; and (e) any Company Risk Account Receivable which is not paid in full when due. Any such charge back shall not be deemed to constitute a reassignment of the Account Receivable, and Factor shall retain a security interest therein as security for all Obligations owing to Factor.

12.     *Collection of Accounts; Returned Goods.*  As owner of the Accounts Receivable, Factor shall have the right to (a) bring suit, or otherwise enforce collection, of the Account Receivable in the name of Company or Factor, (b) modify the terms of payment, settle, compromise or release, in whole or in part, any amounts owing, on terms Factor may deem advisable, and (c) issue credits in the name of Company or Factor.  Should any goods be returned or rejected by Company's Customers or otherwise recovered by Company, Company shall segregate and hold such goods in trust for Factor, but at Company's sole risk and expense. Company shall also promptly notify Factor and, at Factor's request, will deliver such goods to Factor, pay Factor the invoice price thereof, or sell such goods at Company's expense for the purpose of paying Company's Obligations to Factor.  Once Company has granted or issued a discount, credit or allowance to a Customer on any Account Receivable, Company shall have no further interest therein.   Any remittances received by Company on account of any of the Accounts Receivable shall be held by Company as trustee of an express trust for Factor's benefit,