# Exhibit "B"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CAPSTONE BUSINESS CREDIT, LLC, and CAPSTONE :
CAPITAL GROUP I, LLC,

Index No.:
Date Purchased:

                 Plaintiffs,       :

**SUMMONS**

-against-

Plaintiff designates New York
County as the place of trial.

D'ANNUNZIO DISTRIBUTION, INC., D'ANNUNZIO :
SHOWCASE DEALERS, INC., ARTHUR D'ANNUNZIO :
and PHILIP D'ANNUNZIO,

The basis of venue is a written
agreement setting venue in New
York County (CPLR 501)

               Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO:  THE ABOVE NAMED DEFENDANTS

      You are hereby summoned to answer to the complaint in this action and to serve a copy

of your answer, or, if the complaint is not served with this summons, to serve notice of

appearance, on the Plaintiffs' Attorney within twenty (20) days after the service of this

summons, exclusive of the day of service (or within thirty (30) days after service is complete if

this summons is not personally delivered to you within the State of New York); and in case of

your failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

Dated:      New York, New York
                  August 6, 2009

KATTEN MUCHIN ROSENMAN LLP

By:    Bruce M. Sabados
        575 Madison Avenue
        New York, New York  10022
        (212) 940-8800

        Attorneys for Plaintiffs
        Capstone Business Credit, LLC and
        Capstone Capital Group I, LLC

Of Counsel:
Scott A. Brody, Esq.
Brody, O'Connor & O'Connor, Esqs.
111 John St., Suite 900
New York, New York 10038

Addresses of Defendants

D'Annunzio Distribution, Inc.
D'Annunzio Showcase Dealers, Inc.
Arthur D'Annunzio
Philip D'Annunzio

60G Commerce Way
Totowa, New Jersey 07512

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------x

CAPSTONE BUSINESS CREDIT, LLC and CAPSTONE
CAPITAL GROUP, I, LLC,

                                        Plaintiffs,

                        -against-


D'ANNUNZIO DISTRIBUTION, INC., D'ANNUNZIO
SHOWCASE DEALERS, INC., ARTHUR D'ANNUNZIO
and PHILIP D'ANNUNZIO,

                                        Defendants.

--------------------------------------------------------------------x

Index No.


**VERIFIED COMPLAINT OF
CAPSTONE BUSINESS
CREDIT, LLC AND
CAPSTONE CAPITAL
GROUP, I, LLC**

Plaintiffs Capstone Business Credit, LLC ("CBC") and Capstone Capital Group I,

LLC ("CCGI" and, collectively with CBC, "Plaintiffs"), through their attorneys, Katten Muchin

Rosenman LLP, as and for their claims against D'Annunzio Distribution, Inc., ("DDI")

D'Annunzio Showcase Dealers, Inc., ("DSD") D'Annunzio Showcase Distributors, Inc., (together

the "Corporate Defendants") Arthur D'Annunzio, Philip D'annunzio (the "Individual

Defendants" and, together with the Corporate Defendants, the "Defendants") allege as follows:


## BACKGROUND TO THE COMPLAINT

1.      CBC is a commercial factor.  Its affiliate, CCGI, provides trade financing,

purchase order financing, and short-term, asset-backed loans for its clients.

2.      The Defendants are jewelry manufacturers and wholesalers.

3.     Plaintiffs entered into a series of trade financing and factoring agreements with the Defendants pursuant to which Plaintiffs agreed to extend purchase order financing to the Defendants and to purchase the Defendants' accounts receivable.

4.     Each Corporate Defendant guaranteed the performance of the other Corporate Defendant's obligations to each Plaintiff.

5.     The Individual Defendants guaranteed the obligations of the Corporate Defendants to Plaintiffs.

6.     Plaintiffs have a first priority, perfected security interest in all collateral as defined in the applicable agreements, including all inventory currently in the Defendants' possession, any goods which Defendants have placed on consignment, and Defendants' accounts receivable.

7.     Defendants have breached each of their agreements with Plaintiffs and are in default of their obligations to Defendants.  As of May 22, 2009, Defendants owed a total of $22,782,219 to Plaintiffs pursuant to the financing agreements and, as of May 30, 2009, Defendants owed a total $1,337,966 to Plaintiffs pursuant to the factoring agreements, for a total amount due and owing of $24,120,185, plus accruing interest.

8.     Plaintiffs currently own approximately $1.1 million in outstanding accounts receivables of Defendants which have been assigned to CBC and are unpaid.

9.     Plaintiffs served notices of default and terminated the agreements on April 24, 2009.

10.     In this action, Plaintiffs seek the total amount due and owing from the Corporate Defendants, and an Order directing seizure of the collateral in possession of the Defendants and that the collateral be delivered to Plaintiffs.

84390686_9                                        2

## The Parties

11.     Plaintiff CBC is a Delaware limited liability company with its principal place of business located at 1350 Avenue of the Americas, 24th Floor, New York, New York 10019.

12.     At all times material herein Defendant DDI was a New Jersey corporation with its principal place of business at 60G Commerce Way, Totowa, New Jersey, and operated as a jewelry manufacturer and wholesaler.

13.     At all times material herein, Defendant DSD was a New Jersey corporation with its principal place of business at 60G Commerce Way, Totowa, NJ 07512, and operated as a jewelry manufacturer and wholesaler.

14.     During relevant times CBC was DDI's and DSD's commercial factor.

15.     Plaintiff CCGI is a Delaware limited liability company with its principal place of business located at 1350 Avenue of the Americas, 24th Floor, New York, New York 10019.

16.     At all times material herein CCGI provided trade financing, purchase order financing, and short-term, asset-backed loans for its clients.

17.     During relevant times, CCGI provided purchase order financing for Defendants DDI and DSD.

18.     Defendant A. D'Annunzio is an individual residing at 62 Long Hill Rd, Oakland, New Jersey, and is the President of DDI and DSD.

19.     Defendant P. D'Annunzio is an individual residing at 20 Parkside Court, Wayne, New Jersey, and is the Vice President and Secretary of DDI and DSD

### Statement of Facts

#### A.    The DDI Transaction

20.    On October 20, 2006, CBC and CCGI entered into a factoring and financing transaction with DDI, with DDI's performance guaranteed by DSD and the Individual Guarantors.

##### 1.    The DDI Financing Agreement

21.    On October 20, 2006, CCGI and DDI entered into a purchase order financing agreement (the "DDI Financing Agreement," Exh. A).

22.    Pursuant to the terms of the DDI Financing Agreement, CCGI agreed to make purchase money advances and issue letters of credit to DDI to enable DDI to acquire goods for resale for which DDI had obtained purchase orders (Id., ¶¶ 2.1 and 2.2).

23.    The DDI Financing Agreement required DDI to repay CCGI for the amounts advanced within 60 days (Id., ¶¶ 2.1.3 and 2.2.2.1).

24.    DDI was obligated to pay to CCGI certain "cash advance guarantee fees" for periods for which purchase money advances are outstanding, at rates defined in the DDI Financing Agreement (Id., ¶ 1.7).

25.    To secure DDI's obligations to CCGI under the DDI Financing Agreement, DDI granted to CCGI a continuing security interest in and lien upon its collateral, and assigned and pledged to CCGI collateral (Id., ¶ 4), defined under the DDI Financing Agreement as all of DDI's "present and future Accounts, Chattel Paper, Goods (including Inventory and Equipment), Instruments, Investment Property, Documents, and General Intangibles, Letter of Credit Rights, Commercial Tort Claims, Deposit Accounts and the proceeds thereof" (Id., ¶ 1.8).

26.     CCGI has the right under the DDI Financing Agreement to obtain financial information from DDI, review DDI's records and inspect DDI's premises. (Id., ¶ 6.4). Specifically, the DDI Financing Agreement provides that CCGI shall "have access to all premises where Collateral is located for the purpose of inspecting (and removing, if after the occurrence of an Event of Default)[1] any of the Collateral, including [DDI's] books and records"(Id., ¶ 6.4.1); CCGI shall have the right to inspect, audit and copy DDI's records (Id., ¶ 6.4.2); and that CCGI has the right to use any of DDI's personnel or equipment (Id., ¶ 6.4.3).

27.     DDI was obligated under the DDI Financing Agreement to maintain casualty insurance for its inventory (Id., ¶ 6.2) and to maintain business liability insurance (Id., ¶ 6.10.3).

28.     DDI was also required to provide to CCGI annual financial statements and statements from DDI's chief executive officer certifying that DDI is in compliance with all terms of the DDI Financing Agreement (Id., ¶¶ 6.3.1.1 and 6.3.1.2).

29.     Section 7 of the DDI Financing Agreement specifies those events or conditions constituting an event of default (an "Event of Default"), which include the failure of DDI to perform any obligation under the DDI Financing Agreement (Id., ¶ 7.1) and any default of DDI with respect to any agreement between DDI and CBC or CCGI (Id., ¶ 7.2).

30.     The DDI Financing Agreement provides that upon the occurrence of any Event of Default, all obligations shall accrue interest at the default rate of 24% and, in addition to any other remedies available under the loan documents, at law, in equity or otherwise, CCGI may declare all obligations to be immediately due and payable, without presentment, demand, protest, or notice of any kind.  (Id.,  ¶ 8).

31.     The DDI Financing Agreement further provides that DDI agrees to reimburse CCGI on demand for either the actual amount of all costs and expenses, including attorneys'

---

[1] Emphasis added unless otherwise indicated.

fees, which CCGI may incur in enforcing the DDI Financing Agreement and any documents prepared in connection with the DDI Financing Agreement, or 20% of the amount of the claim of CCGI against DDI, which DDI agrees shall constitute a reasonable substitute for such actual fees and expenses. (Id., ¶ 9).

### 2.    The DDI Factoring Agreement

32.    Simultaneously with the DDI Financing Agreement, CBC and DDI on October 20, 2006 entered into a factoring agreement whereby CBC agreed to purchase DDI's accounts receivable (the "DDI Factoring Agreement," Exh. B).

33.    Pursuant to the terms of the DDI Factoring Agreement, DDI appointed CBC as its sole factor with respect to all sales of DDI's merchandise or rendition of DDI's services to its customers, and sold to CBC, "as absolute owner," all accounts receivables arising out of such sales or services.

34.    The DDI Factoring Agreement's definition of accounts receivable assigned to CBC included all "Accounts, contract rights, Instruments, Documents, Chattel Paper, General Intangibles, returned or repossessed goods arising out of or relating to the sale or other disposition of goods at any time or from time to time, all proceeds thereof and merchandise represented thereby," as defined in the DDI Factoring Agreement (Id., ¶ 2).

35.    The DDI Factoring Agreement provides that the assignment of the Accounts Receivable, as defined in that agreement, "shall vest in [CBC] all of [DDI's] rights, securities, guaranties and liens with respect to each Account Receivable, including all rights of stoppage in transit, replevin, reclamation, and all claims of lien filed by [DDI] or held by [DDI] on personal property, and all rights and interest in the merchandise sold, and all of [DDI]'s defenses and rights of offset with respect to any payments received by [CBC] on Accounts Receivable..." (Id.)

36.     The DDI Factoring Agreement provides that CBC shall purchase accounts receivable from DDI for the gross amount of the account receivable, and maintain a reserve account which will be debited by charges due CBC from DDI, including, among other things, credits and discounts extended to DDI's customers and fees and commissions due CBC under the DDI Factoring Agreement. (Id., ¶¶ 4-5).

37.     The DDI Factoring Agreement provides that CBC will render to DDI a monthly statement of the reserve account, and such statement will be considered correct and binding on DDI unless DDI objects in writing within 30 days. (Id., ¶ 5).

38.     The DDI Factoring Agreement defines "obligations" as "all obligations, liabilities and indebtedness of [DDI] to [CBC], now existing or hereafter incurred, direct or indirect, absolute or contingent, whether created under [the DDI Factoring Agreement], any supplement hereto or any other agreement between [DDI] and [CBC] or otherwise, including without limitation, obligations owed by [DDI] to others which [CBC] obtains by assignment." (Id. at p. 3).

39.     As security for all obligations owed by DDI to CBC under the DDI Factoring Agreement, DDI granted to CBC "a continuing lien in, and security interest in," collateral described on Exhibit A to the DDI Factoring Agreement. (Id., ¶ 7). Such collateral includes, among other things, "all inventory and goods, including without limitation, all inventory and goods held for sale or lease or to be furnished under contracts of service, raw materials, work in process, finished goods, goods in transit..." (Id., Exhibit A at 1(a)); "all documents, including without limitation, documents of transport, payment and title" (Id., Exhibit A at 1(b)); all of DDI's "now owned or hereafter acquired Accounts and contract rights..." (Id., Exhibit A at 1(f)); all cash held as collateral to the extent not otherwise constituting collateral (Id., Exhibit A at

1(g)); and all proceeds of any defined collateral (Id., Exhibit A at 1(k)).  DDI agreed to execute

and deliver to CBC all financing statements provided for by the Uniform Commercial Code and

all other documents necessary for CBC to perfect its first priority security interest in its

collateral.

40.     CBC has the right under the DDI Factoring Agreement to obtain financial

information from DDI, review DDI's records and inspect DDI's premises.  Specifically, ¶ 15.1 of

the DDI Factoring Agreement requires DDI to furnish to CBC annual financial statements

prepared by an independent accounting firm; ¶ 15.2 provides that CBC "shall have the right at

any time to access, review and copy, at [DDI]'s expense, all records and documents relating to

any Collateral..." and ¶ 15.3 provides that DDI shall permit any CBC representative "to visit and

inspect any of the properties of DDI" and to examine all relevant books and records.  DDI further

represented that it is solvent, and would remain solvent, during the term of the DDI Factoring

Agreement.  (Id., ¶ 16).

41.     Section 17.1 of the DDI Factoring Agreement permits CBC to terminate the

agreement without notice upon the occurrence of a default (an "Event of Default"), which

include among other things (i) DDI's failure to pay any of its obligations when due (Id., ¶

17.1(c)(i)); (ii) breach of representations and warranties, including the representation regarding

solvency of DDI (Id., ¶ 17.1(c)(ii)); (iii) failure to perform, keep or observe any covenant or

agreement including the failure to provide annual financial statements pursuant to ¶ 15.1, failure

to permit inspection of company records pursuant to ¶ 15.2, failure to permit inspection of

company properties pursuant to ¶ 15.3 and failure to deliver instruments to perfect CBC's first

priority security interest pursuant to ¶ 19 (Id., ¶ 17.1(c)(iii)); (iv) an occurrence of a material

adverse event, including a material adverse effect on CBC's liens (Id., ¶ 17.1 (c)(v)); and (v) failure to remain solvent (Id., ¶ 17.1(c)(vi)).

42.     The DDI Factoring Agreement provides that upon the effective date of termination, all obligations of DDI to CBC "shall become immediately due and payable without further notice or demand irrespective of any maturity dates established thereto."

43.     The DDI Factoring Agreement provides that DDI must pay CBC, "upon demand, all costs and expenses, including reasonable attorneys' fees, incurred by [CBC] to obtain or enforce payment of any Obligations due from [DDI] to [CBC]..." (Id., ¶ 18).

44.     Defendants perfected their security interest in all collateral described in the DDI Factoring Agreement and the DDI Financing Agreement by filing a UCC-1 statement with the Secretary of State of New Jersey on January 24, 2008 under Index Number 24564489 (Exh. C).

### 3.     DSD's Guarantees of DDI's Obligations

45.     DSD guaranteed DDI's obligations to CBC under the DDI Financing Agreement, and DDI's obligations to CCGI under the DDI Factoring Agreement.

#### a.     DSD's Guarantee of DDI's Obligations Under The DDI Financing Agreement

46.     On March 8, 2007, DSD executed an amended and restated guarantee (the "DSD-CCGI Guarantee," Exh. D), guaranteeing DDI's performance to CCGI under the DDI Financing Agreement and under all documents executed in connection with the DDI Financing Agreement, defined in the DSD-CCGI Guarantee as the "Loan Documents" (Id., ¶ 1).

47.     In the DSD-CCGI Guarantee, DSD stated that, to induce CCGI to lend to DDI pursuant to the DDI Financing Agreement, DSD "irrevocably and unconditionally guarantees to [CCGI] the faithful and timely performance and satisfaction of all of the obligations, covenants

and conditions required to be performed or satisfied by [DDI] under the Loan Documents, including without limitation the payment of all amount when due under such agreement, including interest that ... would have accrued on any such obligations, and attorneys' fees" (Id., ¶ 1).

48.     The DSD-CCGI Guarantee provides that DSD's obligations were "primary and direct, and are in addition to, and independent of, the obligations, covenants and conditions required to be performed or satisfied by [DDI] under the Loan Documents." The DSD-CCGI Guarantee further provides that DSD waived "all rights that they might have otherwise have to require [CCGI] to commence any proceeding against [DDI] or the Collateral (as defined in the Loan Documents) or to exhaust [CCGI]'s remedies against [DDI] before seeking to enforce" the DSD-CCGI Guarantee. (Id., ¶ 1)

49.     The DSD-CCGI Guarantee further provides that in order to secure the payment and performance in full of DSD's obligations, DSD granted to CCGI a security interest in all of DSD's "now owned and hereinafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation:  Accounts; Chattel Paper; Goods, including Inventory and Equipment; Instruments; Investment Property; Documents; and General Intangibles (as each is defined in Article 9 of the Uniform Commercial Code in effect from time to time in the State of New York)." (Id., ¶ 3).

50.     Pursuant to the DSD-CCGI Guarantee, DSD waived notice of "any default in the performance of" DDI's obligations.  (Id., ¶ 5(b)(ii)).  DSD also waived any and all surety defenses (Id., ¶ 5(a)) and "any defense based on the invalidity, irregularity, or unenforceability of all or any part of the" obligations guaranteed by DSD (Id., ¶ 5(f)).

        b.     <u>DSD's Guarantee of DDI's Obligations Under The DDI Factoring Agreement</u>

84390686_9

51.     On March 8, 2007, DSD executed an amended and restated guarantee (the "DSD-CBC Guarantee," Exh. E), guaranteeing DDI's performance to CBC under the DDI Factoring Agreement and under all documents executed in connection with the DDI Factoring Agreement, defined in the DSD-CBC Guarantee as the "Financing Documents" (Id., ¶ 1).

52.     In the DSD-CBC Guarantee, DSD stated that, to induce CBC to factor the accounts receivable of DDI pursuant to the DDI Factoring Agreement, DSD "irrevocably and unconditionally guarantees to [CBC] the faithful and timely performance and satisfaction of all of the obligations, covenants and conditions required to be performed or satisfied by [DDI] under the Financing Documents, including without limitation the payment of all amount when due under such agreements, including interest that ... would have accrued on any such obligations, and attorneys' fees" (Id., ¶ 1).

53.     The DSD-CBC Guarantee provides that DSD's obligations were "primary and direct, and are in addition to, and independent of, the obligations, covenants and conditions required to be performed or satisfied by [DDI] under the Financing Documents."  Furthermore, DSD waived "all rights that they might have otherwise have to require [CBC] to commence any proceeding against [DDI] or the Collateral (as defined in the Financing Documents) or to exhaust [CBC]'s remedies against [DDI] before seeking to enforce" the DSD-CBC Guarantee. (Id., ¶ 1).

54.     The DSD-CBC Guarantee provides that in order to secure the payment and performance in full of DSD's obligations, DSD granted to CBC a security interest in all of DSD's "now owned and hereinafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation:  Accounts; Chattel Paper; Goods, including Inventory and Equipment; Instruments; Investment Property; Documents; and

General Intangibles (as each is defined in Article 9 of the Uniform Commercial Code in effect from time to time in the State of New York)." (Id., ¶ 3).

55. Pursuant to the DSD-CBC Guarantee, DSD waived notice of "any default in the performance of" DDI's obligations (Id., ¶ 5(b)(ii)). DSD also waived any and all surety defenses (Id., ¶ 5(a)); "[a]ny other defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations have been fully paid) of [DDI] including any defense arising from any statute of limitations" (Id., ¶ 5(e)); and "any defense based on the invalidity, irregularity, or unenforceability of all or any part of the Guaranteed Obligations or any other circumstance which might constitute a defense of a guarantor." (Id., ¶ 5(f)).

### 4.   The Individual Defendants' Guarantees Of DDI's Obligations

56. The Individual Defendants guaranteed DDI's obligations to CCGI under the DDI Financing Agreement, and DDI's obligations to CBC under the DDI Factoring Agreement.

#### a.   The Individual Defendants' Guarantee Of DDI's Obligations Under the DDI Financing Agreement

57. On October 20, 2006, the Individual Defendants each executed a guarantee (the "Individual DDI-CCGI Guarantee," Exh. F), guaranteeing DDI's performance to CCGI under the DDI Financing Agreement and under all documents executed in connection with the DDI Financing Agreement, defined in the Individual DDI-CCGI Guarantee as the "Loan Documents" (Id., ¶ 1).

58. In the Individual DDI-CCGI Guarantee, the Individual Defendants stated that, to induce CCGI to lend to DDI pursuant to the DDI Financing Agreement, the Individual Defendants "irrevocably and unconditionally guarantees to [CCGI] the faithful and timely performance and satisfaction of all of the obligations, covenants and conditions required to be

performed or satisfied by [DDI] under the Loan Documents, including without limitation the payment of all amount when due under such agreements, including without limitation the payment of all amounts when due under such agreements, including interest that ... would have accrued on any such obligations, and attorneys' fees" (Id., ¶ 1).

59.     The Individual DDI-CCGI Guarantee provided that the Individual Defendants' obligations were "primary and direct, and are in addition to, and independent of, the obligations, covenants and conditions required to be performed or satisfied by [DDI] under the Loan Documents."

60.     The Individual Defendants waived "all rights that they might have otherwise have to require [CCGI] to commence any proceeding against [DDI] or the Collateral (as defined in the Loan Documents) or to exhaust [CCGI]'s remedies against [DDI] before seeking to enforce" the Individual DSD-CCGI Guarantee (Id., ¶ 1).

61.     The Individual DDI-CCGI Guarantee provides that in order to secure the payment and performance in full of the Individual Defendants' obligations, the Individual Defendants granted to CCGI a security interest in all of the Individual Defendants' "now owned and hereinafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation:  Accounts; Chattel Paper; Goods, including Inventory and Equipment; Instruments; Investment Property; Documents; and General Intangibles (as each is defined in Article 9 of the Uniform Commercial Code in effect from time to time in the State of New York)." (Id., ¶ 3).

62.     Pursuant to the Individual DDI-CCGI Guarantee, the Individual Defendants waived notice of "any default in the performance of" DDI's obligations.  (Id., ¶ 5(b)(ii)).  The Individual Defendants also waived any and all surety defenses (Id., ¶ 5(a)); "[a]ny other defense

arising by reason of any disability or other defense (other than the defense that the Guaranteed

Obligations have been fully paid) of [DDI] including any defense arising from any statute of

limitations" (Id., ¶ 5(e)); and "any defense based on the invalidity, irregularity, or

unenforceability of all or any part of the Guaranteed Obligations or any other circumstance

which might constitute a defense of a guarantor." (Id., ¶ 5(f)).

> b.   The Individual Defendants' Guarantee Of DDI's Obligations
> Under the DDI Factoring Agreement

63.     On October 20, 2006, the Individual Defendants each executed a guarantee (the

"Individual DDI-CBC Guarantee," Exh. G), guaranteeing DDI's performance to CBC under the

DDI Factoring Agreement and under all documents executed in connection with the DDI

Factoring Agreement, defined in the Individual DDI-CBC Guarantee as the "Loan Documents"

(Id., ¶ 1).

64.     In the Individual DDI-CBC Guarantee, the Individual Defendants stated that, to

induce CBC to factor the accounts receivable of DDI pursuant to the DDI Factoring Agreement,

the Individual Defendants "irrevocably and unconditionally guarantees to [CBC] the faithful and

timely performance and satisfaction of all of the obligations, covenants and conditions required

to be performed or satisfied by [DDI] under the Loan Documents, including without limitation

the payment of all amount when due under such agreement, including interest that ... would have

accrued on any such obligations, and attorneys' fees" (Id., ¶ 1).

65.     The Individual DDI-CBC Guarantee provides that the Individual Defendants'

obligations were "primary and direct, and are in addition to, and independent of, the obligations,

covenants and conditions required to be performed or satisfied by [DDI] under the Loan

Documents." Furthermore, the Individual Defendants waived "all rights that they might have

otherwise have to require [CBC] to commence any proceeding against [DDI] or the Collateral (as

defined in the Loan Documents) or to exhaust [CBC]'s remedies against [DDI] before seeking to enforce" the Individual DSD-CBC Guarantee (Id., ¶ 1).

66.    The Individual DDI-CBC Guarantee provides that in order to secure the payment and performance in full of the Individual Defendants' obligations, the Individual Defendants granted to CBC a security interest in all of the Individual Defendants' "now owned and hereinafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation:  Accounts; Chattel Paper; Goods, including Inventory and Equipment; Instruments; Investment Property; Documents; and General Intangibles (as each is defined in Article 9 of the Uniform Commercial Code in effect from time to time in the State of New York)." (Id., ¶ 3).

67.    Pursuant to the Individual DDI-CBC Guarantee, the Individual Defendants waived notice of "any default in the performance of" DDI's obligations.  (Id., ¶ 5(b)(ii)).  The Individual Defendants also waived any and all surety defenses (Id., ¶ 5(a)); "[a]ny other defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations have been fully paid) of [DDI] including any defense arising from any statute of limitations" (Id., ¶ 5(e)); and "any defense based on the invalidity, irregularity, or unenforceability of all or any part of the Guaranteed Obligations or any other circumstance which might constitute a defense of a guarantor." (Id., ¶ 5(f)).

### 5.    DDI's Defaults, the Notice of Default And Termination

68.    DDI has breached its obligations under the DDI Financing Agreement and the DDI Factoring Agreement.

### a.    Breach of the DDI Financing Agreement

69.     DDI breached the DDI Financing Agreement by failing to repay to CCGI the purchase money advances before the due date pursuant to ¶ 2.1.3 of the DDI Financing Agreement.

70.     DDI breached the DDI Financing Agreement by failing to timely and fully pay interest on the unpaid balance of advances pursuant to ¶ 3.1.1 of the DDI Financing Agreement.

71.     DDI breached the DDI Financing Agreement by failing to pay the cash advance guarantee fee pursuant to ¶ 3.2.2 of the DDI Financing Agreement.

72.     DDI breached the DDI Financing Agreement by failing to maintain the required insurance pursuant to ¶ 6.2 of the DDI Financing Agreement.

73.     DDI breached the DDI Financing Agreement by failing to provide financial statements pursuant to ¶ 6.3.1.1 of the DDI Financing Agreement.

74.     DDI breached the DDI Financing Agreement by failing to provide certified chief financial officer statements pursuant to ¶ 6.3.1.2 of the DDI Financing Agreement.

75.     DDI breached the DDI Financing Agreement by failing to provide monthly balance sheets pursuant to ¶ 6.3.2 of the DDI Financing Agreement.

76.     DDI breached the DDI Financing Agreement by failing to provide proof of payment of federal payroll taxes pursuant to ¶ 6.3.3.2 of the DDI Financing Agreement.

77.     DDI breached the DDI Financing Agreement by failing to provide access to all premises pursuant to ¶ 6.4.1 of the DDI Financing Agreement.

78.     DDI breached the DDI Financing Agreement by failing to provide access to company records pursuant to ¶ 6.4.2 of the DDI Financing Agreement.

79.     DDI breached the DDI Financing Agreement by failing to execute new consignment agreements for collateral pursuant to ¶ 6.5.1 of the DDI Financing Agreement.

80.    DDI breached the DDI Financing Agreement by failing to maintain business liability insurance pursuant to ¶ 6.10.3 of the DDI Financing Agreement.

81.    Each of the aforesaid defaults constitutes an Event of Default under the DDI Financing Agreement and DDI is in breach of its obligations under the DDI Financing Agreement.

82.    By letter dated April 24, 2009 (Exh. H), CCGI gave notice to DDI that Events of Default had occurred under the DDI Financing Agreement, and further notified DDI that, in light of the defaults, the DDI Financing Agreement was terminated.

83.    CCGI demanded that DDI pay to CCGI $18,809,962.61, the amount then due and owing under the DDI Financing Agreement.

84.    DDI has failed to pay any amount due to CCGI to date.

b.    Breach of the DDI Factoring Agreement

85.    DDI has breached its obligations under the DDI Factoring Agreement by failing to pay all amounts to CBC when due pursuant to ¶ 17.1(c)(i) of the DDI Factoring Agreement.

86.    DDI has breached its obligations under the DDI Factoring Agreement by breaching certain representations and warranties under the DDI Factoring Agreement, including the representation requiring the solvency of DDI pursuant to ¶ 17.1(c)(ii) of the DDI Factoring Agreement.

87.    DDI has breached its obligations under the DDI Factoring Agreement by failing to perform, keep or observe any covenant or agreement pursuant to ¶ 17(c)(iii) of the DDI Factoring Agreement, including failure to provide annual financial statements pursuant to ¶ 15.1.

88.    DDI has breached its obligations under the DDI Factoring Agreement by failing to perform, keep or observe any covenant or agreement pursuant to ¶ 17(c)(iii) of the DDI

Factoring Agreement, including failure to permit inspection of company records pursuant to ¶ 15.2.

89.     DDI has breached its obligations under the DDI Factoring Agreement by failing to perform, keep or observe any covenant or agreement pursuant to ¶ 17(c)(iii) of the DDI Factoring Agreement, including failure to permit inspection of company properties pursuant to ¶ 15.3.

90.     DDI has breached its obligations under the DDI Factoring Agreement by failing to perform, keep or observe any covenant or agreement pursuant to ¶ 17(c)(iii) of the DDI Factoring Agreement, including failure to deliver instruments to perfect CBC's first priority security interest pursuant to ¶ 19.

91.     DDI has breached its obligations under the DDI Factoring Agreement by allowing an occurrence of a material adverse event, including a material adverse effect on CBC's liens pursuant to ¶ 17(c)(v) of the DDI Factoring Agreement.

92.     DDI has breached its obligations under the DDI Factoring Agreement by failing to remain solvent pursuant to ¶ 17(c)(vi) of the DDI Factoring Agreement.

93.     Each of the aforesaid defaults constitutes an Event of Default under the DDI Factoring Agreement pursuant to ¶ 17.1, and DDI is in breach of its obligations under the DDI Financing Agreement.

94.     By letter dated April 24, 2009 (Exh. I), CBC gave notice to DDI that Events of Default had occurred under the DDI Factoring Agreement, and further notified DDI that, in light of the defaults, the DDI Factoring Agreement was terminated.

95.     CBC demanded that DDI pay to CBC $715,984.82, the amount then due and owing under the DDI Factoring Agreement.

96.    DDI has failed to pay any amount due to CBC to date.

97.    Accordingly, DDI is in breach of its obligations under the DDI Factoring Agreement.

### 6.    Obligations of Guarantors

98.    DSD and the Individual Defendants guaranteed all obligations of DDI to CBC and CCGI.

99.    DDI has defaulted on its obligations to CBC and CCGI as described above.

100.    Accordingly, DSD and the Individual Defendants are obligated to pay to CBC and CCGI all amounts due and owing to CBC and CCGI from DDI.

### B.    The DSD Transaction

101.    On March 8, 2007, Defendants and DSD entered into a transaction that was essentially identical to the DDI Transaction described above.

#### 1.    The DSD Financing Agreement, the DSD Factoring Agreement and the related Guarantees

102.    On March 8, 2007, DSD and CCGI entered into a purchase order financing agreement (the "DSD Financing Agreement") (Exh. J) that, except for the identity of the parties, contained language identical to that in the DDI Financing Agreement.

103.    In addition, on March 8, 2007, DSD and CBC entered into a factoring agreement (the "DSD Factoring Agreement") (Exh. K) that, except for the identities of the parties, contained language identical to that in the DDI Factoring Agreement.

104.    Defendants perfected their security interest in all collateral described in the DSD Factoring Agreement and the DSD Financing Agreement by filing a UCC-1 statement with the

Secretary of State of New Jersey on September 14, 2006 under Index Number 23814851 (Exh. L).

105.    In addition, on March 8, 2007, DDI agreed to guarantee all of DSD's obligations under both the DSD Financing Agreement (the "DDI-CCGI Guarantee," Exh. M) and the DSD Factoring Agreement (the "DDI-CBC Guarantee," Exh. N).  Except for the identities of the parties and the designation of the agreements, the DDI-CCGI Guarantee contains language identical to the DSD-CCGI Guarantee, and the DDI-CBC Guarantee contains language identical to the DSD-CBC Guarantee.

106.    In addition, on March 8, 2007, the Individual Defendants each guaranteed all of DSD's obligations to CCGI under the DSD Financing Agreement (the "Individual DSD-CCGI Guarantee," Exh. O) and DSD's obligations to CBC under the DSD Factoring Agreement (the "Individual DSD-CBC Guarantee," Exh. P).  Except for the identities of the parties and the designation of the agreements, these guarantees contain language identical to the Individual DDI-CCGI Guarantee and to the Individual DDI-CBC Guarantee, respectively.

107.    DSD has breached its obligations under the DSD Financing Agreement and the DSD Factoring Agreement.

      a.        <u>Breach of the DSD Financing Agreement</u>

108.    DSD breached the DSD Financing Agreement by failing to repay to CCGI the purchase money advances before the due date pursuant to ¶ 2.1.3 of the DSD Financing Agreement.

109.    DSD breached the DSD Financing Agreement by failing to timely and fully pay interest on the unpaid balance of advances pursuant to ¶ 3.1.1 of the DSD Financing Agreement.

110.    DSD breached the DSD Financing Agreement by failing to pay the cash advance guarantee fee pursuant to ¶ 3.2.2 of the DSD Financing Agreement.

111.    DSD breached the DSD Financing Agreement by failing to maintain the required insurance pursuant to ¶ 6.2 of the DSD Financing Agreement.

112.    DSD breached the DSD Financing Agreement by failing to provide financial statements pursuant to ¶ 6.3.1.1 of the DSD Financing Agreement.

113.    DSD breached the DSD Financing Agreement by failing to provide certified chief financial officer statements pursuant to ¶ 6.3.1.2 of the DSD Financing Agreement.

114.    DSD breached the DSD Financing Agreement by failing to provide monthly balance sheets pursuant to ¶ 6.3.2 of the DSD Financing Agreement.

115.    DSD breached the DSD Financing Agreement by failing to provide proof of payment of federal payroll taxes pursuant to ¶ 6.3.3.2 of the DSD Financing Agreement.

116.    DSD breached the DSD Financing Agreement by failing to provide access to all premises pursuant to ¶ 6.4.1 of the DSD Financing Agreement.

117.    DSD breached the DSD Financing Agreement by failing to provide access to company records pursuant to ¶ 6.4.2 of the DSD Financing Agreement.

118.    DSD breached the DSD Financing Agreement by failing to execute new consignment agreements for collateral pursuant to ¶ 6.5.1 of the DSD Financing Agreement.

119.    DSD breached the DSD Financing Agreement by failing to maintain business liability insurance pursuant to ¶ 6.10.3 of the DSD Financing Agreement.

120.    Each of the aforementioned defaults constitutes an Event of Default under the DSD Financing Agreement and DSD is in breach of its obligations under the DSD Financing Agreement.

121.   By letter dated April 24, 2009 (Exh. Q), CCGI gave notice to DSD that Events of Default had occurred under the DSD Financing Agreement, and further notified DSD that, in light of the defaults, the DSD Financing Agreement was terminated.

122.   CCGI demanded that DSD pay to CCGI $3,712,706.48, the amount then due and owing under the DSD Financing Agreement.

123.   DSD has failed to pay any amount due to CCGI to date.

124.   Accordingly, DSD is in breach of its obligations under the DSD Financing Agreement.

b.    <u>Breach of the DSD Factoring Agreement</u>

125.   DSD has breached its obligations under the DSD Factoring Agreement by failing to pay all amounts to CBC when due pursuant to ¶ 17.1(c)(i) of the DSD Factoring Agreement.

126.   DSD has breached its obligations under the DSD Factoring Agreement by breaching certain representations and warranties under the DSD Factoring Agreement, including the representation requiring the solvency of DSD pursuant to ¶ 17.1(c)(ii) of the DSD Factoring Agreement.

127.   DSD has breached its obligations under the DSD Factoring Agreement by failing to perform, keep or observe any covenant or agreement pursuant to ¶ 17(c)(iii) of the DSD Factoring Agreement, including failure to provide annual financial statements pursuant to ¶ 15.1, failure to permit inspection of company records pursuant to ¶ 15.2, failure to permit inspection of company properties pursuant to ¶ 15.3 and failure to deliver instruments to perfect CBC's first priority security interest pursuant to ¶ 19.

128.   DSD has breached its obligations under the DSD Factoring Agreement by allowing an occurrence of a material adverse event, including a material adverse effect on CBC's liens pursuant to ¶ 17(c)(v) of the DSD Factoring Agreement.

129.   DSD has breached its obligations under the DSD Factoring Agreement by failing to remain solvent pursuant to ¶ 17(c)(vi) of the DSD Factoring Agreement.

130.   Each of these defaults constitutes an Event of Default under the DSD Factoring Agreement.

131.   By letter dated April 24, 2009 (Exh. R), CBC gave notice to DSD that Events of Default had occurred under the DSD Factoring Agreement, and further notified DSD that, in light of the defaults, the DSD Factoring Agreement was terminated.

132.   CBC demanded that DSD pay to CBC $550,844.04, the amount then due and owing under the DSD Factoring Agreement.

133.   DSD has failed to pay any amount due to CBC to date.

134.   Accordingly, DSD is in breach of its obligations under the DSD Factoring Agreement.

c.   Obligations of Guarantors

135.   DDI and the Individual Defendants guaranteed all obligations of DSD to CBC and CCGI.

136.   DSD has defaulted on its obligations to CBC and CCGI as described above.

137.   Accordingly, DDI and the Individual Defendants are obligated to pay to CBC and CCGI all amounts due and owing to CBC and CCGI from DSD.

## C.   Defendants Refuse to Allow Plaintiffs Access to their Collateral

138.   Throughout late April and May 2009, Defendants repeatedly refused Plaintiffs' requests for access to their premises so that Plaintiffs could take inventory of their collateral, as was Plaintiffs' right under the agreements.

139.   During April and May of 2009 Defendants sold collateral and collected accounts receivable.

140.   On April 27, 2009, Nicholas Versandi, a due diligence analyst on behalf of Plaintiffs, sent an e-mail to A. D'Annunzio, the President of the Corporate Defendants, requesting that Plaintiffs' field examiner be given access to Defendants' premises to inspect Defendants' collateral.

141.   In response to the April 27, 2009 e-mail, A. D'Annunzio stated, "considering the circumstances, we are unable to entertain a meeting at this time.  If you have any further requests regarding this please forward them to our attorney."

142.   On Wednesday, April 29, 2009, Michael Ticehurst ("Ticehurst") of Rosenberg and Fecci Consulting, a field examiner retained by Plaintiffs, requested access to the Defendants' premises to inspect the collateral on Friday, May 1, 2009 on behalf of Plaintiffs to obtain access and was denied by A. D'Annunzio.

143.   Subsequently, on Thursday, April 30, 2009, Ticehurst also requested access to the Corporate Defendants' premises on Monday, May 4, 2009, which requested was denied by A. D'Annunzio.

144.   On May 4, 2009, Ticehurst requested that he be granted access to the premises on Friday, May 8, 2009.

145.    On Wednesday, May 6, 2009, A. D'Annunzio claimed that he had "waited to reply because [he] anticipated an unexpected trip and it has come to pass."

146.    Ticehurst went to the premises on May 8, 2009, and at that time, P. D'Annunzio, the Vice President and Secretary of the Corporate Defendants, physically refused to allow Ticehurst into the building to conduct an inspection of the collateral.

147.    Additionally, on April 30, 2009, Ray Hovey ("Hovey"), an employee of Plaintiffs, requested that Defendants send to him the current physical inventory report for April 30 and to post financial records for Plaintiffs' review.

148.    Hovey received no response.

149.    On April 30, 2009, Mr. Hovey further attempted to log in to the Defendants' server over the Internet, as he had done in the past, and found that he no longer had access.

150.    These refusals to provide access to the premises are a breach of Defendants' obligations under the Agreements.

## FIRST CAUSE OF ACTION

### (Breach of Contract)
### (By CCGI against DDI Pursuant to the DDI Financing Agreement)

151.    CCGI repeats and realleges the allegations contained in paragraphs 1 through 150 above as if fully set forth at length herein.

152.    CGI has fully performed under the DDI Financing Agreement.

153.    DDI has defaulted under the DDI Financing Agreement as described above and is in breach of its obligations thereunder.

154.    As a result of DDI's breach, CCGI is entitled to recover damages in an amount not less than $19,018,891, plus CCGI's costs and expenses, including attorneys' fees, plus interest.

## SECOND CAUSE OF ACTION

### (Breach of Contract)
### (By CCGI against DSD Pursuant to the DSD Financing Agreement)

155.   CCGI repeats and realleges the allegations contained in paragraphs 1 through 154 above as if fully set forth at length herein.

156.   CCGI has fully performed under the DSD Financing Agreement.

157.   DSD has defaulted under the DSD Financing Agreement as described above and is in breach of its obligations thereunder.

158.   As a result of DSD's breach, CCGI is entitled to recover damages in an amount not less than $3,763,328, plus CCGI's costs and expenses, including attorneys' fees, plus interest.

## THIRD CAUSE OF ACTION

### (Breach of Contract)
### (By CBC against DDI Pursuant to the DDI Factoring Agreement)

159.   CBC repeats and realleges the allegations contained in paragraphs 1 through 158 above as if fully set forth at length herein.

160.   CBC has fully performed all of its obligations under the DDI Factoring Agreement.

161.   DDI has defaulted under the DDI Factoring Agreement as described above and is in breach of its obligations thereunder.

162.   As a result of DDI's breach, CBC is entitled to recover damages in an amount not less than $737,490, plus CBC's costs and expenses, including attorneys' fees, plus interest.

## FOURTH CAUSE OF ACTION

### (Breach of Contract)
### (By CBC against DSD Pursuant to the DSD Factoring Agreement)

84390686_9

163.    CBC repeats and realleges the allegations contained in paragraphs 1 through 162 above as if fully set forth at length herein.

164.    CBC has fully performed all of its obligations under the DSD Factoring Agreement.

165.    DSD has defaulted under the DSD Factoring Agreement as described above and is in breach of its obligations thereunder.

166.    As a result of DSD's breach, CBC is entitled to damages in an amount not less than $600,476, plus CBC's costs and expenses, including attorneys' fees, plus interest.

## FIFTH CAUSE OF ACTION

### (Account Stated)
### (By Plaintiffs Against Corporate Defendants Pursuant to Factoring and Financing Agreements)

167.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 166 above as if fully set forth at length herein.

168.    Plaintiffs provided to the Corporate Defendants monthly statements setting forth the amounts due pursuant to the Factoring and Financing Agreements.

169.    Corporate Defendants never objected to the statements. The monthly statements constitute an account stated, and Corporate Defendants are bound thereby.

170.    Accordingly, Plaintiffs are entitled to damages in an amount to be proven at trial, plus costs and expenses, including attorneys' fees, plus interest.

## SIXTH CAUSE OF ACTION

### (Breach of Guarantee)
### (By Plaintiffs against DSD Pursuant to the DSD-CCGI Guarantee and the DSD-CBC Guarantee)

171.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 170 above as if fully set forth at length herein.

172.    DSD executed the DSD-CCGI Guarantee and the DSD-CBC Guarantee, which guaranteed all obligations of DDI to Plaintiffs.

173.    As described above, DDI has defaulted in its obligations to Plaintiffs.

174.    Accordingly, DSD is liable to Plaintiffs for all amounts due and owing from DDI to Plaintiffs in an amount not less than $19,756,381, plus costs and expenses, including attorneys' fees, plus interest.

## SEVENTH CAUSE OF ACTION

### (Breach of Guarantee)
### (By Plaintiffs Against DDI Pursuant to DDI-CCGI Guarantee and DDI-CBC Guarantee)

175.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 174 above as if fully set forth at length herein.

176.    DDI executed the DDI-CCGI Guarantee and the DDI-CBC Guarantee, which guaranteed all obligations of DSD to Defendants.

177.    As described above, DSD has defaulted in its obligations to Plaintiffs.

178.    Accordingly, DDI is liable to Plaintiffs for all amounts due and owing from DSD to Plaintiffs in an amount not less than $4,363,804, plus costs and expenses, including attorneys' fees, plus interest.

## EIGHTH CAUSE OF ACTION

### (Breach of Guarantee)
### (By Plaintiffs against Individual Defendants)

179.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 178 above as if fully set forth at length herein.

180.   The Individual Defendants executed the Individual DDI-CCGI Guarantee, the Individual DDI-CBC Guarantee, the Individual DSD-CCGI Guarantee and the Individual DSD-CBC Guarantee, which guaranteed the performance of the Corporate Defendants' obligations to Defendants pursuant to the Financing Agreements and the Factoring Agreements.

181.   Accordingly, the Individual Defendants are liable to Plaintiffs for all amounts due and owing from the Corporate Defendants to Plaintiffs in an amount not less than $24,120,185, plus costs and expenses, including attorneys' fees, plus interest.

## NINTH CAUSE OF ACTION

### (Injunctive Relief and Seizure)

182.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 181 above as if fully set forth at length herein.

183.   The Corporate Defendants executed and delivered to Plaintiffs the Financing Agreements and the Factoring Agreements, each of which granted to Defendants continuing liens in, and securities interest in, collateral described in the Financing Agreements and the Factoring Agreements.

184.   Plaintiffs' security interests in the collateral were duly perfected by filing UCC-1 statements with the Secretary of State of New Jersey under Index Nos. 24564489 and 23814851.

185.   The Financing Agreements provide that Plaintiffs shall "have access to all premises where Collateral is located for the purpose of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including [DDI's] books and records" (Financing Agreements, ¶ 6.4.1).  In addition, the Factoring Agreements vests in Defendants all rights of replevin and reclamation (Factoring Agreements, ¶ 2).

186.   The Corporate Defendants have defaulted in their obligations to Plaintiffs under the Financing Agreements and the Factoring Agreements as described above.

187.   In violation of their duties pursuant to the Agreements, Defendants are dissipating the collateral as described above and Plaintiffs have no adequate remedy at law.

188.   Accordingly, Plaintiffs are entitled to injunctive relief and an order of seizure directing that possession of the collateral be delivered to Plaintiffs.

## TENTH CAUSE OF ACTION

### (Awarding to Plaintiffs All Rights Pursuant to the Uniform Commercial Code)

189.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 188 above as if fully set forth at length herein.

190.   The Corporate Defendants executed and delivered to Plaintiffs the Financing Agreements and the Factoring Agreements, each of which granted to Plaintiffs continuing liens in, and securities interest in, collateral described in the Financing Agreements and the Factoring Agreements.

191.   Plaintiffs' security interests in the collateral were duly perfected by filing UCC-1 statements with the Secretary of State of New Jersey under Index Nos. 24564489 and 23814851.

192.   The Corporate Defendants have defaulted in their obligations to Defendants under the Financing Agreements and the Factoring Agreements as described above.

193.   Accordingly, Plaintiffs are entitled to all of the rights and remedies of a secured party under the Uniform Commercial Code.  Plaintiffs are entitled to the right to repossess and sell all of the collateral defined in the Financing Agreements and the Factoring Agreements including, but not limited to, the inventory, and for damages, attorneys' fees, costs of repossession, and such other and further relief as is just and proper.

84390686_9

30

## ELEVENTH CAUSE OF ACTION

### (Fees and Costs of Collection)

194.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 193 above as if fully set forth at length herein.

195.    The Agreements provide that Plaintiffs are entitled to their attorneys' fees and costs in enforcing the Agreements.

196.    As a result of Defendants' contractual breaches, fraudulent conduct and Events of Default, Plaintiffs have incurred attorneys' fees and other costs in enforcing the parties' Agreement, for which Defendants are liable in an amount to be proven at trial plus interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Awarding damages in favor of CCGI and against DDI with respect to the DDI Financing Agreement in an amount to be proven at trial but not less than $19,018,891, plus CCGI's costs and expenses, including attorneys' fees, plus interest thereon;

B.      Awarding damages in favor of CCGI and against DSD with respect to the DSD Financing Agreement in an amount to be proven at trial but not less than $3,763,328, plus CCGI's costs and expenses, including attorneys' fees, plus interest thereon;

C.      Awarding damages in favor of CBC and against DDI with respect to the DDI Factoring Agreement in an amount to be proven at trial but not less than $737,490, plus CBC's costs and expenses, including attorneys' fees, plus interest thereon;

D.    Awarding damages in favor of CBC and against DSD with respect to the DSD Factoring Agreement in an amount to be proven at trial but not less than $600,476, plus CBC's costs and expenses, including attorneys' fees, plus interest thereon;

E.    Awarding damages in favor of Plaintiffs and against DSD with respect to the CCGI-DSD Guarantee and the CBC-DSD Guarantee in an amount to be proven at trial but not less than $19,756,381, plus Plaintiffs' costs and expenses, including attorneys' fees, plus interest thereon;

F.    Awarding damages in favor of Plaintiffs and against DDI with respect to the CCGI-DDI Guarantee and the CBC-DDI Guarantee in an amount to be proven at trial but not less than $4,363,804, plus Plaintiffs' costs and expenses, including attorneys' fees, plus interest thereon;

G.    Awarding damages in favor of Plaintiffs and against the Individual Defendants with respect to the Individual DDI-CCGI Guarantee, the Individual DDI-CBC Guarantee, the Individual DSD-CCGI Guarantee and the Individual DSD-CBC Guarantee in an amount to be proven at trial but not less than $24,120,185, plus Plaintiffs' costs and expenses, including attorneys' fees, plus interest thereon;

H.    Granting Plaintiffs an Order for seizure, and injunctive relief permitting plaintiffs to collect upon the collateral and accounts receivable of Defendants, and directing that possession of the collateral be delivered to Plaintiffs;

I.    Granting Plaintiffs all of the rights and remedies of a secured party under the Uniform Commercial Code, including the right to repossess and sell all of the collateral and ordering Defendants to deliver to Plaintiffs all of its collateral, including the inventory currently in Defendants' possession;

84390686_9

32

J.     Directing that all amounts received by Defendants from their customers be delivered to Plaintiffs;

K.     Directing Defendants to provide an accounting;

L.     Directing Defendants to provide Plaintiffs access to their premises and books and records for inspection;

M.     Awarding Plaintiffs their costs and expenses of this action, including attorneys' fees; and

N.     Granting such further and other relief as the court may deem just and proper.

Dated: New York, New York
       August 6, 2009

KATTEN MUCHIN ROSENMAN LLP

By: _____
        Bruce M. Sabados
        Daniel A. Edelson
        David S. Stoner
        575 Madison Avenue
        New York, New York 10022
        (212) 940-8800

        Attorneys for Plaintiffs

Of Counsel:
Scott A. Brody, Esq.
Brody, O'Connor & O'Connor
111 John Street, Suite 900
New York, N.Y. 10038
(212) 233-2505

## VERIFICATION

STATE OF NEW YORK     )
                         ) ss.:

COUNTY OF NEW YORK  )

I, Joseph F. Ingrassia, being first duly sworn, states:

I am a Managing Member for Capstone Business Credit, LLC and Capstone Capital Group I, LLC (collectively, "Capstone"), Plaintiffs herein. I have read the foregoing verified Complaint and state that it is true to my knowledge, information and belief. The sources of information and grounds of my belief as to all matters in the foregoing answer not made upon my knowledge are my review of Capstone books and records and documents from other sources, and a general investigation of the facts by Capstone and others who reviewed the matters contained herein on Capstone's behalf.

JOSEPH F. INGRASSIA

Sworn to before me this
06 day of Aug 2009

Notary Public

THOMAS BACKMON
Notary Public, State of New York
No.01BA6204725
Qualified in Kings County
COMMISSION EXPIRES 04/20/2013

84390686_9

34



# PURCHASE ORDER FINANCING AGREEMENT

This PURCHASE ORDER FINANCING AGREEMENT ("Agreement") is dated as of October 20, 2006, by and between D'Annunzio Distribution, Inc., a New Jersey corporation ("Debtor") and Capstone Capital Group I, LLC ("Secured Party").

## RECITALS

A.   Debtor desires to obtain financing from Secured Party to enable Debtor to acquire goods for resale for which Debtor has obtained purchase orders.

B.   In connection therewith, Debtor has requested that Secured Party cause the issuance of Letters of Credit and make cash advances to Debtor in accordance with the terms and conditions herein.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

## AGREEMENT

1.   **DEFINITIONS**.  All terms used herein that are defined in the Uniform Commercial Code shall have the meanings ascribed thereto therein.  As used herein, the following terms shall have the following meanings:

1.1   "**Account**" – means the account between Debtor and Secured Party.

1.2   "**Advances**" – means L/C Advances and Purchase Money Advances.

1.3   "**Advance Limit**" – (i) for the first year of the Agreement, $2,700,000 and (ii) for the second year of the Agreement, $4,500,000.

1.4   "**Agreement Term**" – the period from the date that the Agreement becomes effective until the Termination Date.

1.5   "**Annual Fee**" – (i) for the first year of the Agreement, $67,500 and (ii) for the second year of the Agreement, $112,500.

1.6   "**Buyer**" – a customer of Debtor, acceptable to Secured Party in its sole discretion, who has agreed to purchase the Pre-Sold Goods which are the subject of a Financed Transaction.

1.7   "**Cash Advance Guarantee Fee**" – 2.5% for the first thirty days (or part thereof) that each Purchase Money Advance is outstanding and 1.25% for every fourteen days (or part thereof) thereafter that such Purchase Money Advance remains outstanding.

1.8   "**Collateral**" – all Debtor's present and future Accounts, Chattel Paper, Goods (including Inventory and Equipment), Instruments, Investment Property, Documents, and General Intangibles, Letter of Credit Rights, Commercial Tort Claims, Deposit Accounts, and the proceeds thereof.

Page 1 of 17

1.9     "Chosen State" – New York.

1.10    "Default Rate" – 24%.

1.11    "Delivery Instructions" - arrangements to be used in shipping and storing any Pre-Sold Goods (including, but not limited to, the terms and conditions of any and all warehouse and other agreements relating to the Warehouse).

1.12    "Due Date" – the earlier of sixty (60) days from the date of an Advance or the day on which any of the goods which are the subject of such Advance are shipped to a Buyer.

1.13    "Eligible Purchase Orders" - purchase orders issued in favor of Debtor, and which have not expired or been cancelled, covering the purchase of goods from Debtor, issued by Buyers.

1.14    "Factor" – Capstone Business Credit, LLC.

1.15    "Factoring Agreement" – that certain Discount Factoring Agreement, between Debtor and Factor, dated as of October 20, 2006, as amended.

1.16    "Financed Transaction" - a transaction whereby Debtor has agreed to purchase Pre-Sold Goods from a Supplier for resale to the Buyer of such Pre-Sold Goods, concerning which Secured Party has been requested to providing financing hereunder to enable Debtor to acquire the subject Pre-Sold Goods.

1.17    "Financing Request Package" – the following documents relating to a Financed Transaction:

        1.17.1  all documents between Debtor and a Buyer evidencing a valid and binding contract for the sale by Debtor to a Buyer of Pre-Sold Goods, and the unconditional and irrevocable assignment of such contract to Secured Party;

        1.17.2  a Supplier Letter, duly executed by the subject Supplier;

        1.17.3  undated Invoice(s);

        1.17.4  Eligible Purchase Order(s);

        1.17.5  an itemization of all costs related to such Financed Transaction, including but not limited to the cost and sale price of the Pre-Sold Goods, shipping and insurance costs, and customs duties;

        1.17.6  a description of the freight forwarder, shipping company, Warehouse and any Delivery Instructions; and

        1.17.7  a fully executed Warehouse Agreement.

1.18    "Guarantor(s)" – all entities now or hereafter guaranteeing the Obligations.

1.19    "Guaranty" – a continuing guaranty in form and substance acceptable to Secured Party by which a Guarantor guarantees the Obligations.

1.20    "Issuer" – the issuer of a Letter of Credit.

1.21    "Interest Rate" – at any time the rate which is 4% in excess of the Prime Rate.

1.22    "Invoice(s)" - invoice(s), from Debtor to a Buyer, relating to all Pre-Sold Goods which are the subject of a Financed Transaction.

1.23    "L/C Advances" – all amounts paid by Secured Party on account of Letters of Credit.

1.24    "Letter of Credit" – a letter of credit issued in favor of Debtor's Suppliers:

    1.24.1  to enable Debtor to acquire Pre-Sold Goods;

    1.24.2  in a form acceptable to Secured Party;

    1.24.3  requiring *inter alia*, as a condition of draw by the Beneficiary, that the Beneficiary present an inspection certificate by an independent inspection service acceptable to Secured Party that the subject goods conform to an Eligible Purchase Order;

    1.24.4  requiring that the shipment of the Pre-Sold Goods be evidenced by a negotiable bill of lading, consigned to Secured Party; and

    1.24.5  providing for honor by the acceptance by Issuer of a draft which shall be due at least thirty days from sight.

1.25    "Letter of Credit Fees" – such commissions, issuance fees, transfer fees and other reasonable fees and charges in connection with the issuance or administration of each Letter of Credit as are generally imposed by Secured Party.

1.26    "Letter of Credit Guarantee Fee" – 2.5% for the first thirty days (or part thereof) that each Letter of Credit is outstanding and 1.25% for every fourteen days (or part thereof) thereafter that such Letter of Credit remains outstanding.

1.27    "Loan Documents" - this Agreement, together with any documents, instruments and agreements, executed and/or delivered in connection herewith, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.28    "Obligors" – Debtor and all Guarantors.

1.29    "Obligations" - all present and future obligations owing by Debtor to Secured Party whether arising hereunder or otherwise, and whether arising before, during or after the commencement of any Bankruptcy Case in which Debtor is a debtor.

1.30    "Pre-Sold Goods" – goods which are the subject of Eligible Purchase Orders.

1.31    "Prime Rate" – means that rate designated by JP Morgan Chase Bank, or any successor thereof, from time to time as its prime rate, which shall not necessarily constitute its lowest available rate.

1.32    "Purchase Money Advances" – all amounts paid by Secured Party as loans to Debtor to enable Debtor to acquire Pre-Sold Goods.

1.33    "Purchase Money Advance Limit" – That portion of the Eligible Purchase Orders which relates to the sales price of the Pre-Sold Goods, excluding shipping and like charges.

1.34    "Subject Account" – an Account created by the sale of the goods or services which are the subject of an Eligible Purchase Order to the issuer of the Eligible Purchase Order.

1.35    "Supplier" – a supplier, acceptable to Secured Party in its sole discretion, who has agreed to sell the Pre-Sold Goods which are the subject of a Financed Transaction.

1.36    "Supplier Letter" – a letter from Supplier, with all required information supplied, in the form attached hereto as Exhibit A.

1.37    "Termination Date" – the earlier of (i) two years from the date hereof, or (ii) the date on which Secured Party elects to terminate this Agreement pursuant to the terms herein.

1.38    "Warehouse" – a segregated warehouse space in which Debtor agrees to maintain the Pre-Sold Goods, at a location specified by Secured Party.

1.39    "Warehouse Agreement" – an agreement among the Warehouse, the Buyer and Secured Party, in form acceptable to Secured Party, acknowledging Secured Party's security interest in the Pre-Sold Goods and agreeing among other things that such Pre-Sold Goods shall not be released without Secured Party's prior written consent.

## 2.    CREDIT FACILITIES.

### 2.1    Purchase Money Advances.

2.1.1    During the Agreement Term, upon receipt and approval by Secured Party in its sole discretion of a Financing Request Package, Secured Party may make a Purchase Money Advance up to the Purchase Money Advance Limit.

2.1.2    The Purchase Money Advance will be paid directly by Secured Party to the Supplier for the account of Debtor.

2.1.3    Each Purchase Money Advance shall be repaid in full on or before the Due Date.

## 2.2    Letters Of Credit.

2.2.1    Subject to the terms and conditions of this Agreement, and during the Agreement Term:

2.2.1.1    **Issuance of Letters of Credit.** Secured Party may, from time to time, in its sole discretion and at Debtor's request, cause the issuance of Letters of Credit in an amount or amounts determined by Secured Party.

2.2.1.2    **Request for Issuance.** Each request by Debtor for the issuance of Letter of Credit shall be accompanied by the Financing Request Package on which such request is based.

### 2.2.2    Reimbursement.

2.2.2.1    Debtor shall repay Secured Party for the amount of any L/C Advance on or before its respective Due Date.

2.2.2.2    Secured Party shall have no duty to inquire into the propriety of any request by an Issuer for payment by Secured Party, and all such payments by Secured Party shall conclusively establish Debtor's reimbursement obligations hereunder.

2.2.2.3    Debtor unconditionally indemnifies Secured Party and holds Secured Party harmless from any and all loss, claim or liability incurred by Secured Party arising from any transactions or occurrences relating to any Letter of Credit, the collateral relating thereto and any drafts or acceptances thereunder, and all Obligations thereunder, including any such loss or claim due to any errors, omissions, negligence, misconduct or action taken by any Issuer. This indemnity shall survive termination of this Agreement. Debtor agrees that any charges incurred by Secured Party with respect to Issuer shall be conclusive on Secured Party and may be charged to the Account.

2.2.2.4    Secured Party shall not be responsible for: (a) the existence, character, quality, quantity, condition, packing, value or delivery of the goods purporting to be represented by any documents; (b) any difference or variation in the character, quality, quantity, condition, packing, value or delivery of the goods from that expressed in the documents; (c) the validity, sufficiency or genuineness of any documents or of any endorsements thereon, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged; (d) the time, place, manner or order in which shipment is made; partial or incomplete shipment, or failure or omission to ship any or all of the goods referred to in the Letters of Credit or documents; (e) any deviation from instructions; (f) delay, default, or fraud by the shipper and/or anyone else in connection with the goods or the shipping thereof; or (g) any breach of contract between the shipper or vendors and Debtor.

2.2.2.5    Debtor agrees that any action taken by Secured Party, if taken in good faith, or any action taken by any Issuer, under or in connection with any Letters of Credit, the drafts or acceptances, or the Collateral, shall be binding on Debtor and shall not result in any liability whatsoever of Secured Party to Debtor. In furtherance thereof, Secured Party shall have the full right and authority to: (a) clear and resolve any questions of non compliance of

documents; (b) give any instructions as to acceptance or rejection of any documents or goods; (c) execute any and all steamship or airways guaranties (and applications therefore), indemnities or delivery orders; (d) grant any extensions of the maturity of, time of payment for, or time of presentation of, any drafts, acceptances, or documents; and (e) agree to any amendments, renewals, extensions, modifications, changes or cancellations of any of the terms or conditions of any of the applications, Letters of Credit, drafts or acceptances; all in Secured Party's sole name. The Issuer shall be entitled to comply with and honor any and all such documents or instruments executed by or received solely from Secured Party, all without any notice to or any consent from Debtor. Notwithstanding any prior course of conduct or dealing with respect to the foregoing, including amendments and non-compliance with documents and/or Debtor's instructions with respect thereto, Secured Party may exercise its rights hereunder in its sole and reasonable business judgment. In addition, without Secured Party's express consent and endorsement in writing, Debtor agrees: (a) not to execute any and all applications for steamship or airway guaranties, indemnities or delivery orders; to grant any extensions of the maturity of, time of payment for, or time of presentation of, any drafts, acceptances or documents; or to agree to any amendments, renewals, extensions, modifications, changes or cancellations of any of the terms or conditions of any of the applications, Letters of Credit, drafts or acceptances; and (b) after the occurrence of an Event of Default which is not cured within any applicable grace period, if any, or waived by Secured Party, not to (i) clear and resolve any questions of non-compliance of documents, or (ii) give any instructions as to acceptances or rejection of any documents or goods.

2.2.2.6    Debtor agrees that: (a) any necessary import, export or other licenses or certificates for the import or handling of the Collateral will have been promptly procured; (b) all foreign and domestic governmental laws and regulations in regard to the shipment and importation of the Collateral, or the financing thereof will have been promptly and fully complied with; and (c) any certificates in that regard that Secured Party may at any time request will be promptly furnished. In connection herewith, Debtor warrants and represents that all shipments made under any such Letters of Credit are in accordance with the laws and regulations of the countries in which the shipments originate and terminate, and are not prohibited by any such laws and regulations. Debtor assumes all risk, liability and responsibility for, and agrees to pay and discharge, all present and future local, state, federal or foreign taxes, duties, or levies. Any embargo, restriction, laws, customs or regulations of any country, state, Secured Party, or other political subdivision, where the Collateral is or may be located, or wherein payments are to be made, or wherein drafts may be drawn, negotiated, accepted, or paid, shall be solely Debtor's risk, liability and responsibility.

2.2.2.7    Upon any payments made to the Issuer under the Letter of Credit, Secured Party shall acquire by subrogation, any rights, remedies, duties or obligations granted or undertaken by Debtor to the Issuing Bank in any standing agreement relating to Letters of Credit or otherwise, which shall be deemed to have been granted to Secured Party and apply in all respects to Secured Party and shall be in addition to any rights, remedies, duties or obligations contained herein.

2.3    Debtor acknowledges and agrees that Secured Party does not intend to make any Advances to the extent that, before or as a result thereof, the aggregate Obligations shall exceed the Advance Limit.

3.    **INTEREST AND FEES**.

3.1    **Interest**.

3.1.1    Interest on the unpaid balance of Advances shall accrue interest at the Interest Rate and shall be payable on the first day of the month following its accrual.

3.1.2    Secured Party may charge Debtor's Account with any past due amounts hereunder.

3.1.3    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If Secured Party shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the loans hereunder or, if it exceeds such unpaid principal, refunded to Debtor. In determining whether the interest contracted for, charged, or received by Secured Party exceeds the Maximum Rate, Secured Party may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

3.2    **Fees**.

3.2.1    **Letter of Credit Fees**.  In consideration for Secured Party's causing the issuance of Letters of Credit, Debtor shall pay any Letter of Credit Fees to Secured Party immediately upon the issuance of a Letter of Credit and monthly thereafter, in arrears, on the first (1st) day of each month following the accrual thereof.

3.2.2    **Cash Advance Guarantee Fee**.  Debtor shall pay the Cash Advance Guarantee Fee to Secured Party monthly, in arrears, on the first (1st) day of each month following the accrual thereof.

3.2.3    **Letter of Credit Guarantee Fee**.  Debtor shall pay the Letter of Credit Guarantee Fee to Secured Party monthly, in arrears, on the first (1st) day of each month following the accrual thereof.

3.2.4    **Annual Fee**.  Debtor shall pay to Secured Party any amount by which the Cash Advance Guarantee Fees and Letter of Credit Guarantee Fees earned in the preceding twelve months is less than the Annual Fee, on each anniversary of the date hereof.

4.    **GRANT OF SECURITY INTEREST**.  To secure the payment and performance in full of all of the Obligations, Debtor hereby grants to Secured Party a continuing security interest in and to and lien upon, and a right of setoff against, and Debtor hereby assigns and pledges to Secured Party, all of the Collateral.

5.    **CONDITIONS PRECEDENT TO ALL ADVANCES**.  Secured Party shall not make any Advances unless and until:

BN 967329v2

5.1     Secured Party holds a perfected security interest in the Collateral and the Subject Account.

5.2     Secured Party has received guaranties, in a form acceptable to it in its sole discretion, signed by all guarantors.

6.     COVENANTS.  Debtor covenants that:

6.1     Debtor shall immediately advise Secured Party if and when an Eligible Purchase Order has been cancelled or attempted to have been cancelled.

6.2     Debtor shall maintain or cause to be maintained at all times, with financially sound and reputable insurers, casualty insurance with respect to the Inventory and other assets. All such insurance policies shall be in such form, substance, amounts and coverage as may be satisfactory to Secured Party and shall provide for thirty (30) days' prior written notice to Secured Party of cancellation or reduction of coverage.  Debtor hereby irrevocably authorizes Secured Party and any designee of Secured Party to obtain at debtor's expense, and, after an Event of Default, to adjust or settle any claim or other matter under, or arising pursuant to such insurance or to amend or cancel such insurance.  Debtor shall deliver to Secured Party evidence of such insurance and a Secured Party's loss payable endorsement naming Secured Party as loss payee as to all existing and future insurance policies relating to the Inventory.  Debtor shall deliver to Secured Party, in kind, all instruments representing proceeds of insurance received by Debtor.  Secured Party may apply any and all insurance proceeds received at any time to the cost of repairs to or replacement of any portion of the Inventory and/or, at Secured Party's option, to the payment of or as security for any of the Obligations, whether or not due, in any order or manner as Secured Party determines.

6.3     Debtor shall furnish to Secured Party, in form and substance satisfactory to Secured Party:

6.3.1     As soon as possible after the end of each fiscal year of Debtor, and in any event within one hundred and twenty (120) days thereafter:

6.3.1.1     a complete copy of Debtor's financial statements, including but not limited to (a) the management letter, if any, (b) the balance sheet as of the close of the fiscal year, and (c) the income statement for such year, together with a statement of cash flows, prepared by a firm of independent certified public accountants of recognized standing and acceptable to Debtor, or if permitted by Debtor in writing, by Debtor; and

6.3.1.2     A statement certified by the chief financial officer of Debtor that Debtor is in compliance with all the terms, conditions, covenants and warranties of this Agreement.

6.3.2     No later than fifteen (15) days after the close of each month (an "Accounting Period"), Debtor's balance sheet as of the close of such Accounting Period and its income statement for that portion of the then current fiscal year through the end of such Accounting Period certified by Debtor's chief financial officer as being complete, correct, and fairly representing its financial condition and results of operations.

Page 8 of 17

BN 967329v2

6.3.3   Copies of each of Debtor's:

6.3.3.1   federal income tax returns, and any amendments thereto, within seventy-five (75) days of the filing thereof with the Internal Revenue Service; and

6.3.3.2   federal payroll tax returns within ten (10) days of filing, together with proof, satisfactory to Debtor, that all taxes have been paid.

6.4   Debtor shall permit Secured Party or any representatives thereof, during usual business hours, without notice to Debtor, to periodically:

6.4.1   have access to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Debtor's books and records; and

6.4.2   Permit Secured Party or its designees to inspect, audit, make copies of, and make extracts from Debtor's records as Debtor may request.

6.4.3   Without expense to Secured Party, Secured Party may use any of Debtor's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Secured Party, in its sole discretion, deems appropriate.

6.5   Debtor shall pay all reasonable out-of-pocket expenses of Secured Party (including, but not limited to, fees and disbursements of Secured Party's counsel) incident to (whether by judicial proceedings or otherwise, and whether any resulting dispute resolution procedure involving tort, contract or other claims):

6.5.1   the preparation, negotiation, execution, administration and enforcement of the Loan Documents, any amendments, extensions and renewals thereof, and any other documents prepared in connection with any transactions between Debtor and Secured Party, whether or not executed;

6.5.2   any expenses incurred by Secured Party (whether or not for the benefit of Debtor) under this Agreement, including, without limitation, all expenses for postage relating to the mailing of statements, invoices, and verifications, and all expenses relating to any audits of all or any portion of the Collateral;

6.5.3   the protection of Secured Party's rights under the Loan Documents;

6.5.4   defending against any and all claims against Secured Party relating to any of its acts of commission or omission directly or indirectly relating to the Loan Documents;

6.5.5   or in any way arising out of a bankruptcy proceeding commenced by or against Debtor, including but not limited to expenses incurred in enforcing or defending Secured Party's claims against Debtor or the Collateral, defending any avoidance actions, and expenses related to the administration of said proceeding.

BN 967329v2

6.6     Debtor shall indemnify and save Secured Party harmless from any and all liability with respect to any stamp or other taxes (other than transfer or income taxes) which may be determined to be payable in connection with the execution of the Loan Documents or any action of Secured Party with respect to the Collateral, including, without limitation, the transfer of the Collateral to Secured Party's name or that of Secured Party's nominee or any purchaser at a foreclosure sale.

6.7     Debtor shall reimburse Secured Party for all costs and expenses, including attorneys' fees, which Secured Party incurs in enforcing any judgment rendered in connection with this Agreement.  This provision is severable from all other provisions hereof and shall survive, and not be deemed merged into, such judgment.

6.8     Debtor shall make timely payment or deposit of all taxes, assessments or contributions required of Debtor.  If Debtor fails to make any such payment or deposit or furnish proof of such payment immediately upon Secured Party's request, Secured Party may, in its sole discretion and without notice to Debtor:

6.8.1     make payment of the same or any part thereof, or

6.8.2     Set up such reserves against the Obligations as Secured Party deems necessary to satisfy the liability therefore, or both.

6.8.3     Secured Party may conclusively rely on statements of the amount owing or other official statements issued by the appropriate governmental agency.  Any payment made by Secured Party shall constitute neither:

6.8.3.1     an agreement by Secured Party to make similar payments in the future; nor

6.8.3.2     A waiver by Secured Party of any default under the Loan Documents.  Secured Party need not inquire into, nor contest the validity of, any expense, tax, security interest, encumbrance or lien, and the receipt of the usual official notice requiring the payment thereof shall be conclusive evidence that the same was validly due and owing.

6.9     Debtor shall give Secured Party written notice immediately upon forming an intention to change its name, state of organization or form of business organization.

6.10     Debtor shall maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas.  Such insurance shall be in such minimum amounts that the Secured Party will not be deemed a co-insurer under applicable insurance laws, regulations, and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Secured Party.  In addition, all such insurance shall be payable to the Secured Party under a Secured Party Loss Payable Endorsement.  Without limiting the foregoing, the Debtor will:

BN 967329v2

**6.10.1** Keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverage and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property;

**6.10.2** Maintain all such workers' compensation or similar insurance as may be required by law;

**6.10.3** Maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death, or property damage occurring, on, in or about the properties of the Debtor; business interruption insurance; and product liability insurance.

**6.11** Debtor shall not create, incur, assume or permit to exist any lien upon or with respect to any Collateral now owned or hereafter acquired by Debtor. At the request of Debtor, Secured Party shall enter into a subordination agreement in form reasonably acceptable to Secured Party with respect to any Collateral that is Equipment, so long as Debtor is not in default hereunder at the time of such request.

**7.** **EVENTS OF DEFAULT.** Each of the following events or conditions shall also constitute an "Event of Default":

**7.1** Debtor defaults in the performance of any Obligations due hereunder; and

**7.2** Debtor is in default with respect to any agreement between Debtor and Secured Party or Debtor and Factor.

**7.3** An order for relief is entered against any Obligor by any United States Bankruptcy Court; or any Obligor does not generally pay its debts as they become due (within the meaning of 11 U.S.C. 303(h) as at any time amended, or any successor statute thereto); or any Obligor makes an assignment for the benefit of creditors; or any Obligor applies for or consents to the appointment of a custodian, receiver, trustee, or similar officer for it or for all or any substantial part of its assets; or such custodian, receiver, trustee, or similar officer is appointed without the application or consent of any Obligor; or any Obligor institutes (by petition, application, answer, consent, or otherwise) any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any such proceeding shall be instituted (by petition, application, or otherwise) against any Obligor; or any judgment, writ, warrant of attachment, execution, or similar process shall be issued or levied against a substantial portion of the property of any Obligor;

**7.4** An adverse change occurs with respect to the financial condition or operations of Debtor which results in a material impairment of the prospect of repayment of the Obligations;

**7.5** A sale, hypothecation or other disposition is made of twenty (20%) percent or more of the beneficial interest in any class of voting stock of Debtor; and

Page 11 of 17

7.6    Any Guarantor defaults in the performance of its obligations to Secured Party or shall notify Secured Party of its intention to rescind, modify, terminate or revoke the Guaranty with respect to future transactions, or the Guaranty shall cease to be in full force and effect for any reason whatever.

8.    **REMEDIES**.  Upon the occurrence of any Event of Default, all Obligations shall accrue interest at the Default Rate, and in addition to any other remedies available to Secured Party under the Loan Documents, at law, in equity or otherwise, Secured Party may:

8.1    Declare all Obligations to be immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Debtor; and

8.2    Debtor shall immediately provide Secured Party with cash collateral in the amount of any undrawn face amount of any Letter of Credit.

9.    **ATTORNEYS' FEES**.  Debtor agrees to reimburse Secured Party on demand for:

9.1    the actual amount of all costs and expenses, including attorneys' fees, which Secured Party has incurred or may incur in:

9.1.1    negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith; and

9.1.2    protecting, preserving or enforcing any lien, security interest or other right granted by Debtor to Secured Party or arising under applicable law, whether or not suit is brought;

9.2    the actual costs, including photocopying, travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Debtor is a party; and

9.3    either (the choice of which shall be in the sole discretion of Secured Party):

9.3.1    the actual amount of all costs and expenses, including attorneys' fees, which Secured Party may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Debtor, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversion of the bankruptcy proceeding or (ii) opposing confirmation of Debtor's plan thereunder; or

9.3.2    20% OF THE AMOUNT OF THE CLAIM OF SECURED PARTY AGAINST DEBTOR, WHICH DEBTOR AGREES SHALL CONSTITUTE A REASONABLE SUBSTITUTE FOR SUCH ACTUAL FEES AND EXPENSES.